1  Bret A. Stone  SBN 190161  BStone@PaladinLaw.com
2  PALADIN LAW GROUP® LLP
   3 W. Carrillo Street, Suite 212
3  Santa Barbara, CA  93101
   Telephone:  (805) 898-9700
4  Facsimile:  (805) 852-2495
5
6  Counsel for Estate of Betty Goldberg, Deceased and
   Estate of Al Goldberg, Deceased, by and through their
7  successor in interest, Daniel Rubin

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| ESTATE OF BETTY GOLDBERG, DECEASED and ESTATE OF AL GOLDBERG, DECEASED, by and through their successor in interest, Daniel Rubin, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> GOSS-JEWETT COMPANY, INC. a/k/a TRI-COUNTY SALES, INC., a suspended California Corporation; ARTHUR P. ARNS; ESTATE OF ROBERT W. SCHACK, DECEASED; ESTATE OF BENJAMIN F. FOHRMAN, DECEASED; DONALD J. GEORGE; DAROLD E. MERRITT; JAMES W. ROSS; and ESTATE OF TERRENCE J. GEORGE a/k/a TERRY GEORGE, DECEASED, <br><br> *Defendants.* | Case No. <br><br> COMPLAINT FOR: <br><br> 1.  Cost Recovery under CERCLA § 107(a) <br> 2.  Waste <br> 3.  Breach of Lease <br> 4.  Contractual Indemnification <br> 5.  Negligence <br> 6.  Abatement of a Public and Private Nuisance <br> 7.  Trespass <br> 8.  Contribution under the Hazardous Substance Account Act <br> 9.  Contribution under CERCLA § 113(f) <br> 10. Abatement of an Imminent and Substantial Endangerment RCRA § 7002(a)(1)(B) <br> 11. Ultrahazardous Activity <br> 12. Equitable Indemnity <br> 13. Bus. & Prof. Code § 17200 <br> 14. Declaratory Relief <br><br> Jury Trial Demanded |

24       Plaintiffs Estate of Betty Goldberg, Deceased and Estate of Al Goldberg,

25  Deceased, by and through their successor in interest, Daniel Rubin (collectively,

26  "Plaintiffs" or "Goldberg") bring this action against Defendants Goss-Jewett

27  Company, Inc. a/k/a Tri-County Sales, Inc., a suspended California Corporation;

28  Arthur P. Arns; Estate of Robert W. Schack, Deceased; Estate of Benjamin F.

1 | Fohrman, Deceased; Donald J. George; Darold E. Merritt; James W. Ross; Estate of
2 | Terrence J. George a/k/a Terry George, Deceased (collectively, "Defendants"), and
3 | DOES 1 through 100, inclusive, allege upon knowledge as to their own acts, and
4 | upon information and belief as to the acts of all others, as follows:

### NATURE OF THE ACTION

6 | 1.   Plaintiffs file this third party action in defense of claims against them
7 | made by the California Regional Water Quality Control Board – Central Coast
8 | Region ("RWQCB") and the California Department of Toxic Substances Control
9 | ("DTSC") in order to avoid or minimize their alleged liability associated with
10 | responding to environmental contamination.

11 | 2.   The area of contamination for which Plaintiffs seek relief includes the
12 | property located at 220 W. Gutierrez Street, Santa Barbara, California (the
13 | "Property") and areas to which the contamination has migrated (the "Site").

14 | 3.   On June 8, 1994, Plaintiffs timely filed a lawsuit entitled *Goldberg v.*
15 | *Arns*, Case No., CV94-3834 DSF (SHx) and each of the Defendants, their
16 | predecessors, their successors, their agents, and/or their insurers were on notice of
17 | that case.

18 | 4.   The same facts in the original action form the basis for the instant
19 | action.  The original Defendants are not prejudiced by this action as the same
20 | investigation of facts and defenses existing in the original action are equally
21 | applicable here.

22 | 5.   The original action was closed by a judgment without prejudice on
23 | August 22, 2014.

24 | 6.   Plaintiffs acted in good faith and without unnecessary delay in filing
25 | the instant action.

### PARTIES

### *Plaintiffs*

28 | 7.   Betty Goldberg was the owner of the Property while she was alive.



8.     Al Goldberg was the owner of the Property while he was alive.

### *Defendants*

9.     Goss-Jewett Company, Inc. a/k/a Tri-County Sales, Inc., is a suspended California corporation that operated the dry cleaning supply business at the Property, including the operation and abandonment of aboveground storage tanks containing PCE, as well as the handling of other hazardous substances generated, stored and/or disposed of at the Site.  Goss-Jewett Company, Inc. a/k/a Tri-County Sales, Inc. was also Plaintiffs' lessee.  On information and belief, Goss-Jewett Company, Inc. a/k/a Tri-County Sales, Inc. was the alter ego of its principals, and the corporate entity and principals share a unity of interest such that a separate corporate personality does not exist; the corporation and its principals form a single enterprise.  If the privilege of separate existence of the corporate entity is recognized, an inequitable result will follow.

10.     Arthur P. Arns was the President of Goss-Jewett Company, Inc. a/k/a Tri-County Sales, Inc., who exercised influence and substantial control over the operations of the dry cleaning supply business at the Property, including the operation and abandonment of aboveground storage tanks containing tetrachloroethylene ("PCE"), as well as the handling of other hazardous substances generated, stored and/or disposed of at the Site.  Arns was also Plaintiffs' lessee.

11.     Estate of Robert W. Schack, Deceased, is named as a defendant herein to the extent of his estate's assets whether distributed or undistributed and pursuant to California Probate Code §§ 550 through 555 to establish the decedent's liability for which he was protected by liability insurance policies.  Robert W. Schack was an officer, director, and shareholder of Goss-Jewett Company, Inc. a/k/a Tri-County Sales, Inc., who exercised influence and substantial control over the operations of the dry cleaning supply business at the Property, including the operation of aboveground storage tanks containing PCE, as well as the handling of other hazardous substances generated, stored and/or disposed of at the Site.  Schack was

1    also Plaintiffs' lessee.

2         12.    Estate of Benjamin F. Fohrman, Deceased, is named as a defendant

3    herein to the extent of his estate's assets whether distributed or undistributed and

4    pursuant to California Probate Code §§ 550 through 555 to establish the decedent's

5    liability for which he was protected by liability insurance policies.  Benjamin F.

6    Fohrman was an officer, director, and shareholder of Goss-Jewett Company, Inc.

7    a/k/a Tri-County Sales, Inc., who exercised influence and substantial control over

8    the operations of the dry cleaning supply business at the Property, including the

9    operation of aboveground storage tanks containing PCE, as well as the handling of

10   other hazardous substances generated, stored and/or disposed of at the Site.

11        13.    Donald J. George was an officer, director, and shareholder of Tri-

12   County Sales, Inc., the predecessor in interest to Goss-Jewett & Company, Inc.,

13   who exercised influence and substantial control over the operations of the dry

14   cleaning supply business at the Property, including the installation and operation of

15   aboveground storage tanks containing PCE, as well as the handling of other

16   hazardous substances generated, stored and/or disposed of at the Site.  Donald J.

17   George was also Plaintiffs' lessee.

18        14.    Darold E. Merritt was an officer, director, and shareholder of Goss-

19   Jewett Company, Inc. a/k/a Tri-County Sales, Inc., who exercised influence and

20   substantial control over the operations of the dry cleaning supply business at the

21   Property, including the operation and abandonment of aboveground storage tanks

22   containing PCE, as well as the handling of other hazardous substances generated,

23   stored and/or disposed of at the Site.

24        15.    James W. Ross was an officer, director, and shareholder of Goss-

25   Jewett Company, Inc. a/k/a Tri-County Sales, Inc., who exercised influence and

26   substantial control over the operations of the dry cleaning supply business at the

27   Properyt, including the operation and abandonment of aboveground storage tanks

28   containing PCE, as well as the handling of other hazardous substances generated,



-4-

1  stored and/or disposed of at the Site.

2      16.   Estate of Terrence J. George a/k/a Terry George, Deceased, is named

3  as a defendant herein pursuant to California Probate Code §§ 550 through 555 to

4  establish the decedent's liability for which he was protected by liability insurance

5  policies. Terry George was an officer, director, and shareholder of Tri-County

6  Sales, Inc., the predecessor in interest to Goss-Jewett & Company, Inc., who

7  exercised influence and substantial control over the operations of the dry cleaning

8  supply business at the Property, including the installment and operation of

9  aboveground storage tanks containing PCE, as well as the handling of other

10  hazardous substances generated, stored and/or disposed of at the Site. Terry

11  George was also Plaintiffs' lessee.

12               **JURISDICTION, VENUE, AND NOTICE**

13      17.   This Court has jurisdiction over the subject matter of Plaintiffs' First

14  and Ninth Causes of Action pursuant to sections 107 and 113 of the Comprehensive

15  Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C.

16  §§ 9607 and 9613 and the Tenth Cause of Action pursuant to Section 7002(a) of the

17  Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a). In

18  addition, this Court has jurisdiction over Plaintiffs' Fourteenth Cause of Action

19  under the federal Declaratory Judgment Act, 28 U.S.C. § 2201; and 28 U.S.C. §

20  1331.

21      18.   This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over

22  the Second through Eighth and Eleventh through Thirteenth Causes of Action

23  because those claims are so related to the federal claim in this action that they form

24  the same case and controversy under Article III of the U.S. Constitution.

25      19.   Venue is proper in this Court pursuant to Section CERCLA § 113(b)

26  because the release and damage occurred in this district. Furthermore, venue is

27  proper in this Court pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a),

28  and 28 U.S.C. § 1391(b) because the actual and threatened endangerment, injury



1   and damage at issue are taking place and have taken place in this district.

2   20.   Plaintiffs provided notice of the actual and threatened endangerment,
3   injury and damage alleged herein in their Notices of Endangerment to:   (a) the
4   Administrator of the United States Environmental Protection Agency ("U.S.
5   EPA"); (b) the State of California; and (c) each of the Defendants or their
6   successors in interest.

7   21.   Plaintiffs then waited at least ninety (90) days before filing this action.

8   22.   Plaintiffs have satisfied all jurisdictional prerequisites to filing this
9   Complaint.

**GENERAL ALLEGATIONS**

11   23.   PCE is an industrial solvent that has been used in significant quantities
12   in the dry cleaning industry since the 1940s.

13   24.   PCE and its breakdown products are manmade chemicals and are not
14   naturally occurring.

15   25.   Common synonyms for PCE include perc, perchlor, carbon bichloride,
16   carbon dichloride, ethylene tetrachloride, petrochlorothylene, perclene, perk,
17   perchloroethene , 1,1,2,2-tetrachloroethylene, and tetrachloroethene.

18   26.   PCE degrades to trichloroethylene ("TCE"), which in turn degrades to
19   1,2 dichloroethene ("DCE"), which in turn degrades to vinyl chloride, which in turn
20   degrades to ethene, and finally to carbon dioxide, water, and free chlorine.

21   27.   As a toxic, long-lived, volatile, chlorinated hydrocarbon and likely
22   carcinogen, PCE and many of its degradation products are closely regulated by the
23   state of California and the federal government.   PCE, TCE, DCE, and vinyl chloride
24   are each a hazardous substance as that term is defined in federal law, 42 U.S.C. §
25   9601(14), and state law, Cal. Health & Safety Code § 25281(g) and are each a
26   hazardous waste and solid waste as those terms are defined in federal law, 42
27   U.S.C. § 6903(5), (27), respectively.

28   28.   All groundwater within the state of California, including the

groundwater at and emanating from the Site is "water of the state" pursuant to California Water Code § 13050.

29.     Each Defendant caused or contributed to the past or present handling, storage, treatment, transportation, generation, release, or disposal of hazardous substances, hazardous wastes, and/or solid wastes in the environment in, at, and around the Site, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the waters of the state of California, because each Defendant released or otherwise discarded hazardous substances, hazardous wastes, and/or solid wastes, or controlled and/or operated the Property and business from which hazardous substances, hazardous wastes, and/or solid wastes were released or otherwise discarded, and failed to prevent or abate the hazardous substance, hazardous waste, and/or solid waste  contamination.

30.     At various times from 1968 to 1991 Defendants negligently, suddenly, and accidentally caused or contributed to the presence of hazardous substances, hazardous wastes, and/or solid wastes in the environment, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the waters of the state of California, at the Site.   Once released into the environment, these hazardous substances, hazardous wastes, and/or solid wastes continued to spread and migrate in the environment at the Site, but Defendants failed to abate this contamination.

31.     PCE was stored and delivered in sealed 55-gallon drums until a 5,000 gallon aboveground storage tank was installed in 1969 by one of the chemical manufacturers.   A second aboveground storage tank was installed later.   The tanks were located in the front of the warehouse, to the left of the front door of the building.   No one was officially responsible for maintaining the tanks on a regular basis, but drivers would let the manager know if a new nozzle or hose was needed.

32.     PCE was delivered to the Property by tanker truck.   The tanker trucks had a nozzle similar to that of a service station, but the nozzle did not shut off automatically when the tank was full; it only shut off when the person holding it let

-7-

go. Filling the saddle tanks of the delivery trucks similarly relied on the person holding the nozzle to listen to the sound it made and to stick his finger inside the tank to know when it was full. After filling, the nozzle was supposed to be hung up on the tank, but on occasion it would be left on the ground.

33. As a result of the discovery of the contamination, the RWQCB and DTSC have demanded that Plaintiffs investigate and remediate the Site.

34. On September 29, 1993, RWQCB issued a Cleanup and Abatement Order which found that PCE was "discharged to waters of the State" at the Site creating "a condition of pollution or nuisance." RWQCB found that "PCE is a hazardous substance and possible human carcinogen if ingested in concentrations" exceeding the Maximum Contaminant Level ("MCL") of 5 ppb and that PCE concentrations in groundwater have exceeded 120,000 ppb.

35. On July 17, 2012, DTSC issued an Imminent and Substantial Endangerment Determination and Order and Remedial Action Order which concluded (1) "The actual and threatened release of hazardous substances at the Site may present an imminent and substantial endangerment to the public health or welfare or to the environment" and (2) "Response action is necessary to abate a public nuisance and/or to protect and preserve the public health."

36. On January 30, 2014, DTSC sent a letter to Plaintiffs regarding new indoor air data showing PCE at "concentrations that may pose unacceptable cancer risks, as well as acute and chronic non-cancer hazards to workers at the site." Accordingly, DTSC ordered Plaintiffs to "Immediately take all appropriate action to prevent, abate, or minimize the exposure to workers . . . These actions may include, but are not limited to, (a) removal of workers from the site, (b) placement of an indoor air treatment system, and then (c) remediation of the subsurface for VOC contamination."

37. As a result of Defendants' releases of hazardous substances, hazardous wastes, and/or solid wastes at the Site, Plaintiffs have incurred and will continue to

1    incur response costs in order to investigate and remediate the contamination.

2        38.    From on or about April 1, 1968 and continuing until April 30, 1991,
3    Defendants were tenants at the Property, and lessees, under written leases with
4    Plaintiffs, who were the lessors of the Property.  By the terms of each and every
5    lease, Defendants had obligations including, but not limited to: complying with all
6    rules and regulations, whether municipal, state or federal, then in force and effect;
7    keeping the Property in good and sanitary order, condition and repair; and
8    indemnifying and holding Plaintiffs harmless from all liability, loss, costs and
9    obligations on account of or arising out of any injuries or damages that occurred on
10   the Property during the terms of the leases.

11       39.    On or about August 15, 1991, when Plaintiffs inspected the Property,
12   Plaintiffs discovered that the Property had been contaminated by PCE escaping
13   from the aboveground storage tanks and other releases resulting from Defendants'
14   operations at the Property, which permeated the soil and contaminated the
15   groundwater.  The cement slab that was under the aboveground storage tanks was
16   found to have caved in from the weight of the tanks and was badly cracked.

17       40.    On information and belief, these cracks and depressions allowed PCE
18   to penetrate the concrete and enter the environment.

19       41.    On information and belief, there was at least one spill in the mid-1980s
20   during which a measurable amount of PCE was spilled onto the ground at the
21   Property.

22       42.    Defendants failed to give written notice to Plaintiffs of the release of
23   hazardous substances, hazardous wastes, and/or solid wastes at the Property as
24   required by California Health & Safety Code § 25359.7(b).

25                          **FIRST CAUSE OF ACTION**
                      **(Cost Recovery − CERCLA § 107(a)**
26                           **(Against All Defendants)**

27       43.    Plaintiffs reallege and incorporate by reference the allegations set forth
28   above in paragraphs 1 through 42, inclusive, as though set forth in full herein.

44.     Defendants used, processed, produced, stored, treated, excavated, and/or generated hazardous substances at the Property.

45.     Defendants caused or contributed to the spilling, leaking, disposal, and release of hazardous substances during their ownership or operation at the Property thereby creating a condition of hazardous substance contamination at the Site.

46.     As a result of the condition of hazardous substance contamination at the Site, Plaintiffs undertook various response actions and has incurred various response costs in connection with the hazardous substances at the Site.

47.     Defendants transported or arranged for transport of hazardous substances which it owned or possessed to the Property, and stored, treated, and disposed of hazardous substances at the Property, and otherwise owned, handled, operated the Property during the time that hazardous substances were disposed of at the Site.  Defendants are thereby jointly and severally liable under section 107(a) of CERCLA § 107(a), 42 U.S.C. § 9607(a).

48.     The Site is a "facility," as that term is defined in CERCLA § 101(9), 42 U.S.C. § 9601(9).

49.     A "release" or threatened release of a "hazardous substance," as those terms are defined in CERCLA §§ 101(22), (14), 42 U.S.C. §§ 9601(22), (14), has occurred at the Site.

50.     Plaintiffs did not cause or contribute to the environmental contamination at the Site and deny that they are liable for costs incurred as the result of the alleged release or threatened release of hazardous substances at the Site.  However, in the interest of an expeditious cleanup and acting in good faith, Plaintiffs have incurred and continue to incur response costs to investigate, remove, and remediate the environmental contamination at the Site consistent with the National Contingency Plan.

51.     Defendants are strictly liable to Plaintiffs for the costs referred to above and for interest on those costs pursuant to CERCLA § 107(a), 42 U.S.C. §

1    9607(a).

2                         **SECOND CAUSE OF ACTION**
                                     **(Waste)**
3                         **(Against All Defendants)**

4         52.    Plaintiffs reallege and incorporate by reference the allegations set forth

5    above in paragraphs 1 through 51, inclusive, as though set forth in full herein.

6         53.    Pursuant to the terms of the written lease agreements from on or about

7    April 1, 1968, through April 30, 1991, Defendants and each of them entered into

8    and maintained possession of the Property.

9         54.    From on or about April 1, 1968 and continuing until present,

10   Defendants have caused injury to the Property by committing waste in the form of

11   hazardous substances, hazardous wastes, and/or solid wastes to contaminate the soil

12   and groundwater.

13        55.    But for and prior to the discovery of Defendants' conduct, the real

14   property had a reasonable market value of approximately $525,000.00. Upon

15   discovery of its present condition, its current reasonable market value is a negative

16   value, due to the contamination.

17        56.    Each act and omission of Defendants as alleged herein was done

18   intentionally and over the objection of Plaintiff in contravention to the terms of the

19   leases.  Those Defendants willfully and maliciously engaged in such conduct with

20   the full knowledge that it would result in substantial damage to the Property and

21   Plaintiffs' interest.  Therefore, Plaintiffs are entitled to recover treble damages from

22   Defendants under California Code of Civil Procedure section 732.

23        57.    As a direct and proximate result of Defendants' waste, Plaintiffs have

24   been damaged and will continue to suffer damages, including response costs,

25   attorneys' fees, and expert witness fees.

26                        **THIRD CAUSE OF ACTION**
                                 **(Breach of Lease)**
27                        **(Against All Defendants)**

28        58.    Plaintiffs reallege and incorporate by reference the allegations set forth

1 | above in paragraphs 1 through 57, inclusive, as though set forth in full herein.

2 |     59.   In 1968, Plaintiffs entered into a written lease agreement for the

3 | subject property, which is attached hereto as Exhibit 1 and incorporated herein by

4 | this reference.

5 |     60.   In 1978, the written lease was renewed for an additional 10 years in a

6 | written agreement entitled Loan Extension, Lease Clarification, Lot Lease and

7 | Security Agreement, which is attached hereto as Exhibit 2 and incorporated herein

8 | by this reference.

9 |     61.   On information and belief, the written lease was extended thereafter.

10 |     62.   Paragraph 14 of the lease provides "This lease is made upon the

11 | express condition that Lessors are to be free from all liability and claim for

12 | damages by reason of any injury to any person or persons including Lessees, or

13 | property of any kind whatsoever and to whomsoever belonging, including Lessees,

14 | from any cause or causes whatsoever while in, upon, or in any way connected with

15 | the said demised premises or the said sidewalks adjacent thereto during the term of

16 | this lease or any extension hereof or any occupancy hereunder, Lessees hereby

17 | covenanting and agreeing to indemnify and save harmless Lessors from all liability,

18 | loss, cost, and obligations on account of or arising out of any such injuries or losses

19 | however occurring."

20 |     63.   Claims by RWQCB and DTSC against Plaintiffs allege liability for

21 | contamination in connection with the subject property during Defendants' lease.

22 |     64.   Plaintiffs tendered a claim for indemnity for environmental liabilities

23 | to Defendants, but Defendants have refused to indemnify Plaintiffs and hold

24 | Plaintiffs harmless.

25 |     65.   Plaintiffs have demanded that Defendants indemnify them for the

26 | hazardous substance, hazardous waste, and/or solid waste contamination

27 | complained of, and hereby reiterate that demand.

28 |     66.   Defendants have refused to defend and indemnify Plaintiffs pursuant



to the written agreements.

67.   Contained within the written contracts are provisions for fees.  As a result of the breach of the agreements by Defendants, Plaintiffs were forced to hire counsel and expend fees and costs.  Accordingly, Plaintiffs are entitled to recoup said fees and costs in an amount to be determined by the Court.

68.   Plaintiffs have performed all conditions, covenants, and promises required by them, on their part to be performed, in accordance with the terms and conditions of the written agreements.

69.   Defendants also breached their obligations under the written agreements by causing hazardous substances, hazardous wastes, and/or solid wastes to contaminate the soil, soil vapor, indoor air, and groundwater at and emanating from the Site in violation of municipal, state and federal laws.

70.   Defendants further breached their written agreements by allowing the Property to fall into disrepair.

71.   Defendants further breached their written agreements by failing to give written notice to Plaintiffs of the release of hazardous substances, hazardous wastes, and/or solid wastes at the Property.

72.   The above material facts constitute breaches of the written agreements by Defendants.  The acts, omissions, and conduct of Defendants further breached the implied covenant of good faith and fair dealing contained in the written agreements.

73.   As a direct and proximate result of Defendants' breach of the agreements set forth above, Plaintiffs have been damaged and will continue to suffer damages, including attorneys' fees, expert witness fees, and emotional distress.

**FOURTH CAUSE OF ACTION**
**(Contractual Indemnification)**
**(Against All Defendants)**

74.   Plaintiffs reallege and incorporate by reference the allegations set forth



-13-

above in paragraphs 1 through 73, inclusive, as though set forth in full herein.

75.    Defendants entered into indemnity agreements that require them to hold harmless and indemnify and defend Plaintiffs.

76.    Plaintiffs have demanded that Defendants indemnify them for the hazardous substance, hazardous waste, and/or solid waste contamination complained of, and hereby reiterate that demand.

77.    Defendants failed to defend or indemnify Plaintiffs.

78.    As a direct and proximate result of Defendants' failure to indemnify Plaintiffs, Plaintiffs have been damaged and will continue to suffer damages, including attorneys' fees, expert witness fees, and emotional distress.

### FIFTH CAUSE OF ACTION
#### (Negligence)
#### (Against All Defendants)

79.    Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 78, inclusive, as though set forth in full herein.

80.    On or about April 1, 1968, and continuing until April 30, 1991, Defendants were in possession and control of the Property and had a duty to maintain the real property in good repair and condition free from any hazardous waste.

81.    On or about April 1, 1968, to and including April 30, 1991, Defendants breached their duty to Plaintiffs in that they negligently maintained, controlled, managed and used the subject property and caused such property to go into serious disrepair and caused contamination in the soil and the water table underneath.

82.    By virtue of the facts and circumstances of the contamination in and around the Site, as alleged herein, the doctrine of *res ipsa loquitur* is applicable to the claim against each of the Defendants.   Under such doctrine, the burden of proving that Defendants' operations were free from all negligence in connection with the releases of PCE at the Site is placed on Defendants and the burden of

proving freedom from liability in connection with the contamination is placed on Defendants. In the event any or all of Defendants fail to sustain their respective burdens, they are legally responsible for the damages asserted herein. Under the circumstances, the contamination of the soil, soil vapor, indoor air, and groundwater at and around the Site would not have happened but for negligence on the part of Defendants, their agents, servants, and employees, in the manner in which they conducted their respective operations.

83. In the alternative to the allegation that the doctrine of *res ipsa loquitur* is applicable against Defendants, it is alleged that the contamination and resulting property damage and response costs were due to the negligence of Defendants in their operations and that each of the Defendants is guilty of negligence proximately causing the contamination.

84. Defendants, while operating their chemical supply business at the Property, owed a duty to Plaintiffs to use, store, maintain, monitor, and remove PCE in a safe and careful manner. Defendants also owed a duty to Plaintiffs to avoid storing, disposing of, releasing, or allowing to be released any contaminants in a manner that would cause injury to Plaintiffs, the Site, the public, or the environment.

85. Defendants breached their duties by negligently, carelessly, recklessly, and illegally using, storing, maintaining, monitoring, and removing PCE in a way that contaminants were released into the environment.

86. Defendants failed promptly and diligently to contain and clean up the contamination caused by their releases of hazardous substances, hazardous wastes, and/or solid wastes.

87. The releases of PCE would not have occurred absent some form of negligence by Defendants, and each of them; the releases of contaminants was caused by something within the exclusive control of one or more of the Defendants; and that such release was not due to any voluntary action or contribution on the part



1  of Plaintiffs.

2       88.    The release or disposal of PCE is a violation of California Water Code

3  sections 13050(m), 13350, and 13387, California Health and Safety Code sections

4  5411, 5411.5, and 117555, California Fish and Game Code section 5650, and Civil

5  Code sections 3479-3480, the purpose of which are to set a standard of care or

6  conduct to protect the public and the environment from the type of improper

7  activities engaged in by Defendants.  Therefore, such improper activities and

8  violations constitute negligence *per se*.

9       89.    The injury and damages that Plaintiffs complains of herein resulted

10  from the kind of occurrence the statutory provisions were designed to prevent.

11       90.    Plaintiffs are part of the class of persons the statutory provisions were

12  intended to protect, as Plaintiffs are property owners that have been adversely

13  impacted by Defendants' violations of said statutory provisions.

14       91.    Defendants have failed to comply with federal, state, local, and

15  common law.  As a direct and proximate result of Defendants' failure to comply

16  with applicable statutory provisions, Plaintiffs have incurred and will continue to

17  incur expenses, losses, injury and damages, including consequential, incidental and

18  general damages to be proven at trial.  The above-described acts, omissions, and

19  conduct of Defendants have been without the consent, knowledge, against the will,

20  and in violation of the rights of Plaintiffs.

21  **SIXTH CAUSE OF ACTION**
   **(Abatement of a Public and Private Nuisance)**
22  **(Against All Defendants)**

23       92.    Plaintiffs reallege and incorporate by reference the allegations set forth

24  above in paragraphs 1 through 91, inclusive, as though set forth in full herein.

25       93.    Section 3479 of the Civil Code defines a "nuisance," in relevant part,

26  as "[a]nything which is injurious to health, . . . or is indecent or offensive to the

27  senses, or an obstruction to the free use of the property, so as to interfere with the

28  comfortable enjoyment of life or property, or unlawfully obstructs the free passage



-16-

1  or use, in the customary manner, of any navigable lake, or river, bay, stream, canal

2  or basin."

3      94.    Section 3480 of the Civil Code defines a "public nuisance" as: "[o]ne

4  which affects at the same time an entire community or neighborhood, or any

5  considerable number of persons, although the extent of the annoyance or damage

6  inflicted upon individuals may be unequal."

7      95.    Defendants caused or contributed to the past or present handling,

8  storage, treatment, transportation, or disposal of hazardous substances, hazardous

9  wastes, and/or solid wastes in the environment in, at, and around the Site because

10  each Defendant released or otherwise discarded PCE from their operations or

11  controlled the property from which PCE was released or otherwise discarded, but

12  failed to prevent or abate this hazardous substances, hazardous wastes, and/or solid

13  wastes contamination.

14      96.    Defendants' acts and omissions in causing and contributing to releases

15  of hazardous substances, hazardous wastes, and/or solid wastes in, at, and around

16  the Site create a condition that is injurious to health, is indecent or offensive to the

17  senses, and is an obstruction to the free use of a "basin," namely the aquifer

18  underlying the Site.

19      97.    The public nuisance condition and related endangerments to health and

20  the environment arising from released hazardous substances in, at, around the Site

21  affects the entire surrounding community because it interferes with the free use and

22  enjoyment of the groundwater and there is a public health risk from the vapors

23  intruding peoples' homes and places of work.

24      98.    Defendants have caused, created, maintained, contributed to, and

25  neglected to abate a "public nuisance," as defined in Civil Code §§ 3479 and 3480,

26  namely the potential endangerments to health and the environment created by the

27  hazardous substances, hazardous wastes, and/or solid wastes contamination at the

28  Site.

99.   The release or disposal of PCE, as alleged herein, constitutes a nuisance as the release or disposal is a violation of California Water Code sections 13050(m), 13350, and 13387, California Health and Safety Code sections 5411, 5411.5, and 117555, California Fish and Game Code section 5650, and Civil Code sections 3479-3480, the purpose of which are to set a standard of care or conduct to protect the public and the environment from the type of improper activities engaged in by Defendants.   Therefore, such improper activities and violations constitute a nuisance *per se.*

100.   Plaintiffs have suffered special injury and damages as a direct and proximate result of the contamination at and emanating from the Site as the public nuisance has damaged their property.   To that end, Defendants have also failed to abate a private nuisance *per se.*

101.   Plaintiffs have demanded that Defendants abate the continuing nuisance complained of, and hereby reiterate that demand.

102.   Defendants are strictly and jointly and severally liable for abatement of the public and private nuisance.

103.   Plaintiffs are entitled to relief restraining Defendants and requiring each of them, jointly and severally, promptly and competently to take such action as may be necessary to abate the public and private nuisance and for reimbursing Plaintiffs for all response costs incurred and to be incurred at the Site.

**SEVENTH CAUSE OF ACTION**
**(Continuing Trespass)**
**(Against All Defendants)**

104.   Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 103, inclusive, as though set forth in full herein.

105.   On or about April 1, 1968, and continuing until April 30, 1991, Defendants entered or allowed hazardous substances, hazardous wastes, and/or solid wastes to enter Plaintiffs' property without the consent or knowledge of Plaintiffs.



-18-

106.   Defendants knew or should have known that the release of hazardous substances, hazardous wastes, and/or solid wastes would contaminate the soil and groundwater at, around, and beneath the Site.

107.   Defendants have failed to clean up the contamination and, as a result, the hazardous substances, hazardous wastes, and/or solid wastes have been detected at, around, and beneath the Site.

108.   Unless Defendants are ordered immediately to clean up the contamination of the soil, soil vapor, indoor air, and groundwater, it will be necessary for Plaintiffs to commence many successive actions against Defendants to secure compensation for the damages sustained, thus requiring a multiplicity of suits.

109.   Plaintiffs have no adequate remedy at law for the injuries suffered by reason of the acts, omissions, and conduct of Defendants and by reason of the trespass committed by them, and this Court should grant injunctive relief to compel Defendants immediately to clean up the contamination of the soil, soil vapor, indoor air, and groundwater at and around the Site.

110.   As a direct and proximate result of the acts, omissions, and conduct of Defendants and of the continuing trespass caused thereby, Plaintiffs have suffered and continue to suffer damages to their property to such an extent that repairs were and continue to be necessary to restore the land, by conducting site assessment and site mitigation of the contamination, including soil removal, installation of wells, and additional works which are still necessary to complete the restoration of the property. Because the highest levels of contamination are in the area of the former aboveground storage tanks in the front of the building, a portion of the building will have to be demolished and replaced in order to perform a time critical removal action and to conduct other interim remedial measures. The portion of the building that can be saved will require a vapor barrier and sub-slap depressurization system to prevent PCE from intruding into the indoor space from the soil and groundwater

below as well as other measures to increase ventilation.

111.  As a further proximate result of Defendants' entry onto Plaintiffs' property and continuing trespass upon the land, by virtue of the contamination of the soil, soil vapor, indoor air, and groundwater, Plaintiffs were, from May 1, 1991 to September 30, 1993, unable to use their property for the purpose in which it was intended, and to receive income from their property.  Later, Plaintiffs were able to mitigate their damages to some extent by securing a new tenant (although at below market rate).  However, upon learning of the health risks to its workers as a result of the indoor air contamination identified in DTSC's letter dated January 30, 2014, the tenant refused to pay rent for the uninhabitable property while it searched for a suitable new property to relocate its business and vacate the premises.

112.  Plaintiffs have also been damaged in that they have been unable to sell their property.

113.  The aforementioned acts of Defendants were willful and malicious in that Defendants acted with conscious disregard for the mental and physical safety and well-being of Plaintiffs and any future tenants of Plaintiffs' property.  Plaintiffs are therefore entitled to punitive damages in a sum according to proof at trial.

114.  Defendants' acts of waste and contamination of the Property were and are a continuing trespass and will continue to inhabit the Property until such time as Defendants are mandated to remove the hazardous substances, hazardous wastes, and/or solid wastes from Plaintiffs' property.

**EIGHTH CAUSE OF ACTION**
**(Contribution Under the Hazardous Substance Account Act)**
**(Against All Defendants)**

115.  Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 114, inclusive, as though set forth in full herein.

116.  The Carpenter-Presley-Tanner Hazardous Substance Account Act, California Health & Safety Code § 25300 et seq. ("HSAA"), was enacted to encourage the expedient cleanup of "hazardous substances" that have been released



into the environment.  In furthering this goal, the California Legislature included the statutory right of contribution for those parties who clean up contaminated properties from those parties who are responsible for the contamination.

117.   Section 25363(e) of HSAA provides that "[a]ny person who has incurred removal or remedial action costs in accordance with [HSAA] or the federal [CERCLA, 42 U.S.C. § 9601 et seq.] may seek contribution or indemnity from any person who is liable pursuant to [HSAA]."

118.   A "liable person" is defined in section 25323.5(a) of HSAA as "those persons described in section 107(a) of [CERCLA] (42 U.S.C. Sec. 9607(a))."

119.   "Those persons described in section 107(a)" of CERCLA include the owner and operator of a facility, any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed, and any person who arranged for disposal or treatment of hazardous substances for transport to a disposal facility.  42 U.S.C. § 9607(a).

120.   Plaintiffs are each a "person" within the meaning of section 25319 of the Health & Safety Code.

121.   Defendants are each a "liable person" within the meaning of section 25323(a) of the Health & Safety Code.

122.   As a direct and proximate result of Defendants' actions that caused or contributed to releases of hazardous substances at the Site, Plaintiffs have incurred and will continue to incur costs for removal or remedial actions taken in accordance with the HSAA.   These include, but are not limited to, costs incurred for investigation, testing, site assessment, monitoring and remediation of the contamination.

123.   Plaintiffs gave the Department of Toxic Substances Control notice of the commencement of this action, as required by section 25363(e) of the Health & Safety Code.

124.   Accordingly, under strict liability imposed by the HSAA, Plaintiffs are

1  entitled to contribution or indemnity from Defendants for the costs of such removal
2  or remedial action.

3                          **NINTH CAUSE OF ACTION**
                          **(Contribution – CERCLA § 113 (f)**
4                          **(Against All Defendants)**

5      125.  Plaintiffs reallege and incorporate by reference the allegations set forth
6  above in paragraphs 1 through 124, inclusive, as though set forth in full herein.

7      126.  Plaintiffs did not cause or contribute to the environmental
8  contamination at the Site and deny that they are liable for costs incurred as the
9  result of the alleged release or threatened release of hazardous substances at the
10 Site.  However, in the interest of an expeditious cleanup and acting in good faith,
11 Plaintiffs have incurred and continue to incur response costs to investigate, remove,
12 and remediate the environmental contamination at the Site consistent with the
13 National Contingency Plan.

14     127.  Defendants are liable to Plaintiffs for contribution under CERCLA §
15 113(f), 42 U.S.C. § 9613(f), for some or all amounts that Plaintiffs have incurred
16 and may in the future incur, as the result of the release or threatened release of
17 hazardous substances from the Site, in that Defendants are liable for response costs
18 under CERCLA § 107(a), 42 U.S.C. § 9607(a).

19                          **TENTH CAUSE OF ACTION**
        **(Imminent and Substantial Endangerment – RCRA § 7002(a)(1)(B))**
20                          **(Against All Defendants)**

21     128.  Plaintiffs reallege and incorporate by reference the allegations set forth
22 above in paragraphs 1 through 127, inclusive, as though set forth in full herein.

23     129.  Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), under
24 which Plaintiffs brings this action, is RCRA's citizen enforcement provision.

25     130.  Any person may bring a lawsuit under RCRA § 7002(a)(1)(B) when:
26 (a) a "solid or hazardous waste" (b) "may present an imminent and substantial
27 endangerment to health or the environment" and (c) the defendant falls within one
28 of the categories of entities that Congress declared liable for taking abatement

1    action or "such other action as [this Court determines] may be necessary."

2        131.   The persons declared liable by Congress for abatement of potential

3    endangerments under RCRA § 7002(a)(1)(B) are entities that contributed to "past

4    or present handling, storage, treatment, transportation, or disposal" of the

5    "hazardous wastes" and "solid wastes" at issue.   Pursuant to the express terms of

6    RCRA § 7002(a)(1)(B), these entities specifically include "any past or present

7    generator, past or present transporter, or past or present owner or operator of a

8    treatment, storage, or disposal facility."

9        132.   Under RCRA § 1004(27), 42 U.S.C. § 6903(27), "solid waste" is

10   "discarded material, including solid, liquid, semisolid, or contained gaseous

11   material resulting from industrial, commercial, mining, and agricultural operations,

12   and from community activities."   The term, however, does not include "solid or

13   dissolved material in domestic sewage, or solid or dissolved materials in irrigation

14   return flows or industrial discharges which are point sources subject to permits

15   under Section 1342 of Title 33. . . ."

16       133.   None of the discharges from any of the Defendants is solid or

17   dissolved material in domestic sewage, or solid or dissolved materials in irrigation

18   return flows or industrial discharges which are point sources subject to permits

19   under Section 1342 of Title 33.

20       134.   Under Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), "hazardous

21   waste" is "a solid waste, or combination of solid wastes, which because of its

22   quantity, concentration, or physical, chemical, or infectious characteristics may . . .

23   pose a substantial present or potential hazard to human health or the environment

24   when improperly treated, stored, transported or disposed of, or otherwise

25   managed."

26       135.   Under Section 1004(3) of RCRA, 42 U.S.C. § 6903(3), "disposal"

27   means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of

28   any solid waste or hazardous waste into or on any land or water so that such solid



-23-

waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

136.   Pursuant to authority under Section 3001 of RCRA, 42 U.S.C. § 6921, the Administrator of the U.S. E.P.A. promulgated regulations at 40 C.F.R., Part 261 listing or identifying certain hazardous wastes that the Administrator elects to subject to the strict regulatory program established in Subtitle III of RCRA, 42 U.S.C. §§ 6921-6931.   Pursuant to RCRA § 7006(a)(1), 42 U.S.C. § 6976(a)(1), any RCRA hazardous waste finally so "listed or identified" by the Administrator following formal, "notice and comment" rule-making as being subject to the hazardous waste regulatory program set forth in Subtitle III of RCRA, has been finally and conclusively determined for all purposes of any RCRA enforcement action, including the instant one, to be a "hazardous waste" as defined by RCRA § 1004(5).   However, for purposes of RCRA § 7002(a)(1)(B) citizen suits, substances also qualify as "hazardous wastes" and "solid wastes" when the above statutory definitions (i.e., those set forth in RCRA §§ 1004(5) and (27)) are met.   (40 C.F.R. § 261.1(b)(2).)

137.   Plaintiffs and each Defendant are each a "person" within the meaning of RCRA § 1004(15), 42 U.S.C. § 6903(15).

138.   PCE and other chemicals released into the environment by Defendants are solid wastes because they are discarded material resulting from commercial operations.

139.   The PCE and other chemicals released into the environment by Defendants are "hazardous wastes" because of their concentrations, or physical or chemical characteristics, they pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of, or otherwise managed.

140.   Each of the Defendants caused or contributed to the past or present handling, storage, treatment, transportation, or disposal of "solid wastes,"

-24-

"hazardous wastes," "wastes," and "hazardous substances" in the environment in, at, and around the Site because each Defendant released or otherwise discarded PCE or controlled the property from which PCE and other chemicals were released or otherwise discarded, but failed to prevent or abate this "solid waste," "hazardous waste," "waste," and "hazardous substance" contamination.

141.  The presence of PCE at and around the Site may present an imminent and substantial endangerment to human health or the environment.

142.  On July 17, 2012, DTSC issued an Imminent and Substantial Endangerment Determination and Order and Remedial Action Order which concluded (1) "The actual and threatened release of hazardous substances at the Site may present an imminent and substantial endangerment to the public health or welfare or to the environment" and (2) "Response action is necessary to abate a public nuisance and/or to protect and preserve the public health."

143.  On January 30, 2014, DTSC sent a letter to Plaintiffs regarding new indoor air data showing PCE at "concentrations that may pose unacceptable cancer risks, as well as acute and chronic non-cancer hazards to workers at the site." Accordingly, DTSC ordered Plaintiffs to "Immediately take all appropriate action to prevent, abate, or minimize the exposure to workers . . . These actions may include, but are not limited to, (a) removal of workers from the site, (b) placement of an indoor air treatment system, and then (c) remediation of the subsurface for VOC contamination."

144.  The Defendants' liability for such relief as the Court may determine appropriate and necessary under RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), is strict, joint and several.

145.  Plaintiffs gave the U.S. Attorney General and the EPA Administrator notice of the commencement of this action, as required by RCRA § 7002(b)(2)(F), 42 U.S.C. § 6972(b)(2)(F).

146.  Plaintiffs is entitled to relief under RCRA § 7002(a), 42 U.S.C. §



6972(a), restraining the Defendants and requiring each of them, jointly and severally, to take such action, including a complete, timely and appropriate investigation and abatement of all actual and potential endangerments arising from the released solid wastes and hazardous wastes at and emanating from the Site.

## ELEVENTH CAUSE OF ACTION
### (Ultrahazardous Activity)
### (Against All Defendants)

147.   Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 146, inclusive, as though set forth in full herein.

148.   Defendants engaged in the ultrahazardous activity of handling, storing, transporting, and releasing hazardous substances, hazardous wastes and/or solid wastes into the soil and groundwater, notwithstanding the fact that the toxic materials are a serious and substantial risk of harm to health, including cancer, liver disease, and death.  Handling, storing, transporting, and releasing toxic materials is unsafe and harmful, even when the utmost care is utilized.

149.   Defendants' handling, storage, transportation, and releases of hazardous substances, hazardous wastes and/or solid wastes as alleged herein necessarily involves a risk of serious harm which cannot be eliminated by the exercise of utmost care and is not a matter of common usage.

150.   Defendants recognized, or should have recognized, that the Site was likely to be harmed by Defendants' use and release of hazardous substances, hazardous wastes and/or solid wastes into the soil and groundwater.

151.   As a direct and proximate result of this ultrahazardous activity, Plaintiffs have incurred and will continue to incur expenses, losses, injury and damages as set forth herein.

## TWELFTH CAUSE OF ACTION
### (Equitable Indemnity)
### (Against All Defendants)

152.   Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 151, inclusive, as though set forth in full herein.

153.   The liability, if any, that Plaintiffs may have to any person or entity, including, without limitation, any government or regulatory agency, under any law, regulation, or common law principle, relating to the contamination at the Site, is the result, in whole or in part, of the acts or omissions of Defendants.

154.   As between Plaintiffs and Defendants, Defendants are solely responsible for all costs and expenses to investigate and clean up the contamination at and around the Site.

155.   As between Plaintiffs and Defendants, Defendants are responsible for any legal or administrative actions that have been brought, or may be brought in the future, by any public or private persons concerning or related to the presence of the contaminants at and around the Site.

156.   In the event that Plaintiffs are adjudged liable for any or all relief requested in any judicial or administrative action, arising out of or related to the presence of contaminants at and around the Site, brought against Plaintiffs by any persons or entities, public or private, such liability is purely secondary, imputed, or technical.   Primary and actual liability attaches to Defendants and is a direct and proximate result of the acts, omissions, and conduct of Defendants.

157.   As a direct and proximate result of the acts, omissions, and conduct of Defendants, as herein alleged, Defendants are bound and obligated to indemnify and hold harmless Plaintiffs from and against all response costs, arising out of, or relating in any way to the contamination at the Site, and any other costs heretofore or hereafter incurred by Plaintiffs in responding to the releases or threatened releases of hazardous substances, hazardous wastes and/or solid wastes at the Site.

### THIRTEENTH CAUSE OF ACTION
**(Business and Professions Code § 17200)**
**(Against All Defendants)**

158.   Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 157, inclusive, as though set forth in full herein.

159.   Defendants caused or contributed to the presence of hazardous



substances, hazardous wastes and/or solid wastes in the environment in, at, and around the Site, including the waters of the State of California, because each Defendant released or otherwise discarded PCE or controlled the operations from which PCE was released or otherwise discarded, but failed to prevent or abate the contamination at and emanating from the Site.

160.   Defendants' acts and omissions in causing or contributing to releases of hazardous substances, hazardous wastes and/or solid wastes in, at and around, the Site create a condition that is injurious to health, is indecent or offensive to the senses, and is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of a "basin," namely the aquifer underlying the Site, within the meaning of Section 3479 of the Civil Code, as well as the Defendants failure to abate these conditions.

161.   Therefore, Defendants' acts are violations of federal, state, and local laws, regulations, and codes.  As alleged above, these violations each constitute public and private nuisances *per se*, and, therefore, constitute unlawful business acts within the meaning of Business and Professions Code section 17200. Defendants' were and are likely to mislead the general public in that their operations caused or contributed to releases of hazardous substances, hazardous wastes and/or solid wastes, and in so doing, they achieved an unfair competitive advantage in failing to investigate and remediate said conditions.

162.   The unlawful business practices of defendants are likely to continue and therefore will continue to mislead the public and present a continuing threat to the public.   Indeed, public funds have been expended to investigate the contamination at and emanating from the Site.

163.   As a direct and proximate result of the Defendants' conduct, Defendants received profits and avoidance of investigation and remediation costs that rightfully belong to members of general public who have been adversely



-28-

COMPLAINT

1  affected by Defendants' conduct as well as to Plaintiffs by virtue of the amount
2  expended on costs for investigation, remediation, and litigation.

### FOURTEENTH CAUSE OF ACTION
#### (Declaratory Relief)
#### (Against All Defendants)

5  164.   Plaintiffs reallege and incorporate by reference the allegations set forth
6  above in paragraphs 1 through 163, inclusive, as though set forth in full herein.

7  165.   An actual dispute and controversy has arisen and now exists among the
8  parties to this action concerning their respective rights and duties in that Plaintiffs
9  contend, and Defendants deny, that Defendants are responsible for the
10 contamination at the Site and are obligated to contribute to the costs of the
11 investigation and cleanup.

12 166.   Because the extent and magnitude of the contamination at the Site are
13 not fully known at this time, and the investigatory and remedial works are ongoing,
14 Plaintiffs will incur necessary response costs, including but not limited to
15 investigatory, remedial and removal expenses, and attorneys' fees in the future.

16 167.   Plaintiffs desire a judicial determination of their rights and duties and a
17 declaration that Defendants are liable to Plaintiffs for all responses costs incurred or
18 to be incurred by Plaintiffs at the Site as a result of releases of hazardous
19 substances, hazardous wastes, and/or solid wastes by Defendants.

20 168.   Plaintiffs are entitled to a declaratory judgment establishing the
21 liability of Defendants for such response costs for the purpose of this and any
22 subsequent action or actions to recover further response costs.

23 169.   A judicial declaration is necessary and appropriate under the present
24 circumstances in order that Plaintiffs may ascertain their rights and duties.

### PRAYER FOR RELIEF

26 WHEREFORE, Plaintiffs respectfully requests that judgment be entered in
27 their favor for the following:

28 1.   For a preliminary and permanent injunction requiring Defendants to



1  undertake at their sole cost and consistent with the National Oil and Hazardous
2  Substances Pollution Contingency Plan (the "NCP") at 40 C.F.R. Part 300, all
3  actions necessary to investigate and abate the nuisance conditions and
4  endangerments to health or the environment that may be presented by Defendants'
5  use and disposal of "solid wastes" and "hazardous wastes" as alleged above;

6  2.   For an order requiring Defendants to undertake at their sole cost all
7  actions necessary to investigate and remediate the alleged contamination;

8  3.   For a judicial determination that Defendants are jointly and severally
9  liable for the abatement of the imminent and substantial endangerment to human
10  health or the environment that may be presented by Defendants' use and disposal of
11  "solid wastes" and "hazardous wastes" as alleged above;

12  4.   For a declaration that Defendants are liable under CERCLA § 107(a)
13  and are liable to Plaintiffs in contribution and/or indemnity under CERCLA §
14  113(f) for all past, present, and future response costs and other costs which may be
15  incurred by Plaintiffs connection with the Site;

16  5.   For a declaration that Defendants are obligated to pay to Plaintiffs all
17  future response costs and any other costs incurred by Plaintiffs hereafter in
18  response, removal, or remedial efforts incurred pursuant to law or the order of any
19  governmental agency with jurisdiction over the Site;

20  6.   For damages from Defendants to compensate Plaintiffs for the costs
21  they have incurred and will incur in response, removal, or remedial efforts, the
22  exact amount of which will be ascertained according to proof;

23  7.   For compensatory and consequential damages in excess of $5 million;

24  8.   For an award to Plaintiffs its costs of litigation, including attorneys'
25  fees and expert witness fees pursuant to 42 U.S.C. § 6972(e), section 1021.5 of the
26  Code of Civil Procedure, and written contract;

27  9.   Treble damages for wastes;

28  10.  For exemplary against Defendants according to proof;

-30-
COMPLAINT

11.   For punitive damages against Defendants according to proof;

12.   For all costs of suit herein;

13.   For such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand trial by jury of any and all issues so triable.

DATED: September 8, 2014          PALADIN LAW GROUP® LLP

/s/ *Bret A. Stone*

Bret A. Stone
Counsel for Plaintiffs



# EXHIBIT 1

LEASE

1

2

3    THIS LEASE, executed in duplicate at Santa Barbara, California,

4 on *apr. 1st* , 1968, between AL GOLDBERG and BETTY GOLDBERG, husband

5 and wife, hereinafter referred to as Lessors, and FLOYD R. BAKER and

6 WANDA L. BAKER, husband and wife, hereinafter referred to as Lessees.

7    1.  DESCRIPTION OF PREMISES.  The Lessors hereby lease to

8 Lessees, and Lessees hire from Lessors, on the terms and conditions

9 hereinafter set forth, those certain premises with the appurtenances,

10 situated in the City and County of Santa Barbara, State of Calif-

11 ornia, and described as follows:

12        Beginning at the Southeasterly line of Cottage Grove
          Avenue 130'8" from the Northeasterly line of Bath
13        Street; thence Northeasterly along the Southeasterly
          line of Cottage Grove Avenue 45 feet (to land owned
14        by A. W. Potter); thence at right angles Southeasterly
          105 feet to the line of Gutierrez Street; thence
15        Southwesterly along said Gutierrez Street, 45 feet;
          thence at a right angle Northwesterly 105 feet to
16        Cottage Grove Avenue and the point of beginning,
          being Lot No. 26, as marked and designated on Plat
17        No. 2 of P. J. Barbers subdivision of the Southwest
          one-half of city block No. 252 and filed with the
18        County Recorder August 11, 1900.

19        2.  PARKING.  That Lessors further grant to Lessees, during the

20 term of this lease and any extension thereof, four parking spaces

21 with right of ingress and egress to said spaces on that certain real

22 property situated in the City and County of Santa Barbara, State of

23 California, and described as follows:

24        Beginning at a point on the Northwesterly line of
          Gutierrez Street, distant thereof 135 feet and 8
25        inches Northeasterly from the most Southerly corner
          of block 252, according to the official map and
26        survey of said city; running thence Northeasterly
          along said line of Gutierrez Street 45 feet to a
27        point; thence at right angles Northwesterly 105 feet
          to the Southeasterly line of Cottage Grove Avenue;
28        thence at right angles Southwesterly along said line
          of Cottage Grove Avenue 45 feet to a point; thence
29        at right angles Southeasterly 105 feet to the said line
          of Gutierrez Street and the point of beginning.

30

31    The Lessors reserve the right to designate where the said parking

32 spaces shall be located on the said premises.

-1-

3.   TERM.   The term of this lease shall be for a period of ten years, commencing on the 1st day of April, 1968, and ending on the 31st day of March, 1978.

4.   RENT.   The rent for the leased premises for the period of April 1, 1968, to September 30, 1969, shall be the sum of $14,400.00. The rent for the leased premises for the period of October 1, 1969 to March 31, 1978, shall be the sum of $91,800.00.   In the event the City or County of Santa Barbara, or both, increase the real property taxes on the said leased premises over the amount due for the 1968-1969 taxable year, then the Lessees shall pay to Lessors said increase during the term of this lease as additional rent.   It shall be the duty of the Lessors to furnish the Lessees with copies of tax billings evidencing said increase before Lessees are obligated to pay said sums as additional rent.

The rental for the leased premises shall be paid as follows:

    a.   $2,600.00 upon execution of this lease, that said sum being payment for the first month of the term herein and the last two months of the term herein.

    b.   Installments of $800.00 per month commencing May 1, 1968, and continuing to, and including, September 1, 1969.

    c.   Installments of $900.00 per month commencing October 1, 1969 and continuing until the end of the term.

    d.   Any increase in real property taxes as hereinbefore provided for shall be payable as additional rent in a lump sum within 30 days after presentation of a copy of a tax bill by Lessors to Lessees.

5.   OPTION TO RENEW LEASE.   Lessees are hereby granted an option to renew this lease for a further period of 10 years from and after the expiration of the original term at a rental of $900.00 per month together with additional rent for any increase in real property taxes as hereinbefore provided, but otherwise upon the same terms and conditions as herein contained.   Written notice of Lessees' intention

-2-

1 to renew this lease shall be given to Lessors at least 90 days prior
2 to the expiration of this lease.

3     6.  UTILITIES.  Lessees shall pay for all water, gas, heat,
4 light, power, telephone service, and all other services supplied to
5 the said premises.

6     7.  REPAIRS.  Lessees shall, at their sole cost, keep and main-
7 tain said premises and appurtenances and every part thereof, except-
8 ing exterior walls and roofs which Lessors agree to repair, includ-
9 ing windows and skylights, sidewalks adjacent to said premises, any
10 store front and the interior of said premises, in good and sanitary
11 order, condition and repair, hereby waiving all right to make repairs
12 at the expense of Lessors and as provided in Section 1942 of the
13 Civil Code of the State of California, and all rights provided for
14 by Section 1941 of the said Civil Code.

15     8.  USE.  The premises are leased to the Lessees for the purpose
16 of conducting a wholesale business of furnishing cleaning supplies
17 to dry cleaning establishments, laundries, and hospitals.  Lessees
18 shall not use, or permit said premises, or any part thereof, to be
19 used, for any purpose or purposes other than the purpose or purposes
20 for which the said premises are hereby leased without written consent
21 of the Lessors.

22     9.  INSURANCE HAZARDS.  No use shall be made or permitted to be
23 made of the said premises, nor acts done, which will increase the
24 existing rate of insurance upon the building in which said premises
25 may be located, or cause a cancellation of any insurance policy
26 covering said building, or any part thereof, nor shall Lessees sell,
27 or permit to be kept, used, or sold, in or about said premises, any
28 article which may be prohibited by the standard form of fire insur-
29 ance policies.  Lessees shall, at their sole cost and expense,
30 comply with any and all requirements, pertaining to said premises,
31 of any insurance organization or company, necessary for the main-
32 tenance of reasonable fire and public liability insurance, covering

-3-

1 said building and appurtenances.

2     10. ALTERATIONS. MECHANICS' LIENS. Lessees shall not make,
3 or suffer to be made, any alterations of the said premises, or any
4 part thereof, without the written consent of Lessors first had and
5 obtained, and any additions to, or alterations of, the said premises,
6 except movable furniture and trade fixtures, shall become at once a
7 part of the realty and belong to Lessors. Lessees shall keep the
8 demised premises and the property in which the demised premises are
9 situated free from any liens arising out of any work performed,
10 material furnished, or obligations incurred by Lessees.

11     11. ABANDONMENT OF PREMISES. TRADE FIXTURES. Lessees shall
12 not vacate or abandon the premises at any time during the term; and
13 if Lessees shall abandon, vacate, or surrender said premises, or be
14 dispossessed by process of law, or otherwise, any personal property
15 belonging to Lessees and left on the premises shall be deemed to be
16 abandoned, at the option of Lessors, except such property as may be
17 mortgaged to Lessors.

18     12. ACCEPTANCE OF PREMISES AS IS. SURRENDER AT END OF TERM.
19 By entry hereunder, Lessees accept the premises as being in good
20 and sanitary order, condition and repair and agree on the last day
21 of said term, or sooner termination of this lease, to surrender unto
22 Lessors all and singular said premises with said appurtenances in
23 the same condition as when received, reasonable use and wear thereof
24 and damage by fire, Act of God or by the elements excepted, and to
25 remove all of Lessees' signs from said premises.

26     13. COMPLIANCE WITH LAW. Lessees shall, at their sole cost
27 and expense, comply with all of the requirements of all Municipal,
28 State and Federal authorities now in force, or which may hereafter
29 be in force, pertaining to the said premises, and shall faithfully
30 observe in the use of the premises all Municipal ordinances and
31 State and Federal statutes now in force or which may hereafter be
32 in force. The judgment of any court of competent jurisdiction, or

-4-

the admission of Lessees in any action or proceeding against Lessees, whether Lessors be a party thereto or not, that Lessees have violated any such ordinance or statute in the use of the premises shall be conclusive of that fact as between Lessors and Lessees.

14.   NONLIABILITY OF OWNER FOR DAMAGES.   This lease is made upon the express condition that Lessors are to be free from all liability and claim for damages by reason of any injury to any person or persons, including Lessees, or property of any kind whatsoever and to whomsoever belonging, including Lessees, from any cause or causes whatsoever while in, upon, or in any way connected with the said demised premises or the said sidewalks adjacent thereto during the term of this lease or any extension hereof or any occupancy hereunder, Lessees hereby covenanting and agreeing to indemnify and save harmless Lessors from all liability, loss, cost, and obligations on account of or arising out of any such injuries or losses however occurring.

15.   LIABILITY INSURANCE.   Lessees further agree to take out and keep in force during the life hereof at Lessees' expense public liability insurance in companies and through brokers selected by Lessors to protect against any liability to the public incident to the use of or resulting from any accident occurring in or about said premises, the liability under such insurance to be not less than $50,000.00 for any one person injured, or $100,000.00 for any one accident, or $5,000.00 property damage.   These policies shall insure the contingent liability of Lessors and are to be placed with Lessors, and Lessees are to obtain a written obligation on the part of the insurance carriers to notify Lessors in writing prior to any cancellation thereof, and Lessees agree, if Lessees do not keep such insurance in full force and effect the Lessors may take out the necessary insurance and pay the premium and the repayment thereof shall be deemed to be part of the rental and payment as such on the next day upon which rent becomes due.

16.   ENTRY BY OWNER.   Lessees shall permit Lessors and their

-5-

1 agents to enter into and upon said premises at all reasonable times
2 for the purpose of inspecting the same or for the purpose of main-
3 taining the building located on the leased premises.

4     17.  ASSIGNMENT OR SUBLETTING.  Lessees shall not assign this
5 lease, or any interest therein, and shall not sublet the said pre-
6 mises or any part thereof, or any right or privilege appurtenant
7 thereto, or suffer any other person (the agents and servants of
8 Lessees excepted) to occupy or use the said premises, or any portion
9 thereof, without the written consent of the Lessors first had and
10 obtained, and a consent to one assignment, subletting, accupation,
11 or use by another person shall not be deemed to be a consent to any
12 subsequent assignment, subletting, occupation, or use by another
13 person.  Any such assignment or subletting without such consent
14 shall be void, and shall, at the option of Lessors, terminate this
15 lease.

16     18.  INSOLVENCY.  RECEIVER.  Either (a) the appointment of a
17 receiver to take possession of all or substantially all of the assets
18 of the Lessees, or (b) a general assignment by Lessees for the
19 benefit of creditors, or (c) any action taken or suffered by Lessees
20 under any insolvency or bankruptcy act shall constitue a breach of
21 this lease by Lessees.

22     19.  REMEDIES OF LESSORS ON DEFAULT.  In the event of any
23 breach of this lease by Lessees, then Lessors besides other rights
24 or remedies they may have, shall have the immediate right of re-entry
25 and may remove all persons and property from the premises; such pro-
26 perty may be removed and stored in a public warehouse or elsewhere
27 at the cost of, and for the account of Lessees.  Should Lessors
28 elect to re-enter, as herein provided, or should they take possession
29 pursuant to legal proceedings or pursuant to any notice provided by
30 law, they may either terminate this lease or they may from time to
31 time, without terminating this lease, re-let said premises or any
32 part thereof for such term or terms (which may be for a term extending

-6-

beyond the term of this lease) and at such rental or rentals and upon
such other terms and conditions as Lessors in their sole discretion
may deem advisable with the right to make alterations and repairs
to said premises; upon each re-letting (a) Lessees shall be immediate-
ly liable to pay to Lessors, in addition to any indebtedness other
than rent due hereunder, the cost and expenses of such re-letting and
of such alterations and repairs, incurred by Lessors, and the amount,
if any, by which the rent reserved in this lease for the period of
such re-letting (up to but not beyond the term of this lease) exceeds
the amount agreed to be paid as rent for the demised premises for
such period on such re-letting; or (b) at the option of the Lessors
rents received by such Lessors from such re-letting shall be applied:
first, to the payment of any indebtedness, other than rent due here-
under from Lessees to Lessors; second, to the payment of any costs
and expenses of such re-letting and of such alterations and repairs;
third, to the payment of rent due and unpaid hereunder and the
residue, if any, shall be held by the Lessors and applied in payment
of future rent as the same may become due and payable hereunder.  If
Lessees have been credited with any rent to be received by such re-
letting under option (a), and such rent shall not be promptly paid
to Lessors by the new tenant, or if such rentals received from such
re-letting under option (b) during any month be less than that to be
paid during that month by Lessees hereunder, Lessees shall pay any
such deficiency to Lessors.  Such deficiency shall be calculated
and paid monthly.  No such re-entry or taking possession of said
premises by Lessors shall be construed as an election on their part
to terminate this lease unless a written notice of such intention
be given to Lessees or unless the termination thereof be decreed by
a court of competent jurisdiction.  Notwithstanding any such re-letting
without termination, Lessors may at any time thereafter elect to
terminate this lease for such previous breach.  Should Lessors at any
time terminate this lease for any breach, in addition to any other

-7-

remedy they may have, they may recover from Lessees all damages they may incur by reason of such breach, including the cost of recovering the premises, and including the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this lease for the remainder of the stated term over the then reasonable rental value of the premises for the remainder of the stated term, all of which amounts shall be immediately due and payable from Lessees to Lessors.

20.  ATTORNEYS' FEES.  In case suit should be brought by any party or parties to this lease, then the successful party or parties in said suit shall be paid a reasonable attorneys' fee which shall be fixed by the court by the unsuccessful party or parties.

21.  NOTICES.  All notices to be given to Lessees may be given in writing personally or by depositing the same in the United States mail, postage prepaid, and addressed to Lessees at the said premises, whether or not Lessees have departed from, abandoned, or vacated the premises.

22.  WAIVER.  The waiver by Lessors of any breach of any term, covenant, or condition herein contained shall not be deemed to be a waiver of such term, covenant, or condition or any subsequent breach of the same or any other term, covenant, or condition herein contained.  The subsequent acceptance of rent hereunder by Lessors shall not be deemed to be a waiver of any preceding breach by Lessees of any term, covenant, or condition of this lease, other than the failure of Lessees to pay the particular rental so accepted, regardless of Lessors knowledge of such preceding breach at the time of acceptance of such rent.

23.  BINDING ON SUCCESSORS.  The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators, and assigns of all of the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder.

-8-

24.  TIME is of the essence of this lease.

AL GOLDBERG
AL GOLDBERG

BETTY GOLDBERG
BETTY GOLDBERG

FLOYD R. BAKER
FLOYD R. BAKER

WANDA L. BAKER
WANDA L. BAKER

-9-

**EXHIBIT 2**

SDS:SN; 78-928; 711,472

LOAN EXTENSION, LEASE CLARIFICATION, LOT LEASE
AND SECURITY AGREEMENT
BETWEEN
TERRY GEORGE AND TRI-COUNTY SALES, INC.
AND
AL AND BETTY GOLDBERG

THIS Loan Extension, Lease Clarification, Lot Lease, and Security
Agreement is entered into as of, and is effective, May 1, 1978, at Santa
Barbara, California, by and between TERRANCE GEORGE and TRI-COUNTY SALES, INC.,
a California Corporation doing business as Tri-County Sales (hereinafter
sometimes referred to as "Terry"), and AL GOLDBERG and BETTY GOLDBERG,
husband and wife (hereinafter sometimes referred to as "Goldbergs"), as follows:

## I. RECITALS

1.01 WHEREAS, on March 14, 1978 the Goldbergs sold certain assets located at
220 W. Gutierrez Street, Santa Barbara, California to Floyd N. Baker and Wanda L.
Baker, husband and wife (hereinafter sometimes referred to as the "Bakers"), and
received from the Bakers a negotiable Promissory Note dated March 14, 1978 for
One Hundred Five Thousand Eight Hundred Sixty Four and 63/100 Dollars ($105,864.63),
secured by a security agreement in certain personal property, equipment, vehicles,
stock in trade, trade, stock, trade name, assets, supplies and other interests and
good will in connection with the business known as Tri-County Sales; all of which are
particularly described in that Security Agreement between the Bakers and the
Goldbergs dated March 14, 1978, and that Financing Statement (UCC-1) of the Bakers to
the Goldbergs dated March 11, 1968 (filed with the California Secretary of State on
April 23, 1968, File No. 68-036-237). Said Security Agreement and Financing Statement
are expressly hereat incorporated by reference; and include, but are not limited to,
an express representation and warranty by the Bakers that inventory will be maintained
at the approximate level that existed on March 31, 1968; that quarterly operating
statements (including complete inventories, accounts receivable, etc.) will be
furnished to the Goldbergs, and that the Bakers not only will not replace any item
of equipment without first obtaining the consent of the Goldbergs, but also that any
replacement shall be equal or better security to the Goldbergs.

1.02 WHEREAS, as a separate transaction (Lease) between the Bakers and the
Goldbergs, the Goldbergs leased jointly to the Bakers and "Tri-County Sales, Inc.,
a California Corporation" an improved building and four (4) parking spaces located at
220 W. Gutierrez Street, Santa Barbara, California, and more specifically described
in Attachment "A" hereto; which Attachment is expressly hereat incorporated by
reference. Said Lease is dated April 1, 1968 and would have expired on March 31,
1978 unless then ten (10) year option provided therein was exercised by the Lessee
or its approved assignees within ninety (90) days prior to March 31, 1978. On
"March ____, 1968", the Goldbergs and the Bakers entered into an Agreement modifying
the above described Lease by limiting the use by the Lessees of the premises described
in said April 1, 1968 Lease to ". . . laundry and drycleaning equipment sales,
research and development, janitorial, swimming pool, restaurant supplies, and other
related items." In addition the parties by the same "March ____, 1968" Agreement,
agreed that the Lease did not include an adjacent lot owned by the Goldbergs, but
the Lessee could use said lot provided that it keeps the same clean and maintains it
at the Lessee's sole expense.

1.03 WHEREAS, on September 24, 1968 the Bakers sold Tri-County Sales and the
above described assets pledged to the Goldbergs, to Donald J. George and Jacquiline
George (hereinafter sometimes referred to jointly and severally as "Donald"). In
connection with the Bakers sale to Donald, Donald agreed to be bound by, assumed, and
agreed to pay all obligations and perform all duties owed to the Goldbergs by the
Bakers under the above described Promissory Note, Security Agreement, and Financing
Statement. The Agreement of Donald to the Bakers was a Contract also for the benefit
of the Goldbergs with respect to:  the express and personal assumption of liability

-1-

**ORIGINAL**

and agreement to perform by Donald; the representation and warranty of Donald that
the inventory of Tri-County Sales, Inc. will be kept at least at Thirty-Nine
Thousand Dollars ($39,000.00) at cost; and the express term and condition that Donald
will provide the Goldbergs with a decreasing life insurance policy on Donald's life,
in which the Goldbergs are the beneficiaries in an amount sufficient to satisfy
the principal, interest and any collection costs with respect to the above described
Promissory Note. Further, in connection with the transaction, above described,
between the Bakers and Donald, Donald further agreed to be personally liable, and
perform all the covenants, conditions and duties under the Lease and "March ____,
1968" Agreement between the Goldbergs and the Bakers and Tri-County Sales, Inc., a
California Corporation. On September 28, 1968, the Goldbergs executed a consent to
the Assignment of said Lease and "March ____, 1968" Agreement, provided that the
Bakers were not relieved from liability to the Goldbergs under said Lease and
"March ____, 1968" Agreement, and because of the additional warranties, represen-
tations and express promises of Donald to the Goldbergs by reason of the Agreements,
between the Bakers and Donald, the assignment of Lease executed by the Bakers on
September 24, 1968, and the acceptance of Assignment of Lease executed by Donald on
September 23, 1978 and the Agreement between the Bakers and Donald, respectively
executed on the 24th and 23rd of September, 1968; which Agreements all are expressly
hereat incorporated by reference as though fully set forth.

    1.04 WHEREAS, without the knowledge or consent of the Goldbergs, Donald sold
his capital stock in Tri-County Sales, Inc. to his brother, Terry George (hereinafter
sometimes referred to as "Terry"); which transaction is now represented by Terry to
have been completed on or about December 31, 1974. Terry further represents and
warrants that on the effective date of this document: that he is the sole owner and solely
entitled to possession of all of the outstanding capital stock of Tri-County Sales,
Inc., a California Corporation; and that there are no liens, hypothecations, charges
or claims against said capital stock that encumbers or hinder his ownership. On
or after September 26, 1975, the required life insurance policy on the life of Donald
was replaced by a Seventy Five Thousand Dollar ($75,000.00) twenty year decreasing
term life insurance policy on the life of Terry to cover the balance due on the
above described Promissory Note (originally from the Bakers) to the Goldbergs.

    1.05 WHEREAS, with respect to the above described Promissory Note, Lease,
"March ____, 1968" Agreement, and the rights of, and obligations to the Goldbergs, the
following circumstances exist on April 1, 1978. On April 1, 1978 there is due owing
and unpaid on the above described Promissory Note the balance of Fifty Eight Thousand
Two Hundred Eighteen and 92/100 Dollars ($58,218.92), plus interest from March 1, 1978
to April 1, 1978 at 6% per annum, plus interest on and after April 1, 1978 at 9.25%
per annum on the unpaid balance. As of April 1, 1978, without either the consent or
express knowledge of the Goldbergs, certain other personal property set forth in the
above described Security Agreement had been replaced; plus the security has been augmented
by additional equipment and inventory. A new fire and liability insurance policy will
immediately be needed to be tendered to the Goldbergs for their approval. A new term
life insurance policy on the life of Terry will be needed to be immediately tendered
to the Goldbergs for their approval. Also effective October 1, 1978, the adjacent lot
described in the "March ____, 1968" Agreement will be let by the Goldbergs to Terry
and Tri-County Sales, Inc., upon the terms, rent and conditions set forth hereinbelow.

                        II.  CONSIDERATION

    NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND
ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED BY TERRY, TERRY AND THE GOLDBERGS DO HEREBY
RESPECTIVELY AGREE, AND TERRY WARRANTS, COVENANTS, AGREES AND TRANSFERS AS SET FORTH
HEREINBELOW:

            III.  LOAN EXTENSION AGREEMENT (PROMISSORY NOTE)

    3.01 Joint and several receipt of consideration and promise to pay by Terry and
Tri-County Sales, Inc.: Terry and Tri-County Sales, Inc., a California corporation,
each separately acknowledge receipt of the Goldberg's extension of the hereinabove
described Promissory Note, and other good and valuable consideration; and jointly and
severally agree to assume and be personally liable for the payment of the principal
amount under the terms, installments and interest rates set forth hereinbelow under
paragraph 3.02. Terry and Tri-County Sales, Inc., further agree that the terms set
forth in paragraph 3.02 shall be separately memorialized in a negotiable Promissory
Note, attached to the original note due the Goldbergs, and may be separately from this
agreement, enforced, assigned or transferred - provided that:

                                -2-

                            **ORIGINAL**

(A) In no event shall the Goldbergs collect more than once for the $58,218.92 principal, interest, costs of collection (if applicable), attorneys fees (if applicable), court costs (if applicable), and damages under this agreement (if applicable); even though the Goldbergs may be entitled to different amounts for each of the four described items depending upon whether the original note, promissory note under paragraph 3.02 hereinbelow, with this agreement, or a combination of the foregoing in this agreement are enforced; and

(B) Which the Goldbergs have the option of enforcing:  (alternative "A") the original promissory note described hereinabove; (alternative "B") the promissory note described in paragraph 3.02 hereinbelow; (alternative "C") the promise contained in this agreement; and any combination of the foregoing (alternative "D"), the full satisfaction of any of the alternatives described in this paragraph (whether by performance under the terms, or by payment in full of a Court Judgment) shall be, and are deemed full satisfaction of all of the alternatives described in this paragraph.  Upon full satisfaction the Goldbergs are obligated to, and shall surrender to the respective obligor named therein, the original promissory note described hereinabove and the negotiable promissory note memorializing paragraph 3.03 hereinbelow.

    3.02 Negotiable Promissory Note:  attached hereto and expressly incorporated hereat by reference, as though fully set forth is Attachment "C"; which exhibit shall be executed in original form and attached to the hereinabove described original Promissory Note to the Goldbergs.  The original Promissory Note also has a balance due on April 1, 1978 of Forty Eight Thousand Five Hundred Nine and 92/100 Dollars ($48,509.92).  The balance has been calculated by taking the actual April 1, 1978 balance of $58,218.92 and crediting the $10,000.00 paid thereon on April 7, 1978 as follows:  $291.00 for interest at 6% from February 2, 1978 to April 1, 1978, and $9,650.69 reduction of principal.  There is therefore due in April, 1978 after the credit of the $10,000.00 payment, a principal balance of $48,509.92 plus interest at 9.25% for April, 1978, and thereafter at 9.25% simple interest.  The other $800.00 payment in April of 1978, and each subsequent monthly installment payment on said Promissory Note shall be credited first against interest due for that month at 9.25% simple interest, then principal.  This agreement is not intended by the parties to effect the original Primissory Note to the Goldbergs, hereinabove described except to extend the time for the payment of the balance.  The Goldbergs understand and agree that the legal effect of the extension of the payment schedule of the original Promissory Note, without the expressed permission of the original obligor and all subsequent obligors, guarantors or persons who have assumed the obligation of payment, may allow those persons, not Terry, and not Tri-County Sales, Inc. to assert defenses which they might otherwise not have.

### IV.  GRANT, AND CONTINUANCE OF SECURITY INTEREST

    4.01 Continuance of prior security interest:  Terry and Tri-Counties understand, agree and approve the Goldbergs filing, without the signature of the debtor(s) a continuance financing statement under California Commercial Code Section 9306.  The filing of a continuation statement is understood and agreed to by Terry, Tri-County Sales, Inc. and both to continue with respect to the parties the original security interest granted to the Goldbergs to secure the payment of the hereinabove described Promissory Note to the Goldbergs.

    4.02 Security interest granted:  Terry, individually, and doing business as Tri-County Sales; Tri-County Sales, Inc., a California corporation; and both of them, jointly and severly hereby grant a security interest to the Goldbergs to secure the full and complete performance by Terry, Tri-County Sales, Inc., and both of them of the terms, conditions, promises, warranties and representations contained in this document, their performance as additional obligors of the hereinabove described original Promissory Note to the Goldbergs, their performance of the Promisory Note set forth as Attachment "C" attached hereto, in and to the collateral:  now owned or hereafter acquire (including proceeds and replacement) by Terry, Tri-County Sales, Inc., and both of them, as specifically described in attachment "D" hereof; which attachment is expressly hereat incorporated by reference as though fully set forth.

    4.03 Security interest creation charges: each party to this agreement agrees to separately bear their costs, attorneys fees and other expenses in connection with the continuation, and creation of the security interest herein described, except: the Goldbergs shall pay up to $50.00 for the cost of recording the continuation financing statement, and the financing statement represented by the new security interest herein

-3-

ORIGINAL

granted: Terry and Tri-County Sales, Inc., jointly and severally shall be liable for: any additional acts necessary to perfect the security interests to the Goldbergs herein described; and to otherwise perform the terms, promises and warranties made in this agreement.

4.04 <u>Proceeds and replacements</u>: The security interest herein granted to the Goldbergs is agreed to, and does include all proceeds from the sale or conversion (whether voluntary or involuntary), assignment, transfer, lease, replacement insurance policy proceeds or otherwise with respect to the collateral herein described, whether now owned, or hereafter acquired; except that Terry, Tri-County Sales, Inc., and both of them may sell only in the ordinary course of business, the inventory covered by the security interest herein granted, and apply the proceeds to their own use, if there is no default under this agreement (including, but not limited to all payments to the Goldbergs have been timely made as provided in paragraph 3.02 hereinabove). With the consent of the Goldbergs, Terry or Tri-County Sales, Inc. or both of them may substitute or exchange other collateral, securities or instruments, in place of the collateral herein described. In the event of replacement all of the rights and privileges of the Goldbergs, and all of the obligations on the part of Terry, Tri-County Sales, Inc., and both of them shall apply to the substituted or exchanged collateral, securities or instruments in the same respects as if the property were originally held as collateral under this agreement. Consent of the Goldbergs to the substitution of collateral, shall not unreasonably be withheld if the substituted or replaced collateral has a net liquidation market value in excess of the collateral for which substitution or replacement is requested.

4.05 <u>Proceeds held in express trust</u>: In the event of any breach of this agreement, the payment schedule set forth in paragraph 3.02 hereinabove, or both, Terry, Tri-County Sales, Inc., and both of them jointly and severally covenant, warrant, and agree that with respect to the collateral originally given to the Goldbergs, and the collateral herein given to the Goldbergs, Terry, Tri-County Sales, Inc., and both of them, are automatically trustee of any proceeds received from the sale (whether in the ordinary course of business or otherwise), assignment, transfer, lease, conversion (voluntary or involuntary), insurance proceeds from insurance on, the collateral herein described. This paragraph creates an expressed trust in Terry and Tri-County Sales, Inc.; and both of them expressly covenant and warrant that they shall earmark the proceeds required by this subparagraph to be held in trust, keep said proceeds separate from all other proceeds and monies, and remit said proceeds to the Goldbergs immediately after collection, as received, until all obligations to the Goldbergs have been satisfied in full.

4.06 <u>Sale, lease, disposition and comingling of proceeds prohibited</u>: Unless otherwise specifically allowed under this Agreement, and then only to the extent allowed: Terry, Tri-County Sales, Inc., and both of them shall not sell, transfer, lease, incumber or otherwise dispose of or hypothecate any part or all of the collateral herein described, and shall not comingle any proceeds from said collateral until all obligations to the Goldbergs have been completely satisfied and the indebtedness to the Goldbergs has been discharged; in the event of any dispute between the parties, the collateral and the proceeds shall be held in trust appropriately earmarked to designate the Goldberg's security interest claim, segregated from all other property, and held until the dispute be determined between the parties or by any competent Court having jurisdiction to determine the dispute.

4.07 <u>Power of sale</u>: With respect to Terry, Tri-County Sales, Inc. and both of them, in the event of the failure or suspension of business; insolvency of either or both of them; a Petition for proceedings filed by or against either of them under: the Federal Bankruptcy Act, any California Insolvency or Dissolution Proceedings in which a Receiver is appointed to potentially take control of more than Fifty (50%) percent of their assets; or any Federal or State Proceedings, attachment, levy that could potentially lien, hypothecate or encumber Fifty (50%) percent or more of either or both of their property; in the event of either or both of their general assignment for the benefit of creditors; in the event of any default in the payment of the obligations set forth in paragraph 3.02 hereinabove, and not cured within ten (10) days after default; or in the event of any other default under this agreement and any agreements incorporated by reference herein, all obligations of either and both of them under this agreement are automatically accelerated, due, and payable to the Goldbergs (notwithstanding any extension of time or installment payment schedule allowed). In the event of any default as defined in this agreement (including Section 4.07 hereinabove) Terry, Tri-County Sales, Inc. and both of them jointly and severally hereby constitute and

INITIALS

-4-

irrevocably appoint the Goldbergs, or any one of the Goldbergs' individual successors, assigns or personal representatives as attorney-in-fact of Terry, Tri-County Sales, Inc., and both of them.  This appointment of attorney-in-fact includes the power, among others, to sell the collateral covered by this agreement.  Such sale of the collateral may be as a unit or in parts, at any time or place, and on any terms, provided that the attorney-in-fact acts in good faith and in a commercially reasonable manner.  Unless the collateral threatens to decline speedily in value, the attorney-in-fact shall give to Terry, Tri-County Sales, Inc., and to any other person who has filed with the attorney-in-fact a written request for notice:  a notice in writing of the time and place of any public sale, or of the time on or after which any private sale or other intended disposition is to be made of the collateral.  Such notice may be deposited with the United States Postal Service, postage prepaid, or given by telegram at the addresses set forth in this agreement, or such other addresses as may have been furnished to the attorney-in-fact, in writing, for the purposes of this paragraph, at least five (5) days, before the date fixed for any public sale, or before the date on or after which any private sale or other disposition is to be made of the collateral.  Unless the collateral threatens to decline speedily in value, notice of the time and place of the public sale shall be given at least five (5) days before the date of sale, by publication once in a newspaper of general circulation, published in Santa Barbara County, California; and if the sale is to be in a different County, also in a newspaper of general circulation published in that County.  Any public sale may be postponed from time to time by a public announcement, at the time and place last scheduled for the sale.  The attorney-in-fact, the Goldbergs, and both of them, may bid in, and buy at any public sale.

## V.  WARRANTIES AND COVENANTS

Terry and Tri-County Sales, Inc. each individually and jointly, covenant and warrant as follows:

5.01  That each will immediately pay any indebtedness herein, when due; the Goldbergs cost of collecting any indebtedness and of realizing on collateral, and any expenditures of the Goldbergs pursuant thereto, including attorney's fees and expenses, with interest at the maximum rate allowed by law from the date of expenditure; and any deficiency, after the Goldbergs' realization on collateral.

5.02  That the Goldbergs are dependent upon timely receipt of each of the installment payments on the above described promissory note (for the April 1, 1978 principal balance of $48,509.92); and time is therefore made of the essence.

5.03  That as to all collateral and its proceeds and replacements described in this agreement, each will:

(A) Will maintain possession of 220 West Gutierrez Street, Santa Barbara, California, and will not remove the collateral from that location except under the ordinary course of business sale exception as set forth in this agreement;

(B) Keep the collateral separate and identifiable;

(C) Maintain the collateral in good and saleable condition, repair, if necessary, clean, and otherwise deal with the collateral in all ways as are considered good practices by owners of like property, use it lawfully and only as permitted by insurance policies, and permit the Goldbergs to inspect the collateral at any reasonable time; and

(D) Not sell, contract to sell, lease, encumber or transfer the collateral or proceeds from the sale of the collateral to the extent not otherwise provided in this agreement with respect to sales in the ordinary course of business (if certain conditions are met) until the debt and all


INITIAL

-5-

ORIGINAL

obligations to the Goldbergs have been fully satisfied; and pay
when due all existing or future charges, liens or encumbrances on,
and all taxes and assessments now or hereafter imposed on, or
affecting the collateral and its proceeds; insure the collateral with
the Goldbergs as additional insured in the form, amounts, with
companies, and against the risk and liability as set forth in this
agreement, and deliver to the Goldbergs said policies, and authorize
the Goldbergs to make any claim thereunder, to cancel the insurance
to receive payment in the event of default or any loss; and

(E) Fully and completely comply with the provisions of this agreement,
including, but not limited to such trust provisions, warranties, covenants
and otherwise as set forth herein.

5.04  That each will cooperate with the other and the Goldbergs to execute or
re-execute such additional documents, and to furnish such additional data as may be
necessary or desirable to evidence the intention of the consummation of the transaction
and transactions herein provided for, and to otherwise specifically   vest and protect
the security interest in the Goldbergs in accordance with the terms of this agreement.

5.05  That each has authority to enter into this agreement, and any person signing
it has been duly authorized to execute the same.

5.06 . That each, at their own cost, with respect to the adjacent vacant lot
described in the "March _____, 1968" agreement will have the same clean, repaired,
patched and otherwise restored to both a useable and level parking lot before
October 1, 1978; and each will thereafter insure as set forth below, maintain, repair,
restore, and keep said lot in the condition it was when received originally from
the Goldbergs.

5.07  That on or before September 30, 1978 Terry will provide the Goldbergs, as
beneficiaries, in decreasing term or better life insurance policy on Terry's life in an
amount sufficient to satisfy the principal, interest and any collection costs with respect
to the above described promissory note; pay all premiums under said policy, when due;
and require that the insurance company provide the Goldbergs with thirty (30) days notice
of cancellation due to any cause whatsoever; and require that with respect to the
Goldbergs said policy  is   immediately incontestible and if they should prepay any
premium due or past due, it cannot be cancelled until all obligations to the Goldbergs
have been fully performed and all debt to the Goldbergs paid.

## VI.  ADDITIONAL PROVISIONS OF SECURITY AGREEMENT AND OBLIGATION

INITIAL

6.01  ~~May~~ **APRIL** 1, 1978 effective date and initial payments application:  The parties
hereto agree that with respect to the promissory note being extended, that their agree-
ments   reached as of ~~May~~ 1, 1978, and therefore this document shall be effective as
of ~~May~~ 1, 1978.  All installment payments made with respect to the above described
promissory note and due on ~~May~~ 1, 1978, and thereafter, shall be applied and credited
under the terms, provisions, interest rate and conditions of this agreement.  This
initial provision is not deemed a waiver by the Goldbergs or  a  consent by the
Goldbergs to a different due date; it is solely to set up initially performance under
this agreement.



ORIGINAL

6.02 <u>Obligation to insure and maintain insurance</u>: Terry, Tri-County Sales, Inc. and both of them jointly and severally covenant, agree and warrant to insure the collateral herein described, and maintain said insurance at all times this Agreement is in effect, in amounts sufficient to pay the full amount due the Goldbergs under this Agreement; to name the Goldbergs as additional insured under any such policy; to provide that all proceeds shall be first paid to the Goldbergs; to pay for said insurance at their own cost; to meet all conditions of the insurance company so insuring; to require any insurance company so insuring to give the Goldbergs at least thirty (30) days notice before any such policy or policies are cancelled for any reason whatsoever. Terry, Tri-County Sales, Inc. and both of them further warrant to deliver to the Goldbergs or their authorized representative copies of any policies issued under this provision, authorize the Goldbergs to make a claim under any policies issued, to cancel the insurance on default, and to receive payment of, and endorse any instrument in payment of any loss or return in premium.

6.03 <u>Power of Attorney</u>: In addition to the Power of Attorney given to the Goldbergs in connection with the <u>POWER OF SALE</u>, under paragraph 4.07 of this Agreement, Terry, Tri-County Sales, Inc., and each of them irrevocably appoint the Goldbergs, or any one of them, or any one of their successors, assigns or personal representative's attorney-in-fact to do any act which is required of Terry, Tri-County Sales, Inc. or both of them; to exercise such rights as Terry, Tri-County Sales, Inc., or both of them might exercise; to use such equipment as Terry, Tri-County Sales, Inc. or both of them might use; to enter the premises of Tri-County Sales, Inc. to give notice of the Goldbergs security interest in, and right to collect the collateral, and proceeds; and to execute and file in the name of Terry, Tri-County Sales, Inc. or both of their names any Financing Statement and amendments thereto required to perfect the Goldbergs security interest hereunder; or to protect and preserve the collateral and the Goldbergs rights hereunder. This attorney-in-fact grant includes, but is not limited to the express right to:

(a) Endorse, collect and receive delivery or payment of instruments and documents constituting the collateral under this agreement; make extension agreements with respect to or effecting the collateral or exchanges for other collateral; release persons liable thereunder or take security for the payment thereof; and compromise disputes in connection therewith; and

(b) Use or operate collateral for the purpose of preserving collateral or its value, and for preserving or liquidating collateral.

6.04 <u>Joint and Several Liability</u>: The liability of Terry, Tri-County Sales, Inc., and both of them is joint and several. Discharge of any one of them, (except for full payment), or any extension, forebearance, change in rate of interest, or acceptance, release or substitution of collateral or any impairment or suspension of the Goldbergs rights against either or both of them, or any transfer of either or both of their interest to another, shall not effect the liability of the other. Until the debt to the Goldbergs has been completely discharged and the obligations to the Goldbergs have been fully performed, the Goldbergs rights shall continue even if the debt is outlawed. Terry, Tri-County Sales, Inc. and both of them waive:

(a) Any right to require the Goldbergs to proceed against the other before proceeding against them, or to pursue any other remedy;

(b) Presentment, protest and notice of presentment, demand and notice of nonpayment, demand of performance, notice of sale, and advertisement of sale;

(c) Any right to the benefit of, or to direct the application of any collateral, until the debt to the Goldbergs has been completely discharged and the obligations to the Goldbergs has been fully performed; and

(d) Any and all rights of subrogation, until the debt to the Goldbergs has been completely discharged and the obligations to the Goldbergs have been fully performed.

<u>VII.   CLARIFICATION OF LEASES AND LOT LEASE</u>

7.01 The "Lease" described in paragraph 1.02 hereinabove, and not the "March ___, 1988" Agreement is the only lease of real property in effect on the execution date of

-7-

ORIGINAL

this agreement between Floyd R. Baker and Wanda L. Baker, Tri-County Sales, Inc., and their successors and assigns; except the following additional property is added to said lease.  The Goldbergs hereby lease to Terry and Tri-County Sales, Inc., and they lease from the Goldbergs, the vacant lot which is the subject matter of the "March ____, 1968" agreement at a monthly rental of Seventy-Five Dollars ($75.00) per month, due on the first day of each month, starting October 1, 1978.  The term of the lease is from October 1, 1978 to March 31, 1988, upon the same additional other terms as contained in the April 1, 1968 lease for the improved building at 220 West Guiterrez Street, Santa Barbara, California, except:

    1.  The monthly rent shall be increased by $75.00 per month starting October 1, 1978;

    2.  The obligations to maintain, insure and otherwise as set forth in paragraph 5.06 hereinabove are express covenants and conditions of said lease imposed upon Terry, Tri-County Sales, Inc., and both of them to be performed at their own cost.  Which covenants include adding to the insurance policy required of Terry and Tri-County Sales, Inc. public liability, extended coverage and loss of rental income coverage to protect the Goldbergs with respect to said vacant lot; and

    3.  That in the event of impairment of the use of said lot whether by destruction or condemnation, the Goldbergs shall have the right to all proceeds with respect to said vacant lot from the insurance company and all condemnation awards.  Should the Goldbergs take said proceeds or condemnation awards and more than 50% of said lot is not available for use by Terry, Tri-County Sales, Inc. and both of them either the Goldbergs, at their sole option, or Terry at his sole option, or Tri-County at his sole option, may cancel the lease with respect to the vacant lot upon thirty (30) days written notice to the other parties to this lease; and

    4.  The $75.00 per month additional rent shall not be increased by any tax increase on said vacant lot, but in the event pro rata portion of any taxes, liens and other governmental charges exceeds $75.00 per month, the Goldbergs are hereby given the option, at their sole discretion, to terminate this lease upon thirty days notice if Terry, Tri-County Sales, Inc. or both of them do not agree to pay as additional rent the liens, taxes and other governmental charges against the vacant lot.

    7.02  That Terry, as a duly authorized and proper successor under the lease described in Section 7.01 above has pursuant to that lease with the implied permission given pursuant to the terms of the lease, renewed the same for a ten (10) year period, ending on the thirty-first (31st) day of March, 1988; with rent reserved for said renewed term in the amount of One Hundred Eight Thousand Dollars ($108,000.00) plus any increase in real property taxes as provided in said lease; payable in installments of Nine Hundred Dollars ($900.00) per month plus ~~assessment, lien and cost of~~ any tax increase, on the first day of each month starting April 1, 1978.

    7.03  The restrictions set forth in the "March ___,1968" agreement on the use of the leased premises have been, and are a part of said lease described in Section 7.01 hereinabove.

    7.04  Under paragraph "7" of said lease the landlords obligations are to keep and maintain only the exterior walls and roof; and the other maintenance obligations set forth in said paragraph "7" of said lease are the sole obligations of the lessee, and at the lessee's cost.

    7.05  That due to unanticipated economic conditions the present rent reserved to the landlords is insufficient to pay the present market value of the same or similar rental space; therefore:

      (A)  Each party to this agreement expressly agrees that time is specifically reaffirmed as being of the essence in the payment of installment rent payments; and should any installment payment of the rent reserved under the lease be paid after ten (10) days from the first of each month the full amount of the balance of the rent due shall automatically become due and payable on the eleventh day after default of any one installment rent payment; and

-8-

ORIGINAL

(B) In the event of condemnation of a whole or part of the leased premises, loss or destruction of the whole or part of the leased premises, the parties agree that the value of the loss of rental income with respect to the landlords shall be, and is the greater amount of:  market rental value or rent reserved in the lease.

7.06  The lessees obligation under the above described lease with respect to insurance to be provided to the lessor includes, among other things set forth in said lease:

(A) An all risk form of fire, extended coverage, loss of rental income, and public liability coverage in which the lessors are named as additional insured; and in which is also coverage against the same risks, the lessees inventory; and

(B) The above coverage shall obtain from an insurance company rated in the BEST'S INSURANCE GUIDE OF AAA (Triple A) or better.

## VIII.  DEFAULT AND REMEDIES

8.01  The failure of Terry, Tri-County Sales, Inc., or both of them to perform any of the covenants, conditions or promises set forth under any agreement incorporated by reference herein, shall constitute a default under this agreement.  In addition to the foregoing, default is further defined as any malfeasance, misfeasance or nonfeasance that at law or equity is determined breach of a lease of real property.

8.02  In the event of a default, and without notice or demand, and in addition to all the rights and the remedies given to the Goldbergs, they may, but are not required to, exercise one or more of the following remedies:

(A) Declare without demand or presentment that the entire indebtedness is immediately due and payable, and all obligations are to be immediately performed.

(B) Notify other interesting persons or entities of the default, acceleration and other action of the Goldbergs and take control of the collateral and its proceeds to which the Goldbergs are entitled.

(C) Exercise all rights and set off to the same effect and in the same manner as a Bank may do under its Banker's lien and set off rights.

(D) Sue Terry, Tri-County Sales, Inc. or any other party liable on the indebtedness and/or obligations, and foreclose and otherwise enforce any security interest given in this agreement, by any available judicial process; Terry and Tri-County Sales, Inc., jointly and severally are to be liable for any remaining deficiency.

(E) Retain the collateral in full satisfaction of the obligations and indebtedness set forth in this agreement.

(F) Publicly or privately sell, lease or otherwise dispose of the collateral, and apply the proceeds to:  the reasonable expense of retaking, holding, preparing for sale and selling the collateral, plus attorney's fees, legal expenses and cost incurred by the Goldbergs in exercise of their rights under this agreement, plus the indebtedness and obligations under this agreement; a deficiency, if any, is determined by substracting from the net proceeds of any sale, the items described at the beginning of this sentence--any amount remaining unpaid to the Goldbergs, shall be deemed a deficiency.  Legal expenses include attorney's fees and other costs expended in the exercise of any right or any power under this agreement.

## IX.  NOTICE OF INTENDED SECURITY INTEREST AGREEMENT

upon the written request of the Goldbergs,

9.01  It is hereby covenanted and agreed that/Terry and Tri-County Sales, Inc. will execute and cause to be published pursuant to CALIFORNIA COMMERCIAL CODE Section 6.101-- notice of intended security interest agreement in the form as set forth on Attachment "E" hereof; which attachment is expressly hereat incorporated by reference.

## X.  GENERAL PROVISIONS

10.01  Terry and Tri-County Sales, Inc. each warrant, represent and covenant that they are duly authorized to act with respect to the subject matter of this agreement.

ORIGINAL
-9-

10.02  Any notices, requests, demand or other communications required or permitted hereunder shall be deemed to be properly given when deposited in the United States Postal Service, postage prepaid, or when deposited with a public utility company for transmittal, charges prepaid, addressed:

       (A) With  respect to the Goldbergs: Mr. and Mrs. Al Goldberg, 8756 C - 513 Marin Circle, Huntington Beach, California 92646  ; and, Mr. and Mrs. Al Goldberg, c/o S. David Schwartz, P.O. Box 30190, Santa Barbara, California 93105; or to such other person or address as the Goldbergs may from time to time furnish to Terry and Tri-County Sales, Inc. for this express purpose.

       (B) In the case of Terry and Tri-County Sales, Inc.:  Mr. Terrance George, Tri-County Sales, Inc., 220 West Gutierrez Street, Santa Barbara, California              ; or to such other person or address as either guarantor may from time to time furnish to the Goldbergs, for this express purpose.

10.03  This agreement shall inure to the benefit of, and be binding upon the respective heirs, assigns, successors and personal representatives of each of the parties herein.

10.04  With respect to the "lease" described in Article "VII" of this Agreement, any provision of this document that shall amend or change said lease, shall be deemed controlling and the lease amended or changed as provided in this agreement with respect to the rights and obligations between the Goldbergs, on one hand, and Terry and Tri-County Sales, Inc. on the other hand.

10.05  Each provision of this agreement required to be performed by Terry or Tri-County Sales, Inc. or both shall be deemed both a covenant and a condition.  The invalidity of any portion of this document shall not prevent the remainder from being carried into effect.  Whenever the context of any provision of this document requires it, the singular shall be held to include the plural number, and visa versa; and the use of any gender shall, in the appropriate context, include any other or all genders. The articles and section headings in this document are for convenience only, and do not constitute a part of the provisions herein.  No oral modification of, or amendment to, this document shall be effective.  This document and the agreements contained herein, shall be modified or amended only by written agreement signed by all of the parties.  A waiver by the Goldbergs of a failure to comply by Terry, Tri-County Sales, Inc. or both with any of the covenants, terms, conditions or warranties contained in this agreement shall not be construed as a waiver of any subsequent failure of compliance by Terry, Tri-County Sales, Inc. of the same or other covenants, terms, conditions or warranties herein contained.

THIS DOCUMENT consists of ten (10) pages    , plus attachments "A" through "E ", inclusive, has been executed by the parties hereto and two (2) original counterparts, at Santa Barbara, California on this ?? day of September, 1978; and is deemed effective as of ??1, 1978. **APRIL**

"Goldberg"                                Tri-County Sales, Inc.


_Al Goldberg_                             By _____
Al Goldberg                                  Terrance George, President

"Goldberg"                                "Terry"


_Betty Goldberg_                          _____
Betty Goldberg                            Terrance George

ATTACHMENT "A"


An express part of this agreement is that lease originally executed in
duplicate in Santa Barbara, California on April 1, 1976, between Al Goldberg
and Betty Goldberg, husband and wife, and Floyd R. Baker and Wanda L. Baker,
husband and wife, and Tri-County Sales, Inc., a California Corporation, and
all amendments and modifications thereto (including any amendments, modifications
and changes contained in the loan extension, lease clarification, and security
agreement between Terry George and Tri-County Sales, Inc. and Al and Betty
Goldberg effective May 1, 1978 to which this Exhibit is attached); said lease
is expressly hereat also incorporated by reference.  A true copy of this
Exhibit "A" shall be attached to said lease for the purposes of referring to
the additional documents that constitute said lease as of May 1, 1978.




ATTACHMENT "B"


The four (4) parking spaces described in attachment "A", above are
hereby designated by the parties to be commonly described as follows:

Space for four (4) common-size cars in the portion of the paved parking
lot fronting on Gutierrez Street     between the leased building and the
next and  subsequent parcels adjacent to the freeway. Said four  parking spaces
are located  in a rectangle that ends at the back lateral support of the side
door of the leased building; and may be further defined by a chain link fence
across the back and smaller  line  of the rectangle. One of the four parking
spaces is the covered, but open on two sides, space in the leased building.
A second of the four parking spaces is the open space between the partially
covered parking space and the front of the leased building.  The other four
parking spaces are located in the rest of the rectangle.  Ingress and egress
to the side door and the four parking spaces is only from Gutierrez Street,
and is shared with any use of the rest of the paved parking lot.



INITIAL

ORIGINAL

ATTACHMENT "C"

## NEGOTIABLE AND INSTALLMENT PROMISSORY NOTE

$48,509.92

Santa Barbara, California

In installments, and at the times hereinafter stated, for value received Terrance George, individually and doing business as Tri-County Sales, Inc., and Tri-County Sales, Inc., a California Corporation, jointly and severally promise to pay to Al and Betty Goldberg, husband and wife, or Order, at Santa Barbara, California the principal sum of Forty Eight Thousand Five Hundred Nine and 92/100 Dollars ($48,509.92) with interest from April 1, 1978 on amounts of principal remaining from time to time unpaid, until said principal sum is paid, at the rate of 9.25%, per annum.  Principal and interest due in monthly installments of Eight Hundred Dollars ($800.00) or more, on the first day of each and every month, beginning on the first day of April, 1978, and continuing until said principal sum and interest thereon has been fully paid.

At any time, the privilege is reserved to pay more than the sum due.  Each installment, when paid, shall be first applied to the payment of accrued interest, the next applied to the payment of interest for that month, and then last applied to payment of the principal sum.

This Note shall be attached to the original promissory note dated March 14, 1978 for One Hundred Five Thousand Eight Hundred Sixty-Four and 63/100 Dollars ($105,864.63) by Floyd N. Baker and Wanda L. Baker, husband and wife, to Al and Betty Goldberg; which other promissory note also bears a balance due on April 1, 1978 of Forty Eight Thousand Five Hundred Nine and 92/100 Dollars ($48,509.92).  A sale, transfer assignment or other dealing with this promissory note, shall also include said attached promissory note, except the holder of this promissory note may at his option, enforce this promissory note, enforce the other promissory note, or both.  In the event of full payment of either this promissory note, or the other note, the obligations under both promissory notes shall be deemed fully paid.

If default be made in any payment of this promissory note when due, then the whole sum of the principal and interest shall become immediately due and payable without notice, and at the option of the holder of this promissory note.  In the event of the commencement of suit to enforce payment of this promissory note, that sum as the Court may deem reasonable shall be added hereto for attorney's fees, costs of collection, and all court costs.  The attachment of the other promissory note to this promissory note, shall not impair the negotiability of either this promissory note or the other promissory note, so long as both promissory notes are transferred at the same time, to the same holder.

INITIAL

Terrance George

Tri-County Sales, Inc.

By_____
        Terrance George, President

ORIGINAL

ATTACHMENT "D"

## SECURITY INTEREST GRANTED

Terry, individually, and doing business as Tri-County Sales, Tri-County Sales, Inc., a California Corporation, and both of them, jointly and severally hereby grant a security interest to Al and Betty Goldberg, in and to the following described collateral:

All inventory, equipment, parts, accessories, accessions appliances, appurtenances, leasehold improvements, replacements thereto, increases thereof, proceeds from, and products of, now or hereafter owned by Terrance George doing business as Tri-County Sales, Tri-County Sales, Inc., a California Corporation, and both, whether now located at 220 West Gutierrez Street, Santa Barbara, California or subsequently wherever located, and whether now or hereafter existing; including, but expressly not limited to the additional specific collateral described in the continuation financing statement filed against Tri-County Sales, Inc., and Tri-County Sales previous to the date hereof.



ORIGINAL