JOSEPH B. ADAMS, ESQ. (SBN 194964)
jadams@behblaw.com
MY-LIHN T. LE, ESQ. (SBN 287351)
mtle@behblaw.com
BASSI, EDLIN, HUIE & BLUM LLP
500 Washington Street, Suite 700
San Francisco, CA 94111
Telephone:   (415) 397-9006
Facsimile:   (415) 397-1339

Attorneys for Defendant
DONALD J. GEORGE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF BETTY GOLDBERG, Deceased and ESTATE OF AL GOLDBERG, Deceased, by and through their successor in interest, Daniel Rubin, | Case No. 5:14-cv-01872 |
| Plaintiffs, | **DONALD GEORGE'S CROSS-CLAIM AGAINST ALL OTHER NAMED DEFENDANTS** |
| vs. | |
| GOSS-JEWETT COMPANY, INC., et al., | |
| Defendants. | |
| DONALD GEORGE, | |
| Cross-Claimant, | |
| GOSS-JEWETT COMPANY, INC. a/k/a TRI-COUNTY SALES, INC., a suspended California corporation; ARTHUR P. ARNS; ESTATE OF ROBERT W. SCHACK, DECEASED; ESTATE OF BENJAMIN F. FORHMAN, DECEASED; DAROLD E. MERRITT; JAMES W. ROSS; and ESTATE OF TERRENCE J. GEORGE a/k/a TERRY GEORGE, DECEASE, | |
| Cross-Defendants | |

1106927

Defendant and Cross-Claimant, <u>DONALD J. GEORGE</u> ("DONALD GEORGE") brings this Cross-Claim against Defendants <u>GOSS-JEWETT COMPANY, INC.</u> a/k/a <u>TRI-COUNTY SALES, INC.</u>, a suspended California Corporation; <u>ARTHUR P. ARNS</u>; <u>ESTATE OF ROBERT W. SCHACK,</u> DECEASED; <u>ESTATE OF BENJAMIN F. FORHMAN</u>, DECEASED; <u>DAROLD E. MERRITT</u>; <u>JAMES W. ROSS</u>; and <u>ESTATE OF TERRENCE J. GEORGE a/k/a TERRY GEORGE</u>, DECEASED (collectively, "CROSS-DEFENDANTS") pursuant to Rule 13 of the Federal Rules of Civil Procedure, as follows:

## DESCRIPTION OF ACTION

1.      On September 18, 2014, PLAINTIFFS filed in the United States District Court for the Central District of California, Case No. 5:14-cv-01872, a complaint against several defendants relating to Goss-Jewett Company, Inc., seeking recovery, pursuant to the Federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607 and 9613, and Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a), and various state law claims ("COMPLAINT" and "Underlying Action"). A true and correct copy of the COMPLAINT, dated September 8, 2014, is attached hereto as Exhibit A.

2.      Without admitting any of the allegations except as set forth in DONALD GEORGE's Answer to PLAINTIFFS' Complaint, DONALD GEORGE incorporates herein the COMPLAINT filed in the Underlying Action, for the sole purpose of setting forth the allegations of PLAINTIFFS to which these Cross-Claims relate.

3.      DONALD GEORGE denies that he is liable to PLAINTIFFS and denies that PLAINTIFFS are entitled to any relief against DONALD GEORGE as requested or otherwise.

4.      DONALD GEORGE's Cross-Claim is being filed and served in accordance with Rule 13 of the Federal Rules of Civil Procedure.

1106927

DONALD GEORGE'S CROSS-CLAIM

## GENERAL ALLEGAIONS

5.     At all times mentioned herein, DONALD GEORGE was and now is an individual residing in the State of California.

6.     DONALD GEORGE is informed and believes and thereon alleges that PLAINTIFFS and CROSS-DEFENDANTS ESTATE OF BETTY GOLDBERG, Deceased, and THE ESTATE OF AL GOLDBERG, Deceased ("PLAINTIFFS") were, while alive, the owners of certain real property located at 220 W. Gutierrez Street, Santa Barbara, California ("the Site").

7.     DONALD GEORGE is informed and believes and thereon alleges that CROSS-DEFENDANT GOSS-JEWETT COMPANY, INC. a/k/a TRI-COUNTY SALES, INC., ("GOSS-JEWETT") is a suspended California corporation that operated the dry cleaning supply business at the Site, and was also PLAINTIFFS' lessee.

8.     DONALD GEORGE is informed and believes and thereon alleges that CROSS-DEFENDANT ARTHUR P. ARNS ("ARNS") was the President of GOSS-JEWETT, and also PLAINTIFFS' lessee of the Site.

9.     DONALD GEORGE is informed and believes and thereon alleges that CROSS-DEFENDANT ESTATE OF ROBERT W. SCHACK, DECEASED, ("SCHACK") is named as a defendant in the COMPLAINT to the extent of his estate's assets whether distributed or undistributed and pursuant to California Probate Code §§ 550 through 555. DONALD GEORGE is further informed and believes and thereon alleges that SCHACK was an officer, director, and shareholder of GOSS-JEWETT and also PLAINTIFFS' lessee of the Site.

10.     DONALD GEORGE is informed and believes and thereon alleges that CROSS-DEFENDANT ESTATE OF BENJAMIN F. FORHMAN, DECEASED ("FORHMAN") is named as a defendant in the COMPLAINT to the extent of his estate's assets whether distributed or undistributed and pursuant to California Probate Code §§ 550 through 555. DONALD GEORGE is further

1106927

informed and believes and thereon alleges that FORHMAN was an officer, director, and shareholder of GOSS-JEWETT and also PLAINTIFFS' lessee of the Site.

11. DONALD GEORGE is informed and believes and thereon alleges that CROSS-DEFENDANT DAROLD E. MERRITT ("MERRITT") was an officer, director, and shareholder of GOSS-JEWETT and also PLAINTIFFS' lessee of the Site.

12. DONALD GEORGE is informed and believes and thereon alleges that CROSS-DEFENDANT JAMES W. ROSS ("ROSS") was an officer, director, and shareholder of GOSS-JEWETT and also PLAINTIFFS' lessee of the Site.

13. DONALD GEORGE is informed and believes and thereon alleges that CROSS-DEFENDANT ESTATE OF TERRENCE J. GEORGE, DECEASED ("TERRY GEORGE") is named as a defendant in the COMPLAINT to the extent of his estate's assets whether distributed or undistributed and pursuant to California Probate Code §§ 550 through 555. DONALD GEORGE is further informed and believes and thereon alleges that TERRY GEORGE was an officer, director, and shareholder of GOSS-JEWETT and also PLAINTIFFS' lessee of the Site.

## JURISDICTION

14. This Court has jurisdiction over the Underlying Action, accordingly it also has jurisdiction over these Cross-Claims, which arise out of the same transaction or occurrences.

15. Jurisdiction over this Cross-Claim is also based on 28 U.S.C. Section 1331 and on 42 U.S.C. section 9613(b). This suit is brought under CERCLA and RCRA. Jurisdiction of state law claims is based upon 28 U.S.C. Section 1367(a). These state law claims are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

1106927

DONALD GEORGE'S CROSS-CLAIM

16.     If DONALD GEORGE is found liable to PLAINTIFFS, all CROSS-DEFENDANTS and each of them are jointly liable or jointly and severally liable with DONALD GEORGE to PLAINTIFFS for PLAINTIFFS' damages as alleged in the Underlying Action.

## VENUE

17.     Venue is proper in this Court pursuant to 28 U.S.C. section 1391(b) and 42

U.S.C. section 9613(b) because the alleged acts and omissions relate to hazardous waste and hazardous substances in the environment and emanating from real property situated in Santa Barbara, California, which is part of this District.

## FACTUAL ALLEGATIONS

18.     The area for which PLAINTIFFS seek relief is the real property located at 220 W. Gutierrez Street, Santa Barbara, California ("the Property"), and areas to which the alleged contamination has migrated ("Site").

19.     PLAINTIFFS allege in the COMPLAINT that a dry cleaning supply business operated on the Property. Therefore, on information and belief DONALD GEORGE also alleges that a dry cleaning supply business operated on the Property.

20.     PLAINTIFFS allege in the COMPLAINT that PLAINTIFFS were the owners and lessors of the Property. Therefore, on information and belief DONALD GEORGE also alleges that PLAINTIFFS were the owners and lessors of the Property.

21.     PLAINTIFFS allege in the COMPLAINT that PLAINTIFFS have undertaken environmental investigations at the Site.

22.     PLAINTIFFS allege in the COMPLAINT that the Site is a "facility" as defined by CERCLA.  Therefore, on information and belief, DONALD GEORGE also alleges that the Site is a "facility" as defined by CERCLA.

1106927

23.     DONALD GEORGE informed and believes, and on that basis alleges, that PLAINTIFFS and each of them is a "person," as that term is defined in 42 U.S.C. § 9601(21).

24.     DONALD GEORGE is informed and believes, and on that basis alleges, that PLAINTIFFS and each of them is an "owner and operator" as that term is defined in 42 U.S.C. § 9601(20), of the Site and that hazardous substances have been disposed at the Site during PLAINTIFFS' ownership.

25.     PLAINTIFFS allege in the COMPLAINT that operations at the Site led to the "release" or "threatened release," as that term is defined in 42 U.S.C. § 9601(22), of "hazardous substances," as that term is defined in 42 U.S.C. § 9601(14), to the soil and groundwater underlying the Site.  Therefore, on information and belief DONALD GEORGE also alleges that operations at the Site led to the "release" or "threatened release," as that term is defined in 42 U.S.C. § 9601(22), of "hazardous substances," as that term is defined in 42 U.S.C. § 9601(14), to the soil and groundwater underlying the Site.

26.     As a result of this alleged release or threatened release, DONALD GEORGE may incur response costs for remediation at the Site

27,     PLAINTIFFS allege in the COMPLAINT that GOSS-JEWETT COMPANY, INC. a/k/a TRI-COUNTY SALES, INC., a suspended California Corporation; ARTHUR P. ARNS; ESTATE OF ROBERT W. SCHACK, DECEASED; ESTATE OF BENJAMIN F. FORHMAN, DECEASED; DAROLD E. MERRITT; JAMES W. ROSS; and ESTATE OF TERRENCE J. GEORGE a/k/a TERRY GEORGE, DECEASED (collectively, "CROSS-DEFENDANTS") caused or contributed to the past or present handling, storage, treatment, transportation, generation, release, or disposal of hazardous substances, hazardous wastes, and/or solid wastes in the environment in, at, and around the Site, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the waters of the sate of California, because each CROSS-DEFENDANT released or

otherwise discarded hazardous substances hazardous wastes, and/or solid wastes, or controlled and/or operated the Property and business from which hazardous substances, hazardous wastes, and/or solid wastes were released or otherwise discarded, and failed to prevent or abate the hazardous substance, hazardous waste, and/or solid waste contamination. Therefore, on information and belief DONALD GEORGE also alleges that GOSS-JEWETT COMPANY, INC. a/k/a TRI-COUNTY SALES, INC., a suspended California Corporation; ARTHUR P. ARNS; ESTATE OF ROBERT W. SCHACK, DECEASED; ESTATE OF BENJAMIN F. FORHMAN, DECEASED; DAROLD E. MERRITT; JAMES W. ROSS; and ESTATE OF TERRENCE J. GEORGE a/k/a TERRY GEORGE, DECEASED (collectively, "CROSS-DEFENDANTS") caused or contributed to the past or present handling, storage, treatment, transportation, generation, release, or disposal of hazardous substances, hazardous wastes, and/or solid wastes in the environment in, at, and around the Site, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the waters of the sate of California, because each CROSS-DEFENDANT released or otherwise discarded hazardous substances hazardous wastes, and/or solid wastes, or controlled and/or operated the Property and business from which hazardous substances, hazardous wastes, and/or solid wastes were released or otherwise discarded, and failed to prevent or abate the hazardous substance, hazardous waste, and/or solid waste contamination.

28.    PLAINTIFFS allege in the COMPLAINT that at various times from 1968 to 1991 CROSS-DEFENDANTS negligently, suddenly, and accidentally caused or contributed to the presence of hazardous substances, hazardous wastes, and/or solid wastes in the environment, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the waters of the sate of California, at the Site. PLAINTIFFS further allege that once released into the environment, these hazardous substances, hazardous wastes, and/or solid wastes continued to spread and migrate in the environment at the Site, and that CROSS-DEFENDANTS failed

1    to abate this contamination.  Therefore, on information and belief DONALD

2    GEORGE also alleges that that at various times from 1968 to 1991 CROSS-

3    DEFENDANTS negligently, suddenly, and accidentally caused or contributed to

4    the presence of hazardous substances, hazardous wastes, and/or solid wastes in the

5    environment, including soil, land, subsurface strata, air, vapor, groundwater,

6    surface water, and the waters of the sate of California, at the Site.  DONALD

7    GEORGE further allege that once released into the environment, these hazardous

8    substances, hazardous wastes, and/or solid wastes continued to spread and migrate

9    in the environment at the Site, and that CROSS-DEFENDANTS failed to abate this

10   contamination.

11        29.    PLAINTIFFS alleged in the COMPLAINT that as a result of CROSS-

12   DEFENDANTS' releases of hazardous substances, hazardous wastes, and/or solid

13   wastes at the Site, PLAINTIFFS have incurred and will continue to incur response

14   costs in order to investigate and remediate the contamination.  Therefore, on

15   information and belief DONALD GEORGE also alleges that as a result of

16   CROSS-DEFENDANTS' releases of hazardous substances, hazardous wastes,

17   and/or solid wastes at the Site, PLAINTIFFS brought action against DONALD

18   GEORGE, as alleged in the COMPLAINT, for response costs that PLAINTIFFS

19   allegedly incurred and allegedly will continue to incur in order to investigate and

20   remediate the contamination.

21

22        **FIRST CLAIM FOR RELIEF AGAINST CROSS-DEFENDANTS**

23          (CONTRIBUTION PURSUANT TO CERCLA SECTION 113)

24               **(Against all Cross-Defendants)**

25        30.    DONALD GEORGE refers to and incorporates herein by reference

26   Paragraphs 1 through 29 of this Cross-Claim as though fully set forth herein.

27        31.    DONALD GEORGE did not contribute the alleged contamination at

28   the Site.

1106927

32.   DONALD GEORGE is informed and believes and thereon alleges that the alleged contamination to the Site was contributed to or caused by the acts or omissions of CROSS-DEFENDANTS and each of them.

33.   To the extent any party has incurred recoverable response costs pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), and asserts liability for some or all of those costs against DONALD GEORGE pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), or asserts a contribution claim against DONALD GEORGE for such costs incurred by another party pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), DONALD GEORGE is entitled to one hundred percent (100%) contribution, or contribution in such other percentage as this Court deems appropriate, pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), from CROSS-DEFENDANT and each of them.

## SECOND CLAIM FOR RELIEF AGAINST CROSS-DEFENDANTS

### (Contractual Indemnity)

### (Against all Cross-Defendants)

34.   DONALD GEORGE refers to and incorporates herein by reference Paragraphs 1 through 33 of this Cross-Claim as though fully set forth herein.

35.   CROSS-DEFENDANTS entered into indemnity agreements that require them to hold harmless and indemnify and defend DONALD GEORGE.

36.   DONALD GEORGE demanded that CROSS-DEFENDANTS indemnify DONALD GEORGE for the hazardous substance, hazardous waste, and/or solid waste contamination alleged in the COMPLAINT, and hereby reiterates that demand.

37.   CROSS-DEFENDANTS and each of them failed to defend or indemnify DONALD GEORGE.

38.   As a direct and proximate result of CROSS-DEFENDANTS' failure to indemnify DONALD GEORGE, DONALD GEORGE, has been damaged and will continue to suffer damages, including attorneys' fees, expert witness fees, and

1106927

1  emotional distress.

2  ### THIRD CLAIM FOR RELIEF AGAINST CROSS-DEFENDANTS

3  #### (Declaratory Relief under Federal Law)

4  #### (Against all Cross-Defendants)

5  39.    DONALD GEORGE refers to and incorporates herein by reference

6  Paragraphs 1 through 38 of this Cross-Claim as though fully set forth herein.

7  40.    DONALD GEORGE is entitled to and hereby seeks a declaratory

8  judgment, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), of CROSS-

9  DEFENDANTS' liability to DONALD GEORGE all Response Costs incurred or

10 to be incurred by DONALD GEORGE for the Site and for responding to the

11 Releases and threatened Releases of wastes and adverse environmental

12 consequences at issue herein.

13 41.    DONALD GEORGE is entitled to, and hereby seeks, a judicial

14 determination pursuant to the Federal Declaratory Relief Act, 28 U.S.C. § 2201, of

15 DONALD GEORGE's right to reimbursement from and indemnification by

16 CROSS-DEFENDANTS, and each of them, for all costs, jointly and severally,

17 which DONALD GEORGE may incur resulting from CROSS-DEFENDANTS'

18 contribution to Release of wastes into the environment.

19 ### FOURTH CLAIM FOR RELIEF AGAINST CROSS-DEFENDANTS

20 #### (Declaratory Relief Under State Law)

21 #### (Against all Cross-Defendants)

22 42.    DONALD GEORGE refers to and incorporates herein by reference

23 Paragraphs 1 through 41 of this Cross-Claim as though fully set forth herein.

24 43.    DONALD GEORGE is informed and believes, and on that basis

25 alleges, that all legal liability, whether arising from federal or state statutory law,

26 or from common law, which may in the future be asserted by any entity or

27 individual, arising from or related to the contamination of and at the Site, as

28 alleged, is the sole and actual and/or joint and several liability of CROSS-

1106927

DEFENDANTS.  Therefore, DONALD GEORGE is entitled to a judicial declaration that PLAINTIFFS and CROSS-DEFENDANTS are liable to indemnify DONALD GEORGE for all future damages and costs that may be suffered by DONALD GEORGE as a result of the contamination at the Site or, in the alternative, that PLAINTIFFS and CROSS-DEFENDANTS are liable to contribute to and reimburse DONALD GEORGE for such damages and costs including, without limitation, costs or damages awarded in legal or administrative actions, costs of compliance with any judicial or administrative order, and costs of litigation including attorneys' fees.

## FIFTH CLAIM FOR RELIEF AGAINST CROSS-DEFENDANTS

### (Equitable Indemnification)

### (Against all Cross-Defendants)

44.     DONALD GEORGE refers to and incorporates herein by reference Paragraphs 1 through 41 of this Cross-Claim as though fully set forth herein.

45.     As a direct and proximate result of CROSS-DEFENDANTS' acts or omissions, DONALD GEORGE has been required to act in the protection of his own interests by defending against the COMPLAINT filed in this action and by bringing this Cross-Claim.

46.     DONALD GEORGE is without fault with respect to the matters alleged in the COMPLAINT and any other claim or action arising directly or indirectly from the alleged contamination of the soil and/or groundwater in, at, around, and underlying the Site.  To the extent DONALD GEORGE has any liability for any relief sought in any judicial or administrative proceedings brought against them by any persons or entities with regard to the alleged contamination of the soil and/or groundwater in, at, around, and underlying the Site, including without limitation, the pending COMPLAINT, such liability is purely secondary, imputed, vicarious or technical, and primary liability attaches to CROSS-DEFENDANTS and is attributable to CROSS-DEFENDANTS' acts or omissions.

1106927

DONALD GEORGE'S CROSS-CLAIM

47.     DONALD GEORGE is informed and believes and thereon further alleges that CROSS-DEFENDANTS are responsible to indemnify DONALD GEORGE for any liability arising from CROSS-DEFENDANTS' acts or omissions.  DONALD GEORGE further alleges that the liabilities of CROSS-DEFENDANTS are either total or partial.  If total, DONALD GEORGE is entitled to total indemnity from CROSS-DEFENDANTS for any liability that may be assessed against DONALD GEORGE arising directly or indirectly from contamination of the soil and/or groundwater in, at, around, and underlying the Site.  If partial, CROSS-DEFENDANTS are in some manner partially responsible for said liability and in equity must reimburse DONALD GEORGE for any liability assessed by the Court, based on CROSS-DEENDANTS' fault for the alleged liability arising directly or indirectly from contamination of the soil and/or groundwater in, at, around, and underlying the Site.

## SIXTH CLAIM FOR RELIEF AGAINST CROSS-DEFENDANTS

### (Contribution)

### (Against all Cross-Defendants)

48.     DONALD GEORGE refers to and incorporates herein by reference Paragraphs 1 through 47 of this Cross-Claim as though fully set forth herein.

49.     DONALD GEORGE denies all liability with respect to the alleged contamination of the soil and/or groundwater in, at, around, and underlying the Site.  However, PLAINTIFFS have alleged that DONALD GEORGE is liable under a variety of legal theories.  To the extent that DONALD GEORGE may have any liability for any relief sought in any judicial or administrative proceedings brought against it in by any persons or entities with regard to contamination of the soil and/or groundwater in, at, around and underlying the Site, including without limitation, PLAINTIFFS' COMPLAINT, CROSS-DEFENDANTS are liable to DONALD GEORGE for contribution for all costs, expenses or damages incurred or awarded in legal or administrative actions, clean-up costs, attorneys' fees and

1106927

1   consultants' fees, and costs of litigation.

## SEVENTH CLAIM FOR RELIEF AGAINST CROSS-DEFENDANTS

### (Negligence)

### (Against all Cross-Defendants)

50.   DONALD GEORGE refers to and incorporates herein by reference Paragraphs 1 through 49 of this Cross-Claim as though fully set forth herein.

51.   CROSS-DEFENDANTS and each of them had a duty of care not to dispose of its wastes in a negligent manner so as to damage the Property or the Site.

52.   DONALD GEORGE is informed and believes, and thereon alleges, that CROSS-DEFENDANTS, and each of them, negligently disposed of wastes, or allowed such Disposal, so as to cause the contamination of the Site and the environment, including the surface and sub-surface soils at and groundwater beneath and adjacent to the Site.  This harm was reasonably foreseeable to CROSS-DEFENDANTS, and each of them.

53.   DONALD GEORGE is informed and believes, and thereon alleges, that CROSS-DEFENDANTS' acts and omissions in managing and maintaining the Site were negligent; that these same acts and omissions proximately caused contamination of the soil and groundwater in, at, around, and underlying the Site; that these same acts and omissions have exacerbated and increased the cost of remediating said contamination; and that CROSS-DEFENDANTS, for these reasons, breached its duty to DONALD GEORGE.

54.   As a result of CROSS-DEFENDANTS' acts and/or omissions DONALD GEORGE has been damaged as alleged herein

## PRAYER

WHEREFORE, DONALD GEORGE prays as follows:

1.   For contribution under CERCLA section 113(f), 42 U.S.C. section

1106927

1  9613(f), from PLAINTIFFS, if the Court concludes that DONALD GEORGE is

2  liable under CERCLA;

3      2.      For recovery from CROSS-DEFENDANTS for all response costs that

4  will be incurred by DONALD GEORGE in response to the release and threatened

5  release of hazardous substances at the Site and in the enforcement of CERCLA's

6  statutory liability scheme, according to proof at trial;

7      3.      For a declaration that PLAINTIFFS and CROSS-DEFENDANTS are

8  obligated to pay to DONALD GEORGE all future response costs and any other

9  costs incurred by DONALD GEORGE hereafter in response, removal or

10  remediation efforts incurred;

11      4.      For incidental and consequential damages according to proof;

12      5.      For pre-judgment interest at the legal rate;

13      6.      For all costs of suit incurred herein;

14      7.      For injunctive relief, as appropriate;

15      8.      For such other and further relief as this Court deems just and proper.

18  Date:   December 10, 2014        BASSI, EDLIN, HUIE & BLUM LLP

20  By:

21

22  JOSEPH B. ADAMS
   Attorneys for Cross-Claimant
23  DONALD J. GEORGE

1106927

# EXHIBIT *A*

**DONALD GEORGE'S CROSS-CLAIM AGAINST ALL OTHER**

**NAMED DEFENDANTS**

1   Bret A. Stone  SBN 190161  BStone@PaladinLaw.com
2   PALADIN LAW GROUP® LLP
3   W. Carrillo Street, Suite 212
3   Santa Barbara, CA  93101
4   Telephone:  (805) 898-9700
    Facsimile:   (805) 852-2495
5
6   Counsel for Estate of Betty Goldberg, Deceased and
    Estate of Al Goldberg, Deceased, by and through their
7   successor in interest, Daniel Rubin

8               UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10  ESTATE OF BETTY GOLDBERG,          Case No.
11  DECEASED and ESTATE OF AL
    GOLDBERG, DECEASED, by and         COMPLAINT FOR:
12  through their successor in interest,
    Daniel Rubin,                      1.   Cost Recovery under CERCLA §
13                                           107(a)
          Plaintiffs,                  2.   Waste
14                                     3.   Breach of Lease
                 v.                    4.   Contractual Indemnification
15                                     5.   Negligence
    GOSS-JEWETT COMPANY, INC.          6.   Abatement of a Public and Private
16  a/k/a TRI-COUNTY SALES, INC., a         Nuisance
    suspended California Corporation;   7.   Trespass
17  ARTHUR P. ARNS; ESTATE OF          8.   Contribution under the Hazardous
    ROBERT W. SCHACK,                       Substance Account Act
18  DECEASED; ESTATE OF                9.   Contribution under CERCLA §
    BENJAMIN F. FOHRMAN,                    113(f)
19  DECEASED; DONALD J. GEORGE;        10.  Abatement of an Imminent and
    DAROLD E. MERRITT; JAMES W.             Substantial Endangerment RCRA
20  ROSS; and ESTATE OF TERRENCE           § 7002(a)(1)(B)
    J. GEORGE a/k/a TERRY GEORGE,      11.  Ultrahazardous Activity
21  DECEASED,                          12.  Equitable Indemnity
                                       13.  Bus. & Prof. Code § 17200
22        Defendants.                  14.  Declaratory Relief

23                                     Jury Trial Demanded

24        Plaintiffs Estate of Betty Goldberg, Deceased and Estate of Al Goldberg,

25  Deceased, by and through their successor in interest, Daniel Rubin (collectively,

26  "Plaintiffs" or "Goldberg") bring this action against Defendants Goss-Jewett

27  Company, Inc. a/k/a Tri-County Sales, Inc., a suspended California Corporation;

28  Arthur P. Arns; Estate of Robert W. Schack, Deceased; Estate of Benjamin F.



1  Fohrman, Deceased; Donald J. George; Darold E. Merritt; James W. Ross; Estate of

2  Terrence J. George a/k/a Terry George, Deceased (collectively, "Defendants"), and

3  DOES 1 through 100, inclusive, allege upon knowledge as to their own acts, and

4  upon information and belief as to the acts of all others, as follows:

5  **NATURE OF THE ACTION**

6      1.    Plaintiffs file this third party action in defense of claims against them

7  made by the California Regional Water Quality Control Board – Central Coast

8  Region ("RWQCB") and the California Department of Toxic Substances Control

9  ("DTSC") in order to avoid or minimize their alleged liability associated with

10  responding to environmental contamination.

11      2.    The area of contamination for which Plaintiffs seek relief includes the

12  property located at 220 W. Gutierrez Street, Santa Barbara, California (the

13  "Property") and areas to which the contamination has migrated (the "Site").

14      3.    On June 8, 1994, Plaintiffs timely filed a lawsuit entitled *Goldberg v.*

15  *Arns*, Case No., CV94-3834 DSF (SHx) and each of the Defendants, their

16  predecessors, their successors, their agents, and/or their insurers were on notice of

17  that case.

18      4.    The same facts in the original action form the basis for the instant

19  action. The original Defendants are not prejudiced by this action as the same

20  investigation of facts and defenses existing in the original action are equally

21  applicable here.

22      5.    The original action was closed by a judgment without prejudice on

23  August 22, 2014.

24      6.    Plaintiffs acted in good faith and without unnecessary delay in filing

25  the instant action.

26  **PARTIES**

27  ***Plaintiffs***

28      7.    Betty Goldberg was the owner of the Property while she was alive.



-2-
COMPLAINT

8.     Al Goldberg was the owner of the Property while he was alive.

### Defendants

9.     Goss-Jewett Company, Inc. a/k/a Tri-County Sales, Inc., is a suspended California corporation that operated the dry cleaning supply business at the Property, including the operation and abandonment of aboveground storage tanks containing PCE, as well as the handling of other hazardous substances generated, stored and/or disposed of at the Site.  Goss-Jewett Company, Inc. a/k/a Tri-County Sales, Inc. was also Plaintiffs' lessee.  On information and belief, Goss-Jewett Company, Inc. a/k/a Tri-County Sales, Inc. was the alter ego of its principals, and the corporate entity and principals share a unity of interest such that a separate corporate personality does not exist; the corporation and its principals form a single enterprise.  If the privilege of separate existence of the corporate entity is recognized, an inequitable result will follow.

10.     Arthur P. Arns was the President of Goss-Jewett Company, Inc. a/k/a Tri-County Sales, Inc., who exercised influence and substantial control over the operations of the dry cleaning supply business at the Property, including the operation and abandonment of aboveground storage tanks containing tetrachloroethylene ("PCE"), as well as the handling of other hazardous substances generated, stored and/or disposed of at the Site.  Arns was also Plaintiffs' lessee.

11.     Estate of Robert W. Schack, Deceased, is named as a defendant herein to the extent of his estate's assets whether distributed or undistributed and pursuant to California Probate Code §§ 550 through 555 to establish the decedent's liability for which he was protected by liability insurance policies.  Robert W. Schack was an officer, director, and shareholder of Goss-Jewett Company, Inc. a/k/a Tri-County Sales, Inc., who exercised influence and substantial control over the operations of the dry cleaning supply business at the Property, including the operation of aboveground storage tanks containing PCE, as well as the handling of other hazardous substances generated, stored and/or disposed of at the Site.  Schack was

-3-

1     also Plaintiffs' lessee.

2         12.    Estate of Benjamin F. Fohrman, Deceased, is named as a defendant

3     herein to the extent of his estate's assets whether distributed or undistributed and

4     pursuant to California Probate Code §§ 550 through 555 to establish the decedent's

5     liability for which he was protected by liability insurance policies. Benjamin F.

6     Fohrman was an officer, director, and shareholder of Goss-Jewett Company, Inc.

7     a/k/a Tri-County Sales, Inc., who exercised influence and substantial control over

8     the operations of the dry cleaning supply business at the Property, including the

9     operation of aboveground storage tanks containing PCE, as well as the handling of

10    other hazardous substances generated, stored and/or disposed of at the Site.

11        13.    Donald J. George was an officer, director, and shareholder of Tri-

12    County Sales, Inc., the predecessor in interest to Goss-Jewett & Company, Inc.,

13    who exercised influence and substantial control over the operations of the dry

14    cleaning supply business at the Property, including the installation and operation of

15    aboveground storage tanks containing PCE, as well as the handling of other

16    hazardous substances generated, stored and/or disposed of at the Site. Donald J.

17    George was also Plaintiffs' lessee.

18        14.    Darold E. Merritt was an officer, director, and shareholder of Goss-

19    Jewett Company, Inc. a/k/a Tri-County Sales, Inc., who exercised influence and

20    substantial control over the operations of the dry cleaning supply business at the

21    Property, including the operation and abandonment of aboveground storage tanks

22    containing PCE, as well as the handling of other hazardous substances generated,

23    stored and/or disposed of at the Site.

24        15.    James W. Ross was an officer, director, and shareholder of Goss-

25    Jewett Company, Inc. a/k/a Tri-County Sales, Inc., who exercised influence and

26    substantial control over the operations of the dry cleaning supply business at the

27    Properyt, including the operation and abandonment of aboveground storage tanks

28    containing PCE, as well as the handling of other hazardous substances generated,



-4-
COMPLAINT

1    stored and/or disposed of at the Site.

2        16.    Estate of Terrence J. George a/k/a Terry George, Deceased, is named

3    as a defendant herein pursuant to California Probate Code §§ 550 through 555 to

4    establish the decedent's liability for which he was protected by liability insurance

5    policies.   Terry George was an officer, director, and shareholder of Tri-County

6    Sales, Inc., the predecessor in interest to Goss-Jewett & Company, Inc., who

7    exercised influence and substantial control over the operations of the dry cleaning

8    supply business at the Property, including the installment and operation of

9    aboveground storage tanks containing PCE, as well as the handling of other

10   hazardous substances generated, stored and/or disposed of at the Site.    Terry

11   George was also Plaintiffs' lessee.

## JURISDICTION, VENUE, AND NOTICE

13       17.    This Court has jurisdiction over the subject matter of Plaintiffs' First

14   and Ninth Causes of Action pursuant to sections 107 and 113 of the Comprehensive

15   Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C.

16   §§ 9607 and 9613 and the Tenth Cause of Action pursuant to Section 7002(a) of the

17   Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a).    In

18   addition, this Court has jurisdiction over Plaintiffs' Fourteenth Cause of Action

19   under the federal Declaratory Judgment Act, 28 U.S.C. § 2201; and 28 U.S.C. §

20   1331.

21       18.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over

22   the Second through Eighth and Eleventh through Thirteenth Causes of Action

23   because those claims are so related to the federal claim in this action that they form

24   the same case and controversy under Article III of the U.S. Constitution.

25       19.    Venue is proper in this Court pursuant to Section CERCLA § 113(b)

26   because the release and damage occurred in this district.    Furthermore, venue is

27   proper in this Court pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a),

28   and 28 U.S.C. § 1391(b) because the actual and threatened endangerment, injury



-5-
COMPLAINT

1    and damage at issue are taking place and have taken place in this district.

2        20.   Plaintiffs provided notice of the actual and threatened endangerment,

3 injury and damage alleged herein in their Notices of Endangerment to:  (a) the

4 Administrator of the United States Environmental Protection Agency ("U.S.

5 EPA"); (b) the State of California; and (c) each of the Defendants or their

6 successors in interest.

7        21.   Plaintiffs then waited at least ninety (90) days before filing this action.

8        22.   Plaintiffs have satisfied all jurisdictional prerequisites to filing this

9 Complaint.

10                          **GENERAL ALLEGATIONS**

11        23.   PCE is an industrial solvent that has been used in significant quantities

12 in the dry cleaning industry since the 1940s.

13        24.   PCE and its breakdown products are manmade chemicals and are not

14 naturally occurring.

15        25.   Common synonyms for PCE include perc, perchlor, carbon bichloride,

16 carbon dichloride, ethylene tetrachloride, petrochlorothylene, perclene, perk,

17 perchloroethene , 1,1,2,2-tetrachloroethylene, and tetrachloroethene.

18        26.   PCE degrades to trichloroethylene ("TCE"), which in turn degrades to

19 1,2 dichloroethene ("DCE"), which in turn degrades to vinyl chloride, which in turn

20 degrades to ethene, and finally to carbon dioxide, water, and free chlorine.

21        27.   As a toxic, long-lived, volatile, chlorinated hydrocarbon and likely

22 carcinogen, PCE and many of its degradation products are closely regulated by the

23 state of California and the federal government.  PCE, TCE, DCE, and vinyl chloride

24 are each a hazardous substance as that term is defined in federal law, 42 U.S.C. §

25 9601(14), and state law, Cal. Health & Safety Code § 25281(g) and are each a

26 hazardous waste and solid waste as those terms are defined in federal law, 42

27 U.S.C. § 6903(5), (27), respectively.

28        28.   All groundwater within the state of California, including the

1   groundwater at and emanating from the Site is "water of the state" pursuant to
2   California Water Code § 13050.

3       29.    Each Defendant caused or contributed to the past or present handling,
4   storage, treatment, transportation, generation, release, or disposal of hazardous
5   substances, hazardous wastes, and/or solid wastes in the environment in, at, and
6   around the Site, including soil, land, subsurface strata, air, vapor, groundwater,
7   surface water, and the waters of the state of California, because each Defendant
8   released or otherwise discarded hazardous substances, hazardous wastes, and/or
9   solid wastes, or controlled and/or operated the Property and business from which
10   hazardous substances, hazardous wastes, and/or solid wastes were released or
11   otherwise discarded, and failed to prevent or abate the hazardous substance,
12   hazardous waste, and/or solid waste  contamination.

13       30.    At various times from 1968 to 1991 Defendants negligently, suddenly,
14   and accidentally caused or contributed to the presence of hazardous substances,
15   hazardous wastes, and/or solid wastes in the environment, including soil, land,
16   subsurface strata, air, vapor, groundwater, surface water, and the waters of the state
17   of California, at the Site.  Once released into the environment, these hazardous
18   substances, hazardous wastes, and/or solid wastes continued to spread and migrate
19   in the environment at the Site, but Defendants failed to abate this contamination.

20       31.    PCE was stored and delivered in sealed 55-gallon drums until a 5,000
21   gallon aboveground storage tank was installed in 1969 by one of the chemical
22   manufacturers.  A second aboveground storage tank was installed later.  The tanks
23   were located in the front of the warehouse, to the left of the front door of the
24   building.  No one was officially responsible for maintaining the tanks on a regular
25   basis, but drivers would let the manager know if a new nozzle or hose was needed.

26       32.    PCE was delivered to the Property by tanker truck.  The tanker trucks
27   had a nozzle similar to that of a service station, but the nozzle did not shut off
28   automatically when the tank was full; it only shut off when the person holding it let

1  go. Filling the saddle tanks of the delivery trucks similarly relied on the person

2  holding the nozzle to listen to the sound it made and to stick his finger inside the

3  tank to know when it was full. After filling, the nozzle was supposed to be hung up

4  on the tank, but on occasion it would be left on the ground.

5      33.    As a result of the discovery of the contamination, the RWQCB and

6  DTSC have demanded that Plaintiffs investigate and remediate the Site.

7      34.    On September 29, 1993, RWQCB issued a Cleanup and Abatement

8  Order which found that PCE was "discharged to waters of the State" at the Site

9  creating "a condition of pollution or nuisance." RWQCB found that "PCE is a

10  hazardous substance and possible human carcinogen if ingested in concentrations"

11  exceeding the Maximum Contaminant Level ("MCL") of 5 ppb and that PCE

12  concentrations in groundwater have exceeded 120,000 ppb.

13      35.    On July 17, 2012, DTSC issued an Imminent and Substantial

14  Endangerment Determination and Order and Remedial Action Order which

15  concluded (1) "The actual and threatened release of hazardous substances at the

16  Site may present an imminent and substantial endangerment to the public health or

17  welfare or to the environment" and (2) "Response action is necessary to abate a

18  public nuisance and/or to protect and preserve the public health."

19      36.    On January 30, 2014, DTSC sent a letter to Plaintiffs regarding new

20  indoor air data showing PCE at "concentrations that may pose unacceptable cancer

21  risks, as well as acute and chronic non-cancer hazards to workers at the site."

22  Accordingly, DTSC ordered Plaintiffs to "Immediately take all appropriate action

23  to prevent, abate, or minimize the exposure to workers . . . These actions may

24  include, but are not limited to, (a) removal of workers from the site, (b) placement

25  of an indoor air treatment system, and then (c) remediation of the subsurface for

26  VOC contamination."

27      37.    As a result of Defendants' releases of hazardous substances, hazardous

28  wastes, and/or solid wastes at the Site, Plaintiffs have incurred and will continue to



1     incur response costs in order to investigate and remediate the contamination.

2        38.    From on or about April 1, 1968 and continuing until April 30, 1991,

3     Defendants were tenants at the Property, and lessees, under written leases with

4     Plaintiffs, who were the lessors of the Property. By the terms of each and every

5     lease, Defendants had obligations including, but not limited to: complying with all

6     rules and regulations, whether municipal, state or federal, then in force and effect;

7     keeping the Property in good and sanitary order, condition and repair; and

8     indemnifying and holding Plaintiffs harmless from all liability, loss, costs and

9     obligations on account of or arising out of any injuries or damages that occurred on

10    the Property during the terms of the leases.

11       39.    On or about August 15, 1991, when Plaintiffs inspected the Property,

12    Plaintiffs discovered that the Property had been contaminated by PCE escaping

13    from the aboveground storage tanks and other releases resulting from Defendants'

14    operations at the Property, which permeated the soil and contaminated the

15    groundwater. The cement slab that was under the aboveground storage tanks was

16    found to have caved in from the weight of the tanks and was badly cracked.

17       40.    On information and belief, these cracks and depressions allowed PCE

18    to penetrate the concrete and enter the environment.

19       41.    On information and belief, there was at least one spill in the mid-1980s

20    during which a measurable amount of PCE was spilled onto the ground at the

21    Property.

22       42.    Defendants failed to give written notice to Plaintiffs of the release of

23    hazardous substances, hazardous wastes, and/or solid wastes at the Property as

24    required by California Health & Safety Code § 25359.7(b).

### FIRST CAUSE OF ACTION
#### (Cost Recovery – CERCLA § 107(a))
#### (Against All Defendants)

27       43.    Plaintiffs reallege and incorporate by reference the allegations set forth

28    above in paragraphs 1 through 42, inclusive, as though set forth in full herein.



-9-

44.   Defendants used, processed, produced, stored, treated, excavated, and/or generated hazardous substances at the Property.

45.   Defendants caused or contributed to the spilling, leaking, disposal, and release of hazardous substances during their ownership or operation at the Property thereby creating a condition of hazardous substance contamination at the Site.

46.   As a result of the condition of hazardous substance contamination at the Site, Plaintiffs undertook various response actions and has incurred various response costs in connection with the hazardous substances at the Site.

47.   Defendants transported or arranged for transport of hazardous substances which it owned or possessed to the Property, and stored, treated, and disposed of hazardous substances at the Property, and otherwise owned, handled, operated the Property during the time that hazardous substances were disposed of at the Site.  Defendants are thereby jointly and severally liable under section 107(a) of CERCLA § 107(a), 42 U.S.C. § 9607(a).

48.   The Site is a "facility," as that term is defined in CERCLA § 101(9), 42 U.S.C. § 9601(9).

49.   A "release" or threatened release of a "hazardous substance," as those terms are defined in CERCLA §§ 101(22), (14), 42 U.S.C. §§ 9601(22), (14), has occurred at the Site.

50.   Plaintiffs did not cause or contribute to the environmental contamination at the Site and deny that they are liable for costs incurred as the result of the alleged release or threatened release of hazardous substances at the Site.  However, in the interest of an expeditious cleanup and acting in good faith, Plaintiffs have incurred and continue to incur response costs to investigate, remove, and remediate the environmental contamination at the Site consistent with the National Contingency Plan.

51.   Defendants are strictly liable to Plaintiffs for the costs referred to above and for interest on those costs pursuant to CERCLA § 107(a), 42 U.S.C. §

1  9607(a).

## SECOND CAUSE OF ACTION
### (Waste)
### (Against All Defendants)

52.   Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 51, inclusive, as though set forth in full herein.

53.   Pursuant to the terms of the written lease agreements from on or about April 1, 1968, through April 30, 1991, Defendants and each of them entered into and maintained possession of the Property.

54.   From on or about April 1, 1968 and continuing until present, Defendants have caused injury to the Property by committing waste in the form of hazardous substances, hazardous wastes, and/or solid wastes to contaminate the soil and groundwater.

55.   But for and prior to the discovery of Defendants' conduct, the real property had a reasonable market value of approximately $525,000.00. Upon discovery of its present condition, its current reasonable market value is a negative value, due to the contamination.

56.   Each act and omission of Defendants as alleged herein was done intentionally and over the objection of Plaintiff in contravention to the terms of the leases. Those Defendants willfully and maliciously engaged in such conduct with the full knowledge that it would result in substantial damage to the Property and Plaintiffs' interest. Therefore, Plaintiffs are entitled to recover treble damages from Defendants under California Code of Civil Procedure section 732.

57.   As a direct and proximate result of Defendants' waste, Plaintiffs have been damaged and will continue to suffer damages, including response costs, attorneys' fees, and expert witness fees.

## THIRD CAUSE OF ACTION
### (Breach of Lease)
### (Against All Defendants)

58.   Plaintiffs reallege and incorporate by reference the allegations set forth



1    above in paragraphs 1 through 57, inclusive, as though set forth in full herein.

2        59.    In 1968, Plaintiffs entered into a written lease agreement for the

3    subject property, which is attached hereto as Exhibit 1 and incorporated herein by

4    this reference.

5        60.    In 1978, the written lease was renewed for an additional 10 years in a

6    written agreement entitled Loan Extension, Lease Clarification, Lot Lease and

7    Security Agreement, which is attached hereto as Exhibit 2 and incorporated herein

8    by this reference.

9        61.    On information and belief, the written lease was extended thereafter.

10        62.    Paragraph 14 of the lease provides "This lease is made upon the

11    express condition that Lessors are to be free from all liability and claim for

12    damages by reason of any injury to any person or persons including Lessees, or

13    property of any kind whatsoever and to whomsoever belonging, including Lessees,

14    from any cause or causes whatsoever while in, upon, or in any way connected with

15    the said demised premises or the said sidewalks adjacent thereto during the term of

16    this lease or any extension hereof or any occupancy hereunder, Lessees hereby

17    covenanting and agreeing to indemnify and save harmless Lessors from all liability,

18    loss, cost, and obligations on account of or arising out of any such injuries or losses

19    however occurring."

20        63.    Claims by RWQCB and DTSC against Plaintiffs allege liability for

21    contamination in connection with the subject property during Defendants' lease.

22        64.    Plaintiffs tendered a claim for indemnity for environmental liabilities

23    to Defendants, but Defendants have refused to indemnify Plaintiffs and hold

24    Plaintiffs harmless.

25        65.    Plaintiffs have demanded that Defendants indemnify them for the

26    hazardous substance, hazardous waste, and/or solid waste contamination

27    complained of, and hereby reiterate that demand.

28        66.    Defendants have refused to defend and indemnify Plaintiffs pursuant

1   to the written agreements.

2      67.    Contained within the written contracts are provisions for fees.  As a

3   result of the breach of the agreements by Defendants, Plaintiffs were forced to hire

4   counsel and expend fees and costs.  Accordingly, Plaintiffs are entitled to recoup

5   said fees and costs in an amount to be determined by the Court.

6      68.    Plaintiffs have performed all conditions, covenants, and promises

7   required by them, on their part to be performed, in accordance with the terms and

8   conditions of the written agreements.

9      69.    Defendants also breached their obligations under the written

10  agreements by causing hazardous substances, hazardous wastes, and/or solid wastes

11  to contaminate the soil, soil vapor, indoor air, and groundwater at and emanating

12  from the Site in violation of municipal, state and federal laws.

13     70.    Defendants further breached their written agreements by allowing the

14  Property to fall into disrepair.

15     71.    Defendants further breached their written agreements by failing to give

16  written notice to Plaintiffs of the release of hazardous substances, hazardous wastes,

17  and/or solid wastes at the Property.

18     72.    The above material facts constitute breaches of the written agreements

19  by Defendants.  The acts, omissions, and conduct of Defendants further breached

20  the implied covenant of good faith and fair dealing contained in the written

21  agreements.

22     73.    As a direct and proximate result of Defendants' breach of the

23  agreements set forth above, Plaintiffs have been damaged and will continue to

24  suffer damages, including attorneys' fees, expert witness fees, and emotional

25  distress.

26              **FOURTH CAUSE OF ACTION**
              **(Contractual Indemnification)**
27              **(Against All Defendants)**

28     74.    Plaintiffs reallege and incorporate by reference the allegations set forth



-13-

1   above in paragraphs 1 through 73, inclusive, as though set forth in full herein.

2       75.    Defendants entered into indemnity agreements that require them to

3   hold harmless and indemnify and defend Plaintiffs.

4       76.    Plaintiffs have demanded that Defendants indemnify them for the

5   hazardous substance, hazardous waste, and/or solid waste contamination

6   complained of, and hereby reiterate that demand.

7       77.    Defendants failed to defend or indemnify Plaintiffs.

8       78.    As a direct and proximate result of Defendants' failure to indemnify

9   Plaintiffs, Plaintiffs have been damaged and will continue to suffer damages,

10   including attorneys' fees, expert witness fees, and emotional distress.

11

**FIFTH CAUSE OF ACTION**
**(Negligence)**
**(Against All Defendants)**

12

13       79.    Plaintiffs reallege and incorporate by reference the allegations set forth

14   above in paragraphs 1 through 78, inclusive, as though set forth in full herein.

15       80.    On or about April 1, 1968, and continuing until April 30, 1991,

16   Defendants were in possession and control of the Property and had a duty to

17   maintain the real property in good repair and condition free from any hazardous

18   waste.

19       81.    On or about April 1, 1968, to and including April 30, 1991,

20   Defendants breached their duty to Plaintiffs in that they negligently maintained,

21   controlled, managed and used the subject property and caused such property to go

22   into serious disrepair and caused contamination in the soil and the water table

23   underneath.

24       82.    By virtue of the facts and circumstances of the contamination in and

25   around the Site, as alleged herein, the doctrine of *res ipsa loquitur* is applicable to

26   the claim against each of the Defendants. Under such doctrine, the burden of

27   proving that Defendants' operations were free from all negligence in connection

28   with the releases of PCE at the Site is placed on Defendants and the burden of

-14-

1    proving freedom from liability in connection with the contamination is placed on

2    Defendants.  In the event any or all of Defendants fail to sustain their respective

3    burdens, they are legally responsible for the damages asserted herein.  Under the

4    circumstances, the contamination of the soil, soil vapor, indoor air, and

5    groundwater at and around the Site would not have happened but for negligence on

6    the part of Defendants, their agents, servants, and employees, in the manner in

7    which they conducted their respective operations.

8         83.    In the alternative to the allegation that the doctrine of *res ipsa loquitur*

9    is applicable against Defendants, it is alleged that the contamination and resulting

10   property damage and response costs were due to the negligence of Defendants in

11   their operations and that each of the Defendants is guilty of negligence proximately

12   causing the contamination.

13        84.    Defendants, while operating their chemical supply business at the

14   Property, owed a duty to Plaintiffs to use, store, maintain, monitor, and remove

15   PCE in a safe and careful manner.  Defendants also owed a duty to Plaintiffs to

16   avoid storing, disposing of, releasing, or allowing to be released any contaminants

17   in a manner that would cause injury to Plaintiffs, the Site, the public, or the

18   environment.

19        85.    Defendants breached their duties by negligently, carelessly, recklessly,

20   and illegally using, storing, maintaining, monitoring, and removing PCE in a way

21   that contaminants were released into the environment.

22        86.    Defendants failed promptly and diligently to contain and clean up the

23   contamination caused by their releases of hazardous substances, hazardous wastes,

24   and/or solid wastes.

25        87.    The releases of PCE would not have occurred absent some form of

26   negligence by Defendants, and each of them; the releases of contaminants was

27   caused by something within the exclusive control of one or more of the Defendants;

28   and that such release was not due to any voluntary action or contribution on the part

1   of Plaintiffs.

2       88.    The release or disposal of PCE is a violation of California Water Code

3   sections 13050(m), 13350, and 13387, California Health and Safety Code sections

4   5411, 5411.5, and 117555, California Fish and Game Code section 5650, and Civil

5   Code sections 3479-3480, the purpose of which are to set a standard of care or

6   conduct to protect the public and the environment from the type of improper

7   activities engaged in by Defendants.   Therefore, such improper activities and

8   violations constitute negligence *per se.*

9       89.    The injury and damages that Plaintiffs complains of herein resulted

10  from the kind of occurrence the statutory provisions were designed to prevent.

11      90.    Plaintiffs are part of the class of persons the statutory provisions were

12  intended to protect, as Plaintiffs are property owners that have been adversely

13  impacted by Defendants' violations of said statutory provisions.

14      91.    Defendants have failed to comply with federal, state, local, and

15  common law.   As a direct and proximate result of Defendants' failure to comply

16  with applicable statutory provisions, Plaintiffs have incurred and will continue to

17  incur expenses, losses, injury and damages, including consequential, incidental and

18  general damages to be proven at trial.   The above-described acts, omissions, and

19  conduct of Defendants have been without the consent, knowledge, against the will,

20  and in violation of the rights of Plaintiffs.

21                          **SIXTH CAUSE OF ACTION**
                    **(Abatement of a Public and Private Nuisance)**
22                          **(Against All Defendants)**

23      92.    Plaintiffs reallege and incorporate by reference the allegations set forth

24  above in paragraphs 1 through 91, inclusive, as though set forth in full herein.

25      93.    Section 3479 of the Civil Code defines a "nuisance," in relevant part,

26  as "[a]nything which is injurious to health, . . . or is indecent or offensive to the

27  senses, or an obstruction to the free use of the property, so as to interfere with the

28  comfortable enjoyment of life or property, or unlawfully obstructs the free passage

1  or use, in the customary manner, of any navigable lake, or river, bay, stream, canal
2  or basin."

3      94.    Section 3480 of the Civil Code defines a "public nuisance" as: "[o]ne
4  which affects at the same time an entire community or neighborhood, or any
5  considerable number of persons, although the extent of the annoyance or damage
6  inflicted upon individuals may be unequal."

7      95.    Defendants caused or contributed to the past or present handling,
8  storage, treatment, transportation, or disposal of hazardous substances, hazardous
9  wastes, and/or solid wastes in the environment in, at, and around the Site because
10  each Defendant released or otherwise discarded PCE from their operations or
11  controlled the property from which PCE was released or otherwise discarded, but
12  failed to prevent or abate this hazardous substances, hazardous wastes, and/or solid
13  wastes contamination.

14      96.    Defendants' acts and omissions in causing and contributing to releases
15  of hazardous substances, hazardous wastes, and/or solid wastes in, at, and around
16  the Site create a condition that is injurious to health, is indecent or offensive to the
17  senses, and is an obstruction to the free use of a "basin," namely the aquifer
18  underlying the Site.

19      97.    The public nuisance condition and related endangerments to health and
20  the environment arising from released hazardous substances in, at, around the Site
21  affects the entire surrounding community because it interferes with the free use and
22  enjoyment of the groundwater and there is a public health risk from the vapors
23  intruding peoples' homes and places of work.

24      98.    Defendants have caused, created, maintained, contributed to, and
25  neglected to abate a "public nuisance," as defined in Civil Code §§ 3479 and 3480,
26  namely the potential endangerments to health and the environment created by the
27  hazardous substances, hazardous wastes, and/or solid wastes contamination at the
28  Site.



-17-

COMPLAINT

99.    The release or disposal of PCE, as alleged herein, constitutes a nuisance as the release or disposal is a violation of California Water Code sections 13050(m), 13350, and 13387, California Health and Safety Code sections 5411, 5411.5, and 117555, California Fish and Game Code section 5650, and Civil Code sections 3479-3480, the purpose of which are to set a standard of care or conduct to protect the public and the environment from the type of improper activities engaged in by Defendants.   Therefore, such improper activities and violations constitute a nuisance *per se.*

100.   Plaintiffs have suffered special injury and damages as a direct and proximate result of the contamination at and emanating from the Site as the public nuisance has damaged their property.   To that end, Defendants have also failed to abate a private nuisance *per se.*

101.   Plaintiffs have demanded that Defendants abate the continuing nuisance complained of, and hereby reiterate that demand.

102.   Defendants are strictly and jointly and severally liable for abatement of the public and private nuisance.

103.   Plaintiffs are entitled to relief restraining Defendants and requiring each of them, jointly and severally, promptly and competently to take such action as may be necessary to abate the public and private nuisance and for reimbursing Plaintiffs for all response costs incurred and to be incurred at the Site.

### SEVENTH CAUSE OF ACTION
#### (Continuing Trespass)
#### (Against All Defendants)

104.   Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 103, inclusive, as though set forth in full herein.

105.   On or about April 1, 1968, and continuing until April 30, 1991, Defendants entered or allowed hazardous substances, hazardous wastes, and/or solid wastes to enter Plaintiffs' property without the consent or knowledge of Plaintiffs.

106.   Defendants knew or should have known that the release of hazardous substances, hazardous wastes, and/or solid wastes would contaminate the soil and groundwater at, around, and beneath the Site.

107.   Defendants have failed to clean up the contamination and, as a result, the hazardous substances, hazardous wastes, and/or solid wastes have been detected at, around, and beneath the Site.

108.   Unless Defendants are ordered immediately to clean up the contamination of the soil, soil vapor, indoor air, and groundwater, it will be necessary for Plaintiffs to commence many successive actions against Defendants to secure compensation for the damages sustained, thus requiring a multiplicity of suits.

109.   Plaintiffs have no adequate remedy at law for the injuries suffered by reason of the acts, omissions, and conduct of Defendants and by reason of the trespass committed by them, and this Court should grant injunctive relief to compel Defendants immediately to clean up the contamination of the soil, soil vapor, indoor air, and groundwater at and around the Site.

110.   As a direct and proximate result of the acts, omissions, and conduct of Defendants and of the continuing trespass caused thereby, Plaintiffs have suffered and continue to suffer damages to their property to such an extent that repairs were and continue to be necessary to restore the land, by conducting site assessment and site mitigation of the contamination, including soil removal, installation of wells, and additional works which are still necessary to complete the restoration of the property. Because the highest levels of contamination are in the area of the former aboveground storage tanks in the front of the building, a portion of the building will have to be demolished and replaced in order to perform a time critical removal action and to conduct other interim remedial measures. The portion of the building that can be saved will require a vapor barrier and sub-slap depressurization system to prevent PCE from intruding into the indoor space from the soil and groundwater

1  below as well as other measures to increase ventilation.

2        111.  As a further proximate result of Defendants' entry onto Plaintiffs'

3  property and continuing trespass upon the land, by virtue of the contamination of

4  the soil, soil vapor, indoor air, and groundwater, Plaintiffs were, from May 1, 1991

5  to September 30, 1993, unable to use their property for the purpose in which it was

6  intended, and to receive income from their property.  Later, Plaintiffs were able to

7  mitigate their damages to some extent by securing a new tenant (although at below

8  market rate).  However, upon learning of the health risks to its workers as a result

9  of the indoor air contamination identified in DTSC's letter dated January 30, 2014,

10  the tenant refused to pay rent for the uninhabitable property while it searched for a

11  suitable new property to relocate its business and vacate the premises.

12        112.  Plaintiffs have also been damaged in that they have been unable to sell

13  their property.

14        113.  The aforementioned acts of Defendants were willful and malicious in

15  that Defendants acted with conscious disregard for the mental and physical safety

16  and well-being of Plaintiffs and any future tenants of Plaintiffs' property.  Plaintiffs

17  are therefore entitled to punitive damages in a sum according to proof at trial.

18        114.  Defendants' acts of waste and contamination of the Property were and

19  are a continuing trespass and will continue to inhabit the Property until such time as

20  Defendants are mandated to remove the hazardous substances, hazardous wastes,

21  and/or solid wastes from Plaintiffs' property.

22
23
**EIGHTH CAUSE OF ACTION**
**(Contribution Under the Hazardous Substance Account Act)**
**(Against All Defendants)**

24        115.  Plaintiffs reallege and incorporate by reference the allegations set forth

25  above in paragraphs 1 through 114, inclusive, as though set forth in full herein.

26        116.  The Carpenter-Presley-Tanner Hazardous Substance Account Act,

27  California Health & Safety Code § 25300 et seq. ("HSAA"), was enacted to

28  encourage the expedient cleanup of "hazardous substances" that have been released

1    into the environment.  In furthering this goal, the California Legislature included
2    the statutory right of contribution for those parties who clean up contaminated
3    properties from those parties who are responsible for the contamination.

4         117.  Section 25363(e) of HSAA provides that "[a]ny person who has
5    incurred removal or remedial action costs in accordance with [HSAA] or the federal
6    [CERCLA, 42 U.S.C. § 9601 et seq.] may seek contribution or indemnity from any
7    person who is liable pursuant to [HSAA]."

8         118.  A "liable person" is defined in section 25323.5(a) of HSAA as "those
9    persons described in section 107(a) of [CERCLA] (42 U.S.C. Sec. 9607(a))."

10        119.  "Those persons described in section 107(a)" of CERCLA include the
11   owner and operator of a facility, any person who at the time of disposal of any
12   hazardous substance owned or operated any facility at which hazardous substances
13   were disposed, and any person who arranged for disposal or treatment of hazardous
14   substances for transport to a disposal facility.  42 U.S.C. § 9607(a).

15        120.  Plaintiffs are each a "person" within the meaning of section 25319 of
16   the Health & Safety Code.

17        121.  Defendants are each a "liable person" within the meaning of section
18   25323(a) of the Health & Safety Code.

19        122.  As a direct and proximate result of Defendants' actions that caused or
20   contributed to releases of hazardous substances at the Site, Plaintiffs have incurred
21   and will continue to incur costs for removal or remedial actions taken in accordance
22   with the HSAA.  These include, but are not limited to, costs incurred for
23   investigation, testing, site assessment, monitoring and remediation of the
24   contamination.

25        123.  Plaintiffs gave the Department of Toxic Substances Control notice of
26   the commencement of this action, as required by section 25363(e) of the Health &
27   Safety Code.

28        124.  Accordingly, under strict liability imposed by the HSAA, Plaintiffs are

1  entitled to contribution or indemnity from Defendants for the costs of such removal

2  or remedial action.

3                          **NINTH CAUSE OF ACTION**
                          **(Contribution – CERCLA § 113 (f)**
4                          **(Against All Defendants)**

5     125.   Plaintiffs reallege and incorporate by reference the allegations set forth

6  above in paragraphs 1 through 124, inclusive, as though set forth in full herein.

7     126.   Plaintiffs did not cause or contribute to the environmental

8  contamination at the Site and deny that they are liable for costs incurred as the

9  result of the alleged release or threatened release of hazardous substances at the

10  Site.  However, in the interest of an expeditious cleanup and acting in good faith,

11  Plaintiffs have incurred and continue to incur response costs to investigate, remove,

12  and remediate the environmental contamination at the Site consistent with the

13  National Contingency Plan.

14     127.   Defendants are liable to Plaintiffs for contribution under CERCLA §

15  113(f), 42 U.S.C. § 9613(f), for some or all amounts that Plaintiffs have incurred

16  and may in the future incur, as the result of the release or threatened release of

17  hazardous substances from the Site, in that Defendants are liable for response costs

18  under CERCLA § 107(a), 42 U.S.C. § 9607(a).

19                          **TENTH CAUSE OF ACTION**
                  **(Imminent and Substantial Endangerment – RCRA § 7002(a)(1)(B))**
20                          **(Against All Defendants)**

21     128.   Plaintiffs reallege and incorporate by reference the allegations set forth

22  above in paragraphs 1 through 127, inclusive, as though set forth in full herein.

23     129.   Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), under

24  which Plaintiffs brings this action, is RCRA's citizen enforcement provision.

25     130.   Any person may bring a lawsuit under RCRA § 7002(a)(1)(B) when:

26  (a) a "solid or hazardous waste" (b) "may present an imminent and substantial

27  endangerment to health or the environment" and (c) the defendant falls within one

28  of the categories of entities that Congress declared liable for taking abatement

1    action or "such other action as [this Court determines] may be necessary."

2        131.  The persons declared liable by Congress for abatement of potential

3    endangerments under RCRA § 7002(a)(1)(B) are entities that contributed to "past

4    or present handling, storage, treatment, transportation, or disposal" of the

5    "hazardous wastes" and "solid wastes" at issue.  Pursuant to the express terms of

6    RCRA § 7002(a)(1)(B), these entities specifically include "any past or present

7    generator, past or present transporter, or past or present owner or operator of a

8    treatment, storage, or disposal facility."

9        132.  Under RCRA § 1004(27), 42 U.S.C. § 6903(27), "solid waste" is

10   "discarded material, including solid, liquid, semisolid, or contained gaseous

11   material resulting from industrial, commercial, mining, and agricultural operations,

12   and from community activities."  The term, however, does not include "solid or

13   dissolved material in domestic sewage, or solid or dissolved materials in irrigation

14   return flows or industrial discharges which are point sources subject to permits

15   under Section 1342 of Title 33. . . ."

16       133.  None of the discharges from any of the Defendants is solid or

17   dissolved material in domestic sewage, or solid or dissolved materials in irrigation

18   return flows or industrial discharges which are point sources subject to permits

19   under Section 1342 of Title 33.

20       134.  Under Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), "hazardous

21   waste" is "a solid waste, or combination of solid wastes, which because of its

22   quantity, concentration, or physical, chemical, or infectious characteristics may . . .

23   pose a substantial present or potential hazard to human health or the environment

24   when improperly treated, stored, transported or disposed of, or otherwise

25   managed."

26       135.  Under Section 1004(3) of RCRA, 42 U.S.C. § 6903(3), "disposal"

27   means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of

28   any solid waste or hazardous waste into or on any land or water so that such solid



-23-

COMPLAINT

1    waste or hazardous waste or any constituent thereof may enter the environment or
2    be emitted into the air or discharged into any waters, including ground waters."

3        136.  Pursuant to authority under Section 3001 of RCRA, 42 U.S.C. § 6921,
4    the Administrator of the U.S. E.P.A. promulgated regulations at 40 C.F.R., Part 261
5    listing or identifying certain hazardous wastes that the Administrator elects to
6    subject to the strict regulatory program established in Subtitle III of RCRA, 42
7    U.S.C. §§ 6921-6931.  Pursuant to RCRA § 7006(a)(1), 42 U.S.C. § 6976(a)(1),
8    any RCRA hazardous waste finally so "listed or identified" by the Administrator
9    following formal, "notice and comment" rule-making as being subject to the
10   hazardous waste regulatory program set forth in Subtitle III of RCRA, has been
11   finally and conclusively determined for all purposes of any RCRA enforcement
12   action, including the instant one, to be a "hazardous waste" as defined by RCRA §
13   1004(5).  However, for purposes of RCRA § 7002(a)(1)(B) citizen suits, substances
14   also qualify as "hazardous wastes" and "solid wastes" when the above statutory
15   definitions (i.e., those set forth in RCRA §§ 1004(5) and (27)) are met.  (40 C.F.R.
16   § 261.1(b)(2).)

17       137.  Plaintiffs and each Defendant are each a "person" within the meaning
18   of RCRA § 1004(15), 42 U.S.C. § 6903(15).

19       138.  PCE and other chemicals released into the environment by Defendants
20   are solid wastes because they are discarded material resulting from commercial
21   operations.

22       139.  The PCE and other chemicals released into the environment by
23   Defendants are "hazardous wastes" because of their concentrations, or physical or
24   chemical characteristics, they pose a substantial present or potential hazard to
25   human health or the environment when improperly treated, stored, transported,
26   disposed of, or otherwise managed.

27       140.  Each of the Defendants caused or contributed to the past or present
28   handling, storage, treatment, transportation, or disposal of "solid wastes,"

"hazardous wastes," "wastes," and "hazardous substances" in the environment in, at, and around the Site because each Defendant released or otherwise discarded PCE or controlled the property from which PCE and other chemicals were released or otherwise discarded, but failed to prevent or abate this "solid waste," "hazardous waste," "waste," and "hazardous substance" contamination.

141.  The presence of PCE at and around the Site may present an imminent and substantial endangerment to human health or the environment.

142.  On July 17, 2012, DTSC issued an Imminent and Substantial Endangerment Determination and Order and Remedial Action Order which concluded (1) "The actual and threatened release of hazardous substances at the Site may present an imminent and substantial endangerment to the public health or welfare or to the environment" and (2) "Response action is necessary to abate a public nuisance and/or to protect and preserve the public health."

143.  On January 30, 2014, DTSC sent a letter to Plaintiffs regarding new indoor air data showing PCE at "concentrations that may pose unacceptable cancer risks, as well as acute and chronic non-cancer hazards to workers at the site." Accordingly, DTSC ordered Plaintiffs to "Immediately take all appropriate action to prevent, abate, or minimize the exposure to workers . . . These actions may include, but are not limited to, (a) removal of workers from the site, (b) placement of an indoor air treatment system, and then (c) remediation of the subsurface for VOC contamination."

144.  The Defendants' liability for such relief as the Court may determine appropriate and necessary under RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), is strict, joint and several.

145.  Plaintiffs gave the U.S. Attorney General and the EPA Administrator notice of the commencement of this action, as required by RCRA § 7002(b)(2)(F), 42 U.S.C. § 6972(b)(2)(F).

146.  Plaintiffs is entitled to relief under RCRA § 7002(a), 42 U.S.C. §

-25-
COMPLAINT

1   6972(a), restraining the Defendants and requiring each of them, jointly and

2   severally, to take such action, including a complete, timely and appropriate

3   investigation and abatement of all actual and potential endangerments arising from

4   the released solid wastes and hazardous wastes at and emanating from the Site.

**ELEVENTH CAUSE OF ACTION**
**(Ultrahazardous Activity)**
**(Against All Defendants)**

7   147.   Plaintiffs reallege and incorporate by reference the allegations set forth

8   above in paragraphs 1 through 146, inclusive, as though set forth in full herein.

9   148.   Defendants engaged in the ultrahazardous activity of handling, storing,

10   transporting, and releasing hazardous substances, hazardous wastes and/or solid

11   wastes into the soil and groundwater, notwithstanding the fact that the toxic

12   materials are a serious and substantial risk of harm to health, including cancer, liver

13   disease, and death.  Handling, storing, transporting, and releasing toxic materials is

14   unsafe and harmful, even when the utmost care is utilized.

15   149. Defendants' handling, storage, transportation, and releases of

16   hazardous substances, hazardous wastes and/or solid wastes as alleged herein

17   necessarily involves a risk of serious harm which cannot be eliminated by the

18   exercise of utmost care and is not a matter of common usage.

19   150.   Defendants recognized, or should have recognized, that the Site was

20   likely to be harmed by Defendants' use and release of hazardous substances,

21   hazardous wastes and/or solid wastes into the soil and groundwater.

22   151.   As a direct and proximate result of this ultrahazardous activity,

23   Plaintiffs have incurred and will continue to incur expenses, losses, injury and

24   damages as set forth herein.

**TWELFTH CAUSE OF ACTION**
**(Equitable Indemnity)**
**(Against All Defendants)**

27   152.   Plaintiffs reallege and incorporate by reference the allegations set forth

28   above in paragraphs 1 through 151, inclusive, as though set forth in full herein.

153. The liability, if any, that Plaintiffs may have to any person or entity, including, without limitation, any government or regulatory agency, under any law, regulation, or common law principle, relating to the contamination at the Site, is the result, in whole or in part, of the acts or omissions of Defendants.

154. As between Plaintiffs and Defendants, Defendants are solely responsible for all costs and expenses to investigate and clean up the contamination at and around the Site.

155. As between Plaintiffs and Defendants, Defendants are responsible for any legal or administrative actions that have been brought, or may be brought in the future, by any public or private persons concerning or related to the presence of the contaminants at and around the Site.

156. In the event that Plaintiffs are adjudged liable for any or all relief requested in any judicial or administrative action, arising out of or related to the presence of contaminants at and around the Site, brought against Plaintiffs by any persons or entities, public or private, such liability is purely secondary, imputed, or technical. Primary and actual liability attaches to Defendants and is a direct and proximate result of the acts, omissions, and conduct of Defendants.

157. As a direct and proximate result of the acts, omissions, and conduct of Defendants, as herein alleged, Defendants are bound and obligated to indemnify and hold harmless Plaintiffs from and against all response costs, arising out of, or relating in any way to the contamination at the Site, and any other costs heretofore or hereafter incurred by Plaintiffs in responding to the releases or threatened releases of hazardous substances, hazardous wastes and/or solid wastes at the Site.

**THIRTEENTH CAUSE OF ACTION**
**(Business and Professions Code § 17200)**
**(Against All Defendants)**

158. Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 157, inclusive, as though set forth in full herein.

159. Defendants caused or contributed to the presence of hazardous

1   substances, hazardous wastes and/or solid wastes in the environment in, at, and

2   around the Site, including the waters of the State of California, because each

3   Defendant released or otherwise discarded PCE or controlled the operations from

4   which PCE was released or otherwise discarded, but failed to prevent or abate the

5   contamination at and emanating from the Site.

6        160.   Defendants' acts and omissions in causing or contributing to releases

7   of hazardous substances, hazardous wastes and/or solid wastes in, at and around,

8   the Site create a condition that is injurious to health, is indecent or offensive to the

9   senses, and is an obstruction to the free use of property, so as to interfere with the

10   comfortable enjoyment of life or property, or unlawfully obstructs the free passage

11   or use, in the customary manner, of a "basin," namely the aquifer underlying the

12   Site, within the meaning of Section 3479 of the Civil Code, as well as the

13   Defendants failure to abate these conditions.

14        161.   Therefore, Defendants' acts are violations of federal, state, and local

15   laws, regulations, and codes.   As alleged above, these violations each constitute

16   public and private nuisances *per se*, and, therefore, constitute unlawful business

17   acts within the meaning of Business and Professions Code section 17200.

18   Defendants' were and are likely to mislead the general public in that their

19   operations caused or contributed to releases of hazardous substances, hazardous

20   wastes and/or solid wastes, and in so doing, they achieved an unfair competitive

21   advantage in failing to investigate and remediate said conditions.

22        162.   The unlawful business practices of defendants are likely to continue

23   and therefore will continue to mislead the public and present a continuing threat to

24   the public.   Indeed, public funds have been expended to investigate the

25   contamination at and emanating from the Site.

26        163.   As a direct and proximate result of the Defendants' conduct,

27   Defendants received profits and avoidance of investigation and remediation costs

28   that rightfully belong to members of general public who have been adversely

-28-

1  affected by Defendants' conduct as well as to Plaintiffs by virtue of the amount

2  expended on costs for investigation, remediation, and litigation.

3  **FOURTEENTH CAUSE OF ACTION**
**(Declaratory Relief)**
4  **(Against All Defendants)**

5  164.  Plaintiffs reallege and incorporate by reference the allegations set forth

6  above in paragraphs 1 through 163, inclusive, as though set forth in full herein.

7  165.  An actual dispute and controversy has arisen and now exists among the

8  parties to this action concerning their respective rights and duties in that Plaintiffs

9  contend, and Defendants deny, that Defendants are responsible for the

10  contamination at the Site and are obligated to contribute to the costs of the

11  investigation and cleanup.

12  166.  Because the extent and magnitude of the contamination at the Site are

13  not fully known at this time, and the investigatory and remedial works are ongoing,

14  Plaintiffs will incur necessary response costs, including but not limited to

15  investigatory, remedial and removal expenses, and attorneys' fees in the future.

16  167.  Plaintiffs desire a judicial determination of their rights and duties and a

17  declaration that Defendants are liable to Plaintiffs for all responses costs incurred or

18  to be incurred by Plaintiffs at the Site as a result of releases of hazardous

19  substances, hazardous wastes, and/or solid wastes by Defendants.

20  168.  Plaintiffs are entitled to a declaratory judgment establishing the

21  liability of Defendants for such response costs for the purpose of this and any

22  subsequent action or actions to recover further response costs.

23  169.  A judicial declaration is necessary and appropriate under the present

24  circumstances in order that Plaintiffs may ascertain their rights and duties.

25  **PRAYER FOR RELIEF**

26  WHEREFORE, Plaintiffs respectfully requests that judgment be entered in

27  their favor for the following:

28  1.  For a preliminary and permanent injunction requiring Defendants to



-29-

COMPLAINT

1    undertake at their sole cost and consistent with the National Oil and Hazardous

2    Substances Pollution Contingency Plan (the "NCP") at 40 C.F.R. Part 300, all

3    actions necessary to investigate and abate the nuisance conditions and

4    endangerments to health or the environment that may be presented by Defendants'

5    use and disposal of "solid wastes" and "hazardous wastes" as alleged above;

6        2.    For an order requiring Defendants to undertake at their sole cost all

7    actions necessary to investigate and remediate the alleged contamination;

8        3.    For a judicial determination that Defendants are jointly and severally

9    liable for the abatement of the imminent and substantial endangerment to human

10   health or the environment that may be presented by Defendants' use and disposal of

11   "solid wastes" and "hazardous wastes" as alleged above;

12       4.    For a declaration that Defendants are liable under CERCLA § 107(a)

13   and are liable to Plaintiffs in contribution and/or indemnity under CERCLA §

14   113(f) for all past, present, and future response costs and other costs which may be

15   incurred by Plaintiffs connection with the Site;

16       5.    For a declaration that Defendants are obligated to pay to Plaintiffs all

17   future response costs and any other costs incurred by Plaintiffs hereafter in

18   response, removal, or remedial efforts incurred pursuant to law or the order of any

19   governmental agency with jurisdiction over the Site;

20       6.    For damages from Defendants to compensate Plaintiffs for the costs

21   they have incurred and will incur in response, removal, or remedial efforts, the

22   exact amount of which will be ascertained according to proof;

23       7.    For compensatory and consequential damages in excess of $5 million;

24       8.    For an award to Plaintiffs its costs of litigation, including attorneys'

25   fees and expert witness fees pursuant to 42 U.S.C. § 6972(e), section 1021.5 of the

26   Code of Civil Procedure, and written contract;

27       9.    Treble damages for wastes;

28       10.   For exemplary against Defendants according to proof;

11.   For punitive damages against Defendants according to proof;

12.   For all costs of suit herein;

13.   For such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand trial by jury of any and all issues so triable.

DATED: September 8, 2014              PALADIN LAW GROUP® LLP

                                     /s/ Bret A. Stone

                                     _____
                                     Bret A. Stone
                                     Counsel for Plaintiffs

# EXHIBIT 1

<u>LEASE</u>

THIS LEASE, executed in duplicate at Santa Barbara, California, on *apr. 1st*, 1968, between AL GOLDBERG and BETTY GOLDBERG, husband and wife, hereinafter referred to as Lessors, and FLOYD R. BAKER and WANDA L. BAKER, husband and wife, hereinafter referred to as Lessees.

1.  DESCRIPTION OF PREMISES.  The Lessors hereby lease to Lessees, and Lessees hire from Lessors, on the terms and conditions hereinafter set forth, those certain premises with the appurtenances, situated in the City and County of Santa Barbara, State of California, and described as follows:

> Beginning at the Southeasterly line of Cottage Grove Avenue 130'8" from the Northeasterly line of Bath Street; thence Northeasterly along the Southeasterly line of Cottage Grove Avenue 45 feet (to land owned by A. W. Potter); thence at right angles Southeasterly 105 feet to the line of Gutierrez Street; thence Southwesterly along said Gutierrez Street, 45 feet; thence at a right angle Northwesterly 105 feet to Cottage Grove Avenue and the point of beginning, being Lot No. 26, as marked and designated on Plat No. 2 of P. J. Barbers subdivision of the Southwest one-half of city block No. 252 and filed with the County Recorder August 11, 1900.

2.  PARKING.  That Lessors further grant to Lessees, during the term of this lease and any extension thereof, four parking spaces with right of ingress and egress to said spaces on that certain real property situated in the City and County of Santa Barbara, State of California, and described as follows:

> Beginning at a point on the Northwesterly line of Gutierrez Street, distant thereof 135 feet and 8 inches Northeasterly from the most Southerly corner of block 252, according to the official map and survey of said city; running thence Northeasterly along said line of Gutierrez Street 45 feet to a point; thence at right angles Northwesterly 105 feet to the Southeasterly line of Cottage Grove Avenue; thence at right angles Southwesterly along said line of Cottage Grove Avenue 45 feet to a point; thence at right angles Southeasterly 105 feet to the said line of Gutierrez Street and the point of beginning.

The Lessors reserve the right to designate where the said parking spaces shall be located on the said premises.

-1-

1     3.  TERM.  The term of this lease shall be for a period of

2 ten years, commencing on the 1st day of April, 1968, and ending on

3 the 31st day of March, 1978.

4     4.  RENT.  The rent for the leased premises for the period of

5 April 1, 1968, to September 30, 1969, shall be the sum of $14,400.00.

6 The rent for the leased premises for the period of October 1, 1969

7 to March 31, 1978, shall be the sum of $91,800.00.  In the event

8 the City or County of Santa Barbara, or both, increase the real

9 property taxes on the said leased premises over the amount due for

10 the 1968-1969 taxable year, then the Lessees shall pay to Lessors

11 said increase during the term of this lease as additional rent.  It

12 shall be the duty of the Lessors to furnish the Lessees with copies

13 of tax billings evidencing said increase before Lessees are obligated

14 to pay said sums as additional rent.

15    The rental for the leased premises shall be paid as follows:

16        a.  $2,600.00 upon execution of this lease, that said sum

17        being payment for the first month of the term herein and

18        the last two months of the term herein.

19        b.  Installments of $800.00 per month commencing May 1,

20        1968, and continuing to, and including, September 1, 1969.

21        c.  Installments of $900.00 per month commencing October

22        1, 1969 and continuing until the end of the term.

23        d.  Any increase in real property taxes as hereinbefore

24        provided for shall be payable as additional rent in a

25        lump sum within 30 days after presentation of a copy of a

26        tax bill by Lessors to Lessees.

27     5.  OPTION TO RENEW LEASE.  Lessees are hereby granted an option

28 to renew this lease for a further period of 10 years from and after

29 the expiration of the original term at a rental of $900.00 per month

30 together with additional rent for any increase in real property taxes

31 as hereinbefore provided, but otherwise upon the same terms and

32 conditions as herein contained.  Written notice of Lessees' intention

-2-

1   to renew this lease shall be given to Lessors at least 90 days prior
2   to the expiration of this lease.

3       6.  UTILITIES.  Lessees shall pay for all water, gas, heat,
4   light, power, telephone service, and all other services supplied to
5   the said premises.

6       7.  REPAIRS.  Lessees shall, at their sole cost, keep and main-
7   tain said premises and appurtenances and every part thereof, except-
8   ing exterior walls and roofs which Lessors agree to repair, includ-
9   ing windows and skylights, sidewalks adjacent to said premises, any
10  store front and the interior of said premises, in good and sanitary
11  order, condition and repair, hereby waiving all right to make repairs
12  at the expense of Lessors and as provided in Section 1942 of the
13  Civil Code of the State of California, and all rights provided for
14  by Section 1941 of the said Civil Code.

15      8.  USE.  The premises are leased to the Lessees for the purpose
16  of conducting a wholesale business of furnishing cleaning supplies
17  to dry cleaning establishments, laundries, and hospitals.  Lessees
18  shall not use, or permit said premises, or any part thereof, to be
19  used, for any purpose or purposes other than the purpose or purposes
20  for which the said premises are hereby leased without written consent
21  of the Lessors.

22      9.  INSURANCE HAZARDS.  No use shall be made or permitted to be
23  made of the said premises, nor acts done, which will increase the
24  existing rate of insurance upon the building in which said premises
25  may be located, or cause a cancellation of any insurance policy
26  covering said building, or any part thereof, nor shall Lessees sell,
27  or permit to be kept, used, or sold, in or about said premises, any
28  article which may be prohibited by the standard form of fire insur-
29  ance policies.  Lessees shall, at their sole cost and expense,
30  comply with any and all requirements, pertaining to said premises,
31  of any insurance organization or company, necessary for the main-
32  tenance of reasonable fire and public liability insurance, covering

-3-

1 said building and appurtenances.

2    10.  ALTERATIONS.  MECHANICS' LIENS.  Lessees shall not make,
3 or suffer to be made, any alterations of the said premises, or any
4 part thereof, without the written consent of Lessors first had and
5 obtained, and any additions to, or alterations of, the said premises,
6 except movable furniture and trade fixtures, shall become at once a
7 part of the realty and belong to Lessors.  Lessees shall keep the
8 demised premises and the property in which the demised premises are
9 situated free from any liens arising out of any work performed,
10 material furnished, or obligations incurred by Lessees.

11    11.  ABANDONMENT OF PREMISES.  TRADE FIXTURES.  Lessees shall
12 not vacate or abandon the premises at any time during the term; and
13 if Lessees shall abandon, vacate, or surrender said premises, or be
14 dispossessed by process of law, or otherwise, any personal property
15 belonging to Lessees and left on the premises shall be deemed to be
16 abandoned, at the option of Lessors, except such property as may be
17 mortgaged to Lessors.

18    12.  ACCEPTANCE OF PREMISES AS IS.  SURRENDER AT END OF TERM.
19 By entry hereunder, Lessees accept the premises as being in good
20 and sanitary order, condition and repair and agree on the last day
21 of said term, or sooner termination of this lease, to surrender unto
22 Lessors all and singular said premises with said appurtenances in
23 the same condition as when received, reasonable use and wear thereof
24 and damage by fire, Act of God or by the elements excepted, and to
25 remove all of Lessees' signs from said premises.

26    13.  COMPLIANCE WITH LAW.  Lessees shall, at their sole cost
27 and expense, comply with all of the requirements of all Municipal,
28 State and Federal authorities now in force, or which may hereafter
29 be in force, pertaining to the said premises, and shall faithfully
30 observe in the use of the premises all Municipal ordinances and
31 State and Federal statutes now in force or which may hereafter be
32 in force.  The judgment of any court of competent jurisdiction, or

-4-

1  the admission of Lessees in any action or proceeding against Lessees,

2  whether Lessors be a party thereto or not, that Lessees have violated

3  any such ordinance or statute in the use of the premises shall be

4  conclusive of that fact as between Lessors and Lessees.

5      14.  NONLIABILITY OF OWNER FOR DAMAGES.  This lease is made upon

6  the express condition that Lessors are to be free from all liability

7  and claim for damages by reason of any injury to any person or persons,

8  including Lessees, or property of any kind whatsoever and to whomso-

9  ever belonging, including Lessees, from any cause or causes whatsoever

10  while in, upon, or in any way connected with the said demised pre-

11  mises or the said sidewalks adjacent thereto during the term of this

12  lease or any extension hereof or any occupancy hereunder, Lessees

13  hereby covenanting and agreeing to indemnify and save harmless

14  Lessors from all liability, loss, cost, and obligations on account

15  of or arising out of any such injuries or losses however occurring.

16      15.  LIABILITY INSURANCE.  Lessees further agree to take out

17  and keep in force during the life hereof at Lessees' expense public

18  liability insurance in companies and through brokers selected by

19  Lessors to protect against any liability to the public incident to

20  the use of or resulting from any accident occurring in or about said

21  premises, the liability under such insurance to be not less than

22  $50,000.00 for any one person injured, or $100,000.00 for any one

23  accident, or $5,000.00 property damage.  These policies shall insure

24  the contingent liability of Lessors and are to be placed with Lessors,

25  and Lessees are to obtain a written obligation on the part of the

26  insurance carriers to notify Lessors in writing prior to any can-

27  cellation thereof, and Lessees agree, if Lessees do not keep such

28  insurance in full force and effect the Lessors may take out the

29  necessary insurance and pay the premium and the repayment thereof

30  shall be deemed to be part of the rental and payment as such on the

31  next day upon which rent becomes due.

32      16.  ENTRY BY OWNER.  Lessees shall permit Lessors and their

-5-

1  agents to enter into and upon said premises at all reasonable times
2  for the purpose of inspecting the same or for the purpose of main-
3  taining the building located on the leased premises.

4      17.  ASSIGNMENT OR SUBLETTING.  Lessees shall not assign this
5  lease, or any interest therein, and shall not sublet the said pre-
6  mises or any part thereof, or any right or privilege appurtenant
7  thereto, or suffer any other person (the agents and servants of
8  Lessees excepted) to occupy or use the said premises, or any portion
9  thereof, without the written consent of the Lessors first had and
10  obtained, and a consent to one assignment, subletting, accupation,
11  or use by another person shall not be deemed to be a consent to any
12  subsequent assignment, subletting, occupation, or use by another
13  person.  Any such assignment or subletting without such consent
14  shall be void, and shall, at the option of Lessors, terminate this
15  lease.

16      18.  INSOLVENCY.  RECEIVER.  Either (a) the appointment of a
17  receiver to take possession of all or substantially all of the assets
18  of the Lessees, or (b) a general assignment by Lessees for the
19  benefit of creditors, or (c) any action taken or suffered by Lessees
20  under any insolvency or bankruptcy act shall constitue a breach of
21  this lease by Lessees.

22      19.  REMEDIES OF LESSORS ON DEFAULT.  In the event of any
23  breach of this lease by Lessees, then Lessors besides other rights
24  or remedies they may have, shall have the immediate right of re-entry
25  and may remove all persons and property from the premises; such pro-
26  perty may be removed and stored in a public warehouse or elsewhere
27  at the cost of, and for the account of Lessees.  Should Lessors
28  elect to re-enter, as herein provided, or should they take possession
29  pursuant to legal proceedings or pursuant to any notice provided by
30  law, they may either terminate this lease or they may from time to
31  time, without terminating this lease, re-let said premises or any
32  part thereof for such term or terms (which may be for a term extending

-6-

1 beyond the term of this lease) and at such rental or rentals and upon

2 such other terms and conditions as Lessors in their sole discretion

3 may deem advisable with the right to make alterations and repairs

4 to said premises; upon each re-letting (a) Lessees shall be immediate-

5 ly liable to pay to Lessors, in addition to any indebtedness other

6 than rent due hereunder, the cost and expenses of such re-letting and

7 of such alterations and repairs, incurred by Lessors, and the amount,

8 if any, by which the rent reserved in this lease for the period of

9 such re-letting (up to but not beyond the term of this lease) exceeds

10 the amount agreed to be paid as rent for the demised premises for

11 such period on such re-letting; or (b) at the option of the Lessors

12 rents received by such Lessors from such re-letting shall be applied;

13 first, to the payment of any indebtedness, other than rent due here-

14 under from Lessees to Lessors; second, to the payment of any costs

15 and expenses of such re-letting and of such alterations and repairs;

16 third, to the payment of rent due and unpaid hereunder and the

17 residue, if any, shall be held by the Lessors and applied in payment

18 of future rent as the same may become due and payable hereunder.  If

19 Lessees have been credited with any rent to be received by such re-

20 letting under option (a), and such rent shall not be promptly paid

21 to Lessors by the new tenant, or if such rentals received from such

22 re-letting under option (b) during any month be less than that to be

23 paid during that month by Lessees hereunder, Lessees shall pay any

24 such deficiency to Lessors.  Such deficiency shall be calculated

25 and paid monthly.  No such re-entry or taking possession of said

26 premises by Lessors shall be construed as an election on their part

27 to terminate this lease unless a written notice of such intention

28 be given to Lessees or unless the termination thereof be decreed by

29 a court of competent jurisdiction.  Notwithstanding any such re-letting

30 without termination, Lessors may at any time thereafter elect to

31 terminate this lease for such previous breach.  Should Lessors at any

32 time terminate this lease for any breach, in addition to any other

-7-

remedy they may have, they may recover from Lessees all damages they may incur by reason of such breach, including the cost of recovering the premises, and including the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this lease for the remainder of the stated term over the then reasonable rental value of the premises for the remainder of the stated term, all of which amounts shall be immediately due and payable from Lessees to Lessors.

20.  ATTORNEYS' FEES.  In case suit should be brought by any party or parties to this lease, then the successful party or parties in said suit shall be paid a reasonable attorneys' fee which shall be fixed by the court by the unsuccessful party or parties.

21.  NOTICES.  All notices to be given to Lessees may be given in writing personally or by depositing the same in the United States mail, postage prepaid, and addressed to Lessees at the said premises, whether or not Lessees have departed from, abandoned, or vacated the premises.

22.  WAIVER.  The waiver by Lessors of any breach of any term, covenant, or condition herein contained shall not be deemed to be a waiver of such term, covenant, or condition or any subsequent breach of the same or any other term, covenant, or condition herein contained.  The subsequent acceptance of rent hereunder by Lessors shall not be deemed to be a waiver of any preceding breach by Lessees of any term, covenant, or condition of this lease, other than the failure of Lessees to pay the particular rental so accepted, regardless of Lessors knowledge of such preceding breach at the time of acceptance of such rent.

23.  BINDING ON SUCCESSORS.  The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators, and assigns of all of the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder.

-8-

24.   TIME is of the essence of this lease.

AL GOLDBERG
AL GOLDBERG

BETTY GOLDBERG
BETTY GOLDBERG

FLOYD R. BAKER
FLOYD R. BAKER

WANDA L. BAKER
WANDA L. BAKER

--9--

# EXHIBIT 2

SUS:SN; 78-928; 711,472

## LOAN EXTENSION, LEASE CLARIFICATION, LOT LEASE AND SECURITY AGREEMENT
### BETWEEN
### TERRY GEORGE AND TRI-COUNTY SALES, INC.
### AND
### AL AND BETTY GOLDBERG

THIS Loan Extension, Lease Clarification, Lot Lease, and Security Agreement is entered into as of, and is effective, May 1, 1978, at Santa Barbara, California, by and between TERRANCE GEORGE and TRI-COUNTY SALES, INC., a California Corporation doing business as Tri-County Sales (hereinafter sometimes referred to as "Terry"), and AL GOLDBERG and BETTY GOLDBERG, husband and wife (hereinafter sometimes referred to as "Goldbergs"), as follows:

### I. RECITALS

1.01 WHEREAS, on March 14, 1978 the Goldbergs sold certain assets located at 220 W. Gutierrez Street, Santa Barbara, California to Floyd N. Baker and Wanda L. Baker, husband and wife (hereinafter sometimes referred to as the "Bakers"), and received from the Bakers a negotiable Promissory Note dated March 14, 1978 for One Hundred Five Thousand Eight Hundred Sixty Four and 63/100 Dollars ($105,864.63), secured by a security agreement in certain personal property, equipment, vehicles, stock in trade, trade, stock, trade name, assets, supplies and other interests and good will in connection with the business known as Tri-County Sales; all of which are particularly described in that Security Agreement between the Bakers and the Goldbergs dated March 14, 1978, and that Financing Statement (UCC-1) of the Bakers to the Goldbergs dated March 11, 1968 (filed with the California Secretary of State on April 23, 1968, File No. 68-036-237). Said Security Agreement and Financing Statement are expressly hereat incorporated by reference; and include, but are not limited to, an express representation and warranty by the Bakers that inventory will be maintained at the approximate level that existed on March 31, 1968; that quarterly operating statements (including complete inventories, accounts receivable, etc.) will be furnished to the Goldbergs, and that the Bakers not only will not replace any item of equipment without first obtaining the consent of the Goldbergs, but also that any replacement shall be equal or better security to the Goldbergs.

1.02 WHEREAS, as a separate transaction (Lease) between the Bakers and the Goldbergs, the Goldbergs leased jointly to the Bakers and "Tri-County Sales, Inc., a California Corporation" an improved building and four (4) parking spaces located at 220 W. Gutierrez Street, Santa Barbara, California, and more specifically described in Attachment "A" hereto; which Attachment is expressly hereat incorporated by reference. Said Lease is dated April 1, 1968 and would have expired on March 31, 1978 unless then ten (10) year option provided therein was exercised by the Lessee or its approved assignees within ninety (90) days prior to March 31, 1978. On "March ____, 1968", the Goldbergs and the Bakers entered into an Agreement modifying the above described Lease by limiting the use by the Lessees of the premises described in said April 1, 1968 Lease to ". . . laundry and drycleaning equipment sales, research and development, janitorial, swimming pool, restaurant supplies, and other related items." In addition the parties by the same "March ____, 1968" Agreement, agreed that the Lease did not include an adjacent lot owned by the Goldbergs, but the Lessee could use said lot provided that it keeps the same clean and maintains it at the Lessee's sole expense.

1.03 WHEREAS, on September 24, 1968 the Bakers sold Tri-County Sales and the above described assets pledged to the Goldbergs, to Donald J. George and Jacquiline George (hereinafter sometimes referred to jointly and severally as "Donald"). In connection with the Bakers sale to Donald, Donald agreed to be bound by, assumed, and agreed to pay all obligations and perform all duties owed to the Goldbergs by the Bakers under the above described Promissory Note, Security Agreement, and Financing Statement. The Agreement of Donald to the Bakers was a Contract also for the benefit of the Goldbergs with respect to: the express and personal assumption of liability

-1-

**ORIGINAL**

and agreement to perform by Donald; the representation and warranty of Donald that the inventory of Tri-County Sales, Inc. will be kept at least at Thirty-Nine Thousand Dollars ($39,000.00) at cost; and the express term and condition that Donald will provide the Goldbergs with a decreasing life insurance policy on Donald's life, in which the Goldbergs are the beneficiaries in an amount sufficient to satisfy the principal, interest and any collection costs with respect to the above described Promissory Note. Further, in connection with the transaction, above described, between the Bakers and Donald, Donald further agreed to be personally liable, and perform all the covenants, conditions and duties under the Lease and "March ____, 1968" Agreement between the Goldbergs and the Bakers and Tri-County Sales, Inc., a California Corporation. On September 28, 1968, the Goldbergs executed a consent to the Assignment of said Lease and "March ____, 1968" Agreement, provided that the Bakers were not relieved from liability to the Goldbergs under said Lease and "March ____, 1968" Agreement, and because of the additional warranties, representations and express promises of Donald to the Goldbergs by reason of the Agreements, between the Bakers and Donald, the assignment of Lease executed by Donald on September 24, 1968, and the acceptance of Assignment of Lease executed by Donald on September 23, 1978 and the Agreement between the Bakers and Donald, respectively executed on the 24th and 23rd of September, 1968; which Agreements all are expressly hereat incorporated by reference as though fully set forth.

1.04 WHEREAS, without the knowledge or consent of the Goldbergs, Donald sold his capital stock in Tri-County Sales, Inc. to his brother, Terry George (hereinafter sometimes referred to as "Terry"); which transaction is now represented by Terry to have been completed on or about December 31, 1974. Terry further represents and warrants that on the effective date of this document: that he is the sole owner and solely entitled to possession of all of the outstanding capital stock of Tri-County Sales, Inc., a California Corporation; and that there are no liens, hypothecations, charges or claims against said capital stock that encumbers or hinder his ownership. On or after September 26, 1975, the required life insurance policy on the life of Donald was replaced by a Seventy Five Thousand Dollar ($75,000.00) twenty year decreasing term life insurance policy on the life of Terry to cover the balance due on the above described Promissory Note (originally from the Bakers) to the Goldbergs.

1.05 WHEREAS, with respect to the above described Promissory Note, Lease, "March ____, 1968" Agreement, and the rights of, and obligations to the Goldbergs, the following circumstances exist on April 1, 1978. On April 1, 1978 there is due owing and unpaid on the above described Promissory Note the balance of Fifty Eight Thousand Two Hundred Eighteen and 92/100 Dollars ($58,218.92), plus interest from March 1, 1978 to April 1, 1978 at 6% per annum, plus interest on and after April 1, 1978 at 9.25% per annum on the unpaid balance. As of April 1, 1978, without either the consent or express knowledge of the Goldbergs, certain other personal property set forth in the above described Security Agreement had been replaced; plus the security has been augmented by additional equipment and inventory. A new fire and liability insurance policy will immediately be needed to be tendered to the Goldbergs for their approval. A new term life insurance policy on the life of Terry will be needed to be immediately tendered to the Goldbergs for their approval. Also effective October 1, 1978, the adjacent lot described in the "March ____, 1968" Agreement will be let by the Goldbergs to Terry and Tri-County Sales, Inc., upon the terms, rent and conditions set forth hereinbelow.

II.   CONSIDERATION

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED BY TERRY, TERRY AND THE GOLDBERGS DO HEREBY RESPECTIVELY AGREE, AND TERRY WARRANTS, COVENANTS, AGREES AND TRANSFERS AS SET FORTH HEREINBELOW:

III.   LOAN EXTENSION AGREEMENT (PROMISSORY NOTE)

3.01 Joint and several receipt of consideration and promise to pay by Terry and Tri-County Sales, Inc.: Terry and Tri-County Sales, Inc., a California corporation, each separately acknowledge receipt of the Goldberg's extension of the hereinabove described Promissory Note, and other good and valuable consideration; and jointly and severally agree to assume and be personally liable for the payment of the principal amount under the terms, installments and interest rates set forth hereinbelow under paragraph 3.02. Terry and Tri-County Sales, Inc., further agree that the terms set forth in paragraph 3.02 shall be separately memorialized in a negotiable Promissory Note, attached to the original note due the Goldbergs, and may be separately from this agreement, enforced, assigned or transferred - provided that:

-2-

ORIGINAL

(A) In no event shall the Goldbergs collect more than once for the $58,218.92 principal, interest, costs of collection (if applicable), attorneys fees (if applicable), court costs (if applicable), and damages under this agreement (if applicable); even though the Goldbergs may be entitled to different amounts for each of the four described items depending upon whether the original note, promissory note under paragraph 3.02 hereinbelow, with this agreement, or a combination of the foregoing in this agreement are enforced; and

(B) Which the Goldbergs have the option of enforcing: (alternative "A") the original promissory note described hereinabove; (alternative "B") the promissory note described in paragraph 3.02 hereinbelow; (alternative "C") the promise contained in this agreement; and any combination of the foregoing (alternative "D"), the full satisfaction of any of the alternatives described in this paragraph (whether by performance under the terms, or by payment in full of a Court Judgment) shall be, and are deemed full satisfaction of all of the alternatives described in this paragraph.  Upon full satisfaction the Goldbergs are obligated to, and shall surrender to the respective obligor named therein, the original promissory note described hereinabove and the negotiable promissory note memorializing paragraph 3.03 hereinbelow.

3.02  Negotiable Promissory Note:  attached hereto and expressly incorporated hereat by reference, as though fully set forth is Attachment "C"; which exhibit shall be executed in original form and attached to the hereinabove described original Promissory Note to the Goldbergs.  The original Promissory Note also has a balance due on April 1, 1978 of Forty Eight Thousand Five Hundred Nine and 92/100 Dollars ($48,509.92).  The balance has been calculated by taking the actual April 1, 1978 balance of $58,218.92 and crediting the $10,000.00 paid thereon on April 7, 1978 as follows:  $291.00 for interest at 6% from February 2, 1978 to April 1, 1978, and $9,650.69 reduction of principal.  There is therefore due in April, 1978 after the credit of the $10,000.00 payment, a principal balance of $48,509.92 plus interest at 9.25% for April, 1978, and thereafter at 9.25% simple interest.  The other $800.00 payment in April of 1978, and each subsequent monthly installment payment on said Promissory Note shall be credited first against interest due for that month at 9.25% simple interest, then principal.  This agreement is not intended by the parties to effect the original Primissory Note to the Goldbergs, hereinabove described except to extend the time for the payment of the balance.  The Goldbergs understand and agree that the legal effect of the extension of the payment schedule of the original Promissory Note, without the expressed permission of the original obligor and all subsequent obligors, guarantors or persons who have assumed the obligation of payment, may allow those persons, not Terry, and not Tri-County Sales, Inc. to assert defenses which they might otherwise not have.

## IV.  GRANT, AND CONTINUANCE OF SECURITY INTEREST

4.01  Continuance of prior security interest:  Terry and Tri-Counties understand, agree and approve the Goldbergs filing, without the signature of the debtor(s) a continuance financing statement under California Commercial Code Section 9306.  The filing of a continuation statement is understood and agreed to by Terry, Tri-County Sales, Inc. and both to continue with respect to the parties the original security interest granted to the Goldbergs to secure the payment of the hereinabove described Promisory Note to the Goldbergs.

4.02  Security interest granted:  Terry, individually, and doing business as Tri-County Sales; Tri-County Sales, Inc., a California corporation; and both of them, jointly and severly hereby grant a security interest to the Goldbergs to secure the full and complete performance by Terry, Tri-County Sales, Inc., and both of them of the terms, conditions, promises, warranties and representations contained in this document, their performance as additional obligors of the hereinabove described original Promisory Note to the Goldbergs, their performance of the Promisory Note set forth as Attachment "C" attached hereto, in and to the collateral:  now owned or hereafter acquire (including proceeds and replacement) by Terry, Tri-County Sales, Inc., and both of them, as specifically described in attachment "D" hereof; which attachment is expressly hereat incorporated by reference as though fully set forth.

4.03  Security interest creation charges:  each party to this agreement agrees to separately bear their costs, attorneys fees and other expenses in connection with the continuation, and creation of the security interest herein described, except: the Goldbergs shall pay up to $50.00 for the cost of recording the continuation financing statement, and the financing statement represented by the new security interest herein

ORIGINAL

granted:  Terry and Tri-County Sales, Inc., jointly and severally shall be liable
for:  any additional acts necessary to perfect the security interests to the Goldbergs
herein described; and to otherwise perform the terms, promises and warranties made
in this agreement.

4.04  Proceeds and replacements:  The security interest herein granted to the
Goldbergs is agreed to, and does include all proceeds from the sale or conversion
(whether voluntary or involuntary), assignment, transfer, lease, replacement insurance
policy proceeds or otherwise with respect to the collateral herein described, whether
now owned, or hereafter acquired; except that Terry, Tri-County Sales, Inc., and both
of them may sell only in the ordinary course of business, the inventory covered by
the security interest herein granted, and apply the proceeds to their own use, if
there is no default under this agreement (including, but not limited to all payments
to the Goldbergs have been timely made as provided in paragraph 3.02 hereinabove).
With the consent of the Goldbergs, Terry or Tri-County Sales, Inc. or both of them may
substitute or exchange other collateral, securities or instruments, in place of the
collateral herein described.  In the event of replacement all of the rights and
privileges of the Goldbergs, and all of the obligations on the part of Terry, Tri-County
Sales, Inc., and both of them shall apply to the substituted or exchanged collateral,
securities or instruments in the same measure as if the property were originally held
as collateral under this agreement.  Consent of the Goldbergs to the substitution of
collateral, shall not unreasonably be withheld if the substituted or replaced collateral
has a net liquidation market value in excess of the collateral for which substitution
or replacement is requested.

4.05  Proceeds held in express trust:  In the event of any breach of this agree-
ment, the payment schedule set forth in paragraph 3.02 hereinabove, or both, Terry,
Tri-County Sales, Inc., and both of them jointly and severally covenant, warrant, and
agree that with respect to the collateral originally given to the Goldbergs, and the
collateral herein given to the Goldbergs, Terry, Tri-County Sales, Inc., and both of
them, are automatically trustee of any proceeds received from the sale (whether in the
ordinary course of business or otherwise), assignment, transfer, lease, conversion
(voluntary or involuntary), insurance proceeds from insurance on, the collateral
herein described.  This paragraph creates an expressed trust in Terry and Tri-County
Sales, Inc.; and both of them expressly covenant and warrant that they shall earmark
the proceeds required by this subparagraph to be held in trust, keep said proceeds
separate from all other proceeds and monies, and remit said proceeds to the Goldbergs
immediately after collection, as received, until all obligations to the Goldbergs have
been satisfied in full.

4.06  Sale, lease, disposition and comingling of proceeds prohibited:  Unless
otherwise specifically allowed under this Agreement, and then only to the extent
allowed:  Terry, Tri-County Sales, Inc., and both of them shall not sell, transfer,
lease, incumber or otherwise dispose of or hypothecate any part or all of the collateral
herein described, and shall not comingle any proceeds from said collateral until all
obligations to the Goldbergs have been completely satisfied and the indebtedness to the
Goldbergs has been discharged; in the event of any dispute between the parties, the
collateral and the proceeds shall be held in trust appropriately earmarked to designate
the Goldberg's security interest claim, segregated from all other property, and held
until the dispute be determined between the parties or by any competent Court having
jurisdiction to determine the dispute.

4.07  Power of sale:  With respect to Terry, Tri-County Sales, Inc. and both of
them, in the event of the failure or suspension of business; insolvency of either or
both of them; a Petition for proceedings filed by or against either of them under:
the Federal Bankruptcy Act, any California Insolvency or Dissolution Proceedings in which
a Receiver is appointed to potentially take control of more than Fifty (50%) percent
of their assets; or any Federal or State Proceedings, attachment, levy that could
potentially lien, hypothecate or encumber Fifty (50%) percent or more of either or both
of their property; in the event of either or both of their general assignment for the
benefit of creditors; in the event of any default in the payment of the obligations
set forth in paragraph 3.02 hereinabove, and not cured within ten (10) days after default;
or in the event of any other default under this agreement and any agreements incorpor-
ated by reference herein, all obligations of either and both of them under this agree-
ment are automatically accelerated, due, and payable to the Goldbergs (notwithstanding
any extension of time or installment payment schedule allowed).  In the event of any
default as defined in this agreement (including Section 4.07 hereinabove) Terry, Tri-
County Sales, Inc. and both of them jointly and severally hereby constitute and

-4-

ORIGINAL

irrevocably appoint the Goldbergs, or any one of the Goldbergs' individual successors, assigns or personal representatives as attorney-in-fact of Terry, Tri-County Sales, Inc., and both of them. This appointment of attorney-in-fact includes the power, among others, to sell the collateral covered by this agreement. Such sale of the collateral may be as a unit or in parts, at any time or place, and on any terms, provided that the attorney-in-fact acts in good faith and in a commercially reasonable manner. Unless the collateral threatens to decline speedily in value, the attorney-in-fact shall give to Terry, Tri-County Sales, Inc., and to any other person who has filed with the attorney-in-fact a written request for notice: a notice in writing of the time and place of any public sale, or of the time on or after which any private sale or other intended disposition is to be made of the collateral. Such notice may be deposited with the United States Postal Service, postage prepaid, or given by telegram at the addresses set forth in this agreement, or such other addresses as may have been furnished to the attorney-in-fact, in writing, for the purposes of this paragraph, at least five (5) days, before the date fixed for any public sale, or before the date on or after which any private sale or other disposition is to be made of the collateral. Unless the collateral threatens to decline speedily in value, notice of the time and place of the public sale shall be given at least five (5) days before the date of sale, by publication once in a newspaper of general circulation, published in Santa Barbara County, California; and if the sale is to be in a different County, also in a newspaper of general circulation published in that County. Any public sale may be postponed from time to time by a public announcement, at the time and place last scheduled for the sale. The attorney-in-fact, the Goldbergs, and both of them, may bid in, and buy at any public sale.

## V.   WARRANTIES AND COVENANTS

Terry and Tri-County Sales, Inc. each individually and jointly, covenant and warrant as follows:

5.01   That each will immediately pay any indebtedness herein, when due; the Goldbergs cost of collecting any indebtedness and of realizing on collateral, and any expenditures of the Goldbergs pursuant thereto, including attorney's fees and expenses, with interest at the maximum rate allowed by law from the date of expenditure; and any deficiency, after the Goldbergs' realization on collateral.

5.02   That the Goldbergs are dependent upon timely receipt of each of the installment payments on the above described promissory note (for the April 1, 1978 principal balance of $48,509.92); and time is therefore made of the essence.

5.03   That as to all collateral and its proceeds and replacements described in this agreement, each will:

(A)   Will maintain possession of 220 West Gutierrez Street, Santa Barbara, California, and will not remove the collateral from that location except under the ordinary course of business sale exception as set forth in this agreement;

(B)   Keep the collateral separate and identifiable;

(C)   Maintain the collateral in good and saleable condition, repair, if necessary, clean, and otherwise deal with the collateral in all ways as are considered good practices by owners of like property, use it lawfully and only as permitted by insurance policies, and permit the Goldbergs to inspect the collateral at any reasonable time; and

(D)   Not sell, contract to sell, lease, encumber or transfer the collateral or proceeds from the sale of the collateral to the extent not otherwise provided in this agreement with respect to sales in the oridinary course of business (if certain conditions are met) until the debt and all



-5-

**ORIGINAL**

obligations to the Goldbergs have been fully satisfied; and pay when due all existing or future charges, liens or encumbrances on, and all taxes and assessments now or hereafter imposed on, or affecting the collateral and its proceeds; insure the collateral with the Goldbergs as additional insured in the form, amounts, with companies, and against the risk and liability as set forth in this agreement, and deliver to the Goldbergs said policies, and authorize the Goldbergs to make any claim thereunder, to cancel the insurance to receive payment in the event of default or any loss; and

(E) Fully and completely comply with the provisions of this agreement, including, but not limited to such trust provisions, warranties, covenants and otherwise as set forth herein.

5.04   That each will cooperate with the other and the Goldbergs to execute or re-execute such additional documents, and to furnish such additional data as may be necessary or desirable to evidence the intention of the consummation of the transaction and transactions herein provided for, and to otherwise specifically   vest and protect the security interest in the Goldbergs in accordance with the terms of this agreement.

5.05   That each has authority to enter into this agreement, and any person signing it has been duly authorized to execute the same.

5.06 . That each, at their own cost, with respect to the adjacent vacant lot described in the "March _____ , 1968" agreement will have the same clean, repaired, patched and otherwise restored to both a useable and level parking lot before October 1, 1978; and each will thereafter insure as set forth below, maintain, repair, restore, and keep said lot in the condition it was when received originally from the Goldbergs.

5.07   That on or before September 30, 1978 Terry will provide the Goldbergs, as beneficiaries, in decreasing term or better life insurance policy on Terry's life in an amount sufficient to satisfy the principal, interest and any collection costs with respect to the above described promissory note; pay all premiums under said policy, when due; and require that the insurance company provide the Goldbergs with thirty (30) days notice of cancellation due to any cause whatsoever; and require that with respect to the Goldbergs said policy is   immediately incontestible and if they should prepay any premium due or past due, it cannot be cancelled until all obligations to the Goldbergs have been fully performed and all debt to the Goldbergs paid.

## VI.   ADDITIONAL PROVISIONS OF SECURITY AGREEMENT AND OBLIGATION

INITIAL

6.01 **APRIL** , 1978 effective date and initial payments application: The parties hereto agree that with respect to the promissory note being extended, that their agreements   reached as of 1, 1978, and therefore this document shall be effective as of 1, 1978. All installment payments made with respect to the above described promissory note and due on 1, 1978, and thereafter, shall be applied and credited under the terms, provisions, interest rate and conditions of this agreement. This initial provision is not deemed a waiver by the Goldbergs or a consent by the Goldbergs to a different due date; it is solely to set up initially performance under this agreement.



INITIAL

~6~

ORIGINAL

6.02  Obligation to insure and maintain insurance:  Terry, Tri-County Sales, Inc. and both of them jointly and severally covenant, agree and warrant to insure the collateral herein described, and maintain said insurance at all times this Agreement is in effect, in amounts sufficient to pay the full amount due the Goldbergs under this Agreement; to name the Goldbergs as additional insured under any such policy; to provide that all proceeds shall be first paid to the Goldbergs; to pay for said insurance at their own cost; to meet all conditions of the insurance company so insuring; to require any insurance company so insuring to give the Goldbergs at least thirty (30) days notice before any such policy or policies are cancelled for any reason whatsoever.  Terry, Tri-County Sales, Inc. and both of them further warrant to deliver to the Goldbergs or their authorized representative copies of any policies issued under this provision, authorize the Goldbergs to make a claim under any policies issued, to cancel the insurance on default, and to receive payment of, and endorse any instrument in payment of any loss or return in premium.

6.03  Power of Attorney:  In addition to the Power of Attorney given to the Goldbergs in connection with the POWER OF SALE, under paragraph 4.07 of this Agreement, Terry, Tri-County Sales, Inc., and each of them irrevocably appoint the Goldbergs, or any one of them, or any one of their successors, assigns or personal representative's attorney-in-fact to do any act which is required of Terry, Tri-County Sales, Inc. or both of them; to exercise such rights as Terry, Tri-County Sales, Inc., or both of them might exercise; to use such equipment as Terry, Tri-County Sales, Inc. or both of them might use; to enter the premises of Tri-County Sales, Inc. to give notice of the Goldbergs security interest in, and right to collect the collateral, and proceeds; and to execute and file in the name of Terry, Tri-County Sales, Inc. or both of their names any Financing Statement and amendments thereto required to perfect the Goldbergs security interest hereunder; or to protect and preserve the collateral and the Goldbergs rights hereunder. This attorney-in-fact grant includes, but is not limited to the express right to:

    (a)  Endorse, collect and receive delivery or payment of instruments and documents constituting the collateral under this agreement; make extension agreements with respect to or effecting the collateral or exchanges for other collateral; release persons liable thereunder or take security for the payment thereof; and compromise disputes in connection therewith; and

    (b)  Use or operate collateral for the purpose of preserving collateral or its value, and for preserving or liquidating collateral.

6.04  Joint and Several Liability:  The liability of Terry, Tri-County Sales, Inc., and both of them is joint and several.  Discharge of any one of them, (except for full payment), or any extension, forebearance, change in rate of interest, or acceptance, release or substitution of collateral or any impairment or suspension of the Goldbergs rights against either or both of them, or any transfer of either or both of their interest to another, shall not effect the liability of the other.  Until the debt to the Goldbergs has been completely discharged and the obligations to the Goldbergs have been fully performed, the Goldbergs rights shall continue even if the debt is outlawed.  Terry, Tri-County Sales, Inc. and both of them waive:

    (a)  Any right to require the Goldbergs to proceed against the other before proceeding against them, or to pursue any other remedy;

    (b)  Presentment, protest and notice of presentment, demand and notice of nonpayment, demand of performance, notice of sale, and advertisement of sale;

    (c)  Any right to the benefit of, or to direct the application of any collateral, until the debt to the Goldbergs has been completely discharged and the obligations to the Goldbergs has been fully performed; and

    (d)  Any and all rights of subrogation, until the debt to the Goldbergs has been completely discharged and the obligations to the Goldbergs have been fully performed.

## VII.  CLARIFICATION OF LEASES AND LOT LEASE

7.01  The "Lease" described in paragraph 1.02 hereinabove, and not the "March ___", Agreement is the only lease of real property in effect on the execution date of

-7-

ORIGINAL

this agreement between Floyd R. Baker and Wanda L. Baker, Tri-County Sales, Inc., and their successors and assigns; except the following additional property is added to said lease. The Goldbergs hereby lease to Terry and Tri-County Sales, Inc., and they lease from the Goldbergs, the vacant lot which is the subject matter of the "March ____, 1968" agreement at a monthly rental of Seventy-Five Dollars ($75.00) per month, due on the first day of each month, starting October 1, 1978. The term of the lease is from October 1, 1978 to March 31, 1988, upon the same additional other terms as contained in the April 1, 1968 lease for the improved building at 220 West Guiterrez Street, Santa Barbara, California, except:

     1. The monthly rent shall be increased by $75.00 per month starting October 1, 1978;

     2. The obligations to maintain, insure and otherwise as set forth in paragraph 5.06 hereinabove are express covenants and conditions of said lease imposed upon Terry, Tri-County Sales, Inc., and both of them to be performed at their own cost. Which covenants include adding to the insurance policy required of Terry and Tri-County Sales, Inc. public liability, extended coverage and loss of rental income coverage to protect the Goldbergs with respect to said vacant lot; and

     3. That in the event of impairment of the use of said lot whether by destruction or condemnation, the Goldbergs shall have the right to all proceeds with respect to said vacant lot from the insurance company and all condemnation awards. Should the Goldbergs take said proceeds or condemnation awards and more than 50% of said lot is not available for use by Terry, Tri-County Sales, Inc. and both of them either the Goldbergs, at their sole option, or Terry at his sole option, or Tri-County at his sole option, may cancel the lease with respect to the vacant lot upon thirty (30) days written notice to the other parties to this lease; and

     4. The $75.00 per month additional rent shall not be increased by any tax increase on said vacant lot, but in the event pro rata portion of any taxes, liens and other governmental charges exceeds $75.00 per month, the Goldbergs are hereby given the option, at their sole discretion, to terminate this lease upon thirty days notice if Terry, Tri-County Sales, Inc. or both of them do not agree to pay as additional rent the liens, taxes and other governmental charges against the vacant lot.

     7.02 That Terry, as a duly authorized and proper successor under the lease described in Section 7.01 above has pursuant to that lease with the implied permission given pursuant to the terms of the lease, renewed the same for a ten (10) year period, ending on the thirty-first (31st) day of March, 1988; with rent reserved for said renewed term in the amount of One Hundred Eight Thousand Dollars ($108,000.00) plus any increase in real property taxes as provided in said lease; payable in installments of Nine Hundred Dollars ($900.00) per month plus ~~any annual rent increase provided~~ ~~any tax increase~~, on the first day of each month starting April 1, 1978.

     7.03 The restrictions set forth in the "March ____, 1968" agreement on the use of the leased premises have been, and are a part of said lease described in Section 7.01 hereinabove.

     7.04 Under paragraph "7" of said lease the landlords obligations are to keep and maintain only the exterior walls and roof; and the other maintenance obligations set forth in said paragraph "7" of said lease are the sole obligations of the lessee, and at the lessee's cost.

     7.05 That due to unanticipated economic conditions the present rent reserved to the landlords is insufficient to pay the present market value of the same or similar rental space; therefore:

     (A) Each party to this agreement expressly agrees that time is specifically reaffirmed as being of the essence in the payment of installment rent payments; and should any installment payment of the rent reserved under the lease be paid after ten (10) days from the first of each month, the full amount of the balance of the rent due shall automatically become due and payable on the eleventh day after default of any one installment rent payment; and

-8-

(B) In the event of condemnation of a whole or part of the leased premises, loss or destruction of the whole or part of the leased premises, the parties agree that the value of the loss of rental income with respect to the landlords shall be, and is the greater amount of: market rental value or rent reserved in the lease.

7.06 The lessees obligation under the above described lease with respect to insurance to be provided to the lessor includes, among other things set forth in said lease:

(A) An all risk form of fire, extended coverage, loss of rental income, and public liability coverage in which the lessors are named as additional insured; and in which is also coverage against the same risks, the lessees inventory; and

(B) The above coverage shall obtain from an insurance company rated in the BEST'S INSURANCE GUIDE OF AAA (Triple A) or better.

## VIII.  DEFAULT AND REMEDIES

8.01 The failure of Terry, Tri-County Sales, Inc., or both of them to perform any of the covenants, conditions or promises set forth under any agreement incorporated by reference herein, shall constitute a default under this agreement.  In addition to the foregoing, default is further defined as any malfeasance, misfeasance or nonfeasance that at law or equity is determined breach of a lease of real property.

8.02 In the event of a default, and without notice or demand, and in addition to all the rights and the remedies given to the Goldbergs, they may, but are not required to, exercise one or more of the following remedies:

(A) Declare without demand or presentment that the entire indebtedness is immediately due and payable, and all obligations are to be immediately performed.

(B) Notify other interesting persons or entities of the default, acceleration and other action of the Goldbergs and take control of the collateral and its proceeds to which the Goldbergs are entitled.

(C) Exercise all rights and set off to the same effect and in the same manner as a Bank may do under its Banker's lien and set off rights.

(D) Sue Terry, Tri-County Sales, Inc. or any other party liable on the indebtedness and/or obligations, and foreclose and otherwise enforce any security interest given in this agreement, by any available judicial process; Terry and Tri-County Sales, Inc., jointly and severally are to be liable for any remaining deficiency.

(E) Retain the collateral in full satisfaction of the obligations and indebtedness set forth in this agreement.

(F) Publicly or privately sell, lease or otherwise dispose of the collateral, and apply the proceeds to:  the reasonable expense of retaking, holding, preparing for sale and selling the collateral, plus attorney's fees, legal expenses and cost incurred by the Goldbergs in exercise of their rights under this agreement, plus the indebtedness and obligations under this agreement; a deficiency, if any, is determined by substracting from the net proceeds of any sale, the items described at the beginning of this sentence--any amount remaining unpaid to the Goldbergs, shall be deemed a deficiency.  Legal expenses include attorney's fees and other costs expended in the exercise of any right or any power under this agreement.

## IX.  NOTICE OF INTENDED SECURITY INTEREST AGREEMENT

upon the written request of the Goldbergs,
9.01 It is hereby covenanted and agreed that Terry and Tri-County Sales, Inc. will execute and cause to be published pursuant to CALIFORNIA COMMERCIAL CODE Section 6.101-- notice of intended security interest agreement in the form as set forth on Attachment "E" hereof; which attachment is expressly hereat incorporated by reference.

## X.  GENERAL PROVISIONS

10.01 Terry and Tri-County Sales, Inc. each warrant, represent and covenant that they are duly authorized to act with respect to the subject matter of this agreement.

ORIGINAL
-9-

10.02  Any notices, requests, demand or other communications required or permitted hereunder shall be deemed to be properly given when deposited in the United States Postal Service, postage prepaid, or when deposited with a public utility company for transmittal, charges prepaid, addressed:

(A)  With  respect to the Goldbergs: Mr. and Mrs. Al Goldberg, 8756 C - 513 Marin Circle, Huntington Beach, California 92646  ; and, Mr. and Mrs. Al Goldberg, c/o S. David Schwartz, P.O. Box 30190, Santa Barbara, California 93105; or to such other person or address as the Goldbergs may from time to time furnish to Terry and Tri-County Sales, Inc. for this express purpose.

(B)  In the case of Terry and Tri-County Sales, Inc.: Mr. Terrance George, Tri-County Sales, Inc.,  220 West Gutierrez Street, Santa Barbara, California            ; or to such other person or address as either guarantor may from time to time furnish to the Goldbergs, for this express purpose.

10.03  This agreement shall inure to the benefit of, and be binding upon the respective heirs, assigns, successors and personal representatives of each of the parties herein.

10.04  With respect to the "lease" described in Article "VII" of this Agreement, any provision of this document that shall amend or change said lease, shall be deemed controlling and the lease amended or changed as provided in this agreement with respect to the rights and obligations between the Goldbergs, on one hand, and Terry and Tri-County Sales, Inc. on the other hand.

10.05  Each provision of this agreement required to be performed by Terry or Tri-County Sales, Inc. or both shall be deemed both a covenant and a condition.  The invalidity of any portion of this document shall not prevent the remainder from being carried into effect.  Whenever the context of any provision of this document requires it, the singular shall be held to include the plural number, and visa versa; and the use of any gender shall, in the appropriate context, include any other or all genders. The articles and section headings in this document are for convenience only, and do not constitute a part of the provisions herein.  No oral modification of, or amendment to, this document shall be effective.  This document and the agreements contained herein, shall be modified or amended only by written agreement signed by all of the parties.  A waiver by the Goldbergs of a failure to comply by Terry, Tri-County Sales, Inc. or both with any of the covenants, terms, conditions or warranties contained in this agreement shall not be construed as a waiver of any subsequent failure of compliance by Terry, Tri-County Sales, Inc. of the same or other covenants, terms, conditions or warranties herein contained.

THIS DOCUMENT consists of ten (10) pages    , plus attachments "A" through "E ", inclusive, has been executed by the parties hereto and two (2) original counterparts, at Santa Barbara, California on this      day of September, 1978; and is deemed effective as of        1, 1978.
                                                                          APRIL

"Goldberg"                              Tri-County Sales, Inc.


_Al Goldberg_                           By _____
Al Goldberg                                  Terrance George, President

"Goldberg"                              "Terry"


_Betty Goldberg_                        _____
Betty Goldberg                          Terrance George

ATTACHMENT "A"

An express part of this agreement is that lease originally executed in
duplicate in Santa Barbara, California on April 1, 1976, between Al Goldberg
and Betty Goldberg, husband and wife, and Floyd R. Baker and Wanda L. Baker,
husband and wife, and Tri-County Sales, Inc., a California Corporation, and
all amendments and modifications thereto (including any amendments, modifications
and changes contained in the loan extension, lease clarification, and security
agreement between Terry George and Tri-County Sales, Inc. and Al and Betty
Goldberg effective May 1, 1978 to which this Exhibit is attached); said lease
is expressly hereat also incorporated by reference. A true copy of this
Exhibit "A" shall be attached to said lease for the purposes of referring to
the additional documents that constitute said lease as of May 1, 1978.

ATTACHMENT "B"

The four (4) parking spaces described in attachment "A", above are
hereby designated by the parties to be commonly described as follows:

Space for four (4) common-size cars in the portion of the paved parking
lot fronting on Gutierrez Street     between the leased building and the
next and subsequent parcels adjacent to the freeway. Said four parking spaces
are located in a rectangle that ends at the back lateral support of the side
door of the leased building; and may be further defined by a chain link fence
across the back and smaller line of the rectangle. One of the four parking
spaces is the covered, but open on two sides, space in the leased building.
A second of the four parking spaces is the open space between the partially
covered parking space and the front of the leased building. The other four
parking spaces are located in the rest of the rectangle. Ingress and egress
to the side door and the four parking spaces is only from Gutierrez Street,
and is shared with any use of the rest of the paved parking lot.



ORIGINAL

ATTACHMENT "C"

## NEGOTIABLE AND INSTALLMENT PROMISSORY NOTE

$48,509.92

Santa Barbara, California

In installments, and at the times hereinafter stated, for value received Terrance George, individually and doing business as Tri-County Sales, Inc., and Tri-County Sales, Inc., a California Corporation, jointly and severally promise to pay to Al and Betty Goldberg, husband and wife, or Order, at Santa Barbara, California the principal sum of Forty Eight Thousand Five Hundred Nine and 92/100 Dollars ($48,509.92) with interest from April 1, 1978 on amounts of principal remaining from time to time unpaid, until said principal sum is paid, at the rate of 9.25%, per annum. Principal and interest due in monthly installments of Eight Hundred Dollars ($800.00) or more, on the first day of each and every month, beginning on the first day of April, 1978, and continuing until said principal sum and interest thereon has been fully paid.

At any time, the privilege is reserved to pay more than the sum due. Each installment, when paid, shall be first applied to the payment of accrued interest, the next applied to the payment of interest for that month, and then last applied to payment of the principal sum.

This Note shall be attached to the original promissory note dated March 14, 1978 for One Hundred Five Thousand Eight Hundred Sixty-Four and 63/100 Dollars ($105,864.63) by Floyd N. Baker and Wanda L. Baker, husband and wife, to Al and Betty Goldberg; which other promissory note also bears a balance due on April 1, 1978 of Forty Eight Thousand Five Hundred Nine and 92/100 Dollars ($48,509.92). A sale, transfer assignment or other dealing with this promissory note, shall also include said attached promissory note, except the holder of this promissory note may at his option, enforce this promissory note, enforce the other promissory note, or both. In the event of full payment of either this promissory note, or the other note, the obligations under both promissory notes shall be deemed fully paid.

If default be made in any payment of this promissory note when due, then the whole sum of the principal and interest shall become immediately due and payable without notice, and at the option of the holder of this promissory note. In the event of the commencement of suit to enforce payment of this promissory note, that sum as the Court may deem reasonable shall be added hereto for attorney's fees, costs of collection, and all court costs. The attachment of the other promissory note to this promissory note, shall not impair the negotiability of either this promissory note or the other promissory note, so long as both promissory notes are transferred at the same time, to the same holder.



_____
Terrance George

Tri-County Sales, Inc.

By_____
    Terrance George, President

ORIGINAL

ATTACHMENT "D"

## SECURITY INTEREST GRANTED

Terry, individually, and doing business as Tri-County Sales, Tri-County Sales, Inc., a California Corporation, and both of them, jointly and severally hereby grant a security interest to Al and Betty Goldberg, in and to the following described collateral:

All inventory, equipment, parts, accessories, accessions appliances, appurtenances, leasehold improvements, replacements thereto, increases thereof, proceeds from, and products of, now or hereafter owned by Terrance George doing business as Tri-County Sales, Tri-County Sales, Inc., a California Corporation, and both, whether now located at 220 West Gutierrez Street, Santa Barbara, California or subsequently wherever located, and whether now or hereafter existing; including, but expressly not limited to the additional specific collateral described in the continuation financing statement filed against Tri-County Sales, Inc., and Tri-County Sales previous to the date hereof.



ORIGINAL

1  Re:  **Estate of Betty Goldberg, et al.  v. Goss Jewett Company, Inc., et al.**
2       **Amador County Superior Court Case No. 5:14-cv-01872**

3       **PROOF OF SERVICE – ELECTRONIC TRANSMISSION**

4       STATE OF CALIFORNIA/COUNTY OF San Francisco

5       I am a citizen of the United States and an employee in the County of San Francisco. I am
6  over the age of eighteen (18) years and not a party to the within action. My business address is
   BASSI, EDLIN, HUIE & BLUM LLP, 500 Washington Street, Suite 700, San Francisco,
7  California 94111.

8       On the date executed below, I electronically served the document(s) via ECF, described
9  below, on the recipients designated on the Transaction Receipt located on the ECF website.

10  # DONALD GEORGE'S CROSS-CLAIM AGAINST ALL OTHER NAMED

11  # DEFENDANTS

12  On the following parties:

13       PLEASE SEE SERVICE LIST VIA ECF WEBSITE

14       I declare under penalty of perjury that the foregoing is true and correct and that this
15  document is executed on December 10, 2014, at San Francisco, California.

16

17

18                              ADELA AREVALO

19

20

21

22

23

24

25

26

27

28

1106927

---

15

DONALD GEORGE'S CROSS-CLAIM