# EXHIBIT G

Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 2 of 41   Page ID #:4946

DANIEL RUBIN Volume I                                February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                    1

1               UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   ESTATE OF BETTY GOLDBERG,
    DECEASED and ESTATE OF AL
5   GOLDBERG, by and
    through their successor in
6   interest Daniel Rubin,

7                    Plaintiffs,

8       vs.                        CASE NO.: 5:14-cv-01872-
                                   DSF (AFMx)
9

10  GOSS-JEWETT COMPANY INC.;
    et al.,

11                   Defendants.

12  ─────────────────────────────

13  AND RELATED CROSS-ACTIONS
    AND THIRD-PARTY ACTIONS.

14  ─────────────────────────────

15

16          DEPOSITION OF DANIEL RUBIN

17        VOLUME I, PAGES 1 THROUGH 159

18

19              February 5, 2016

20                10:13 a.m.

21

22            41707 Winchester Road
                  Suite 106
23            Temecula, California

24

25      Christine L. Herzing, CSR No. 7467



ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 3 of 41   Page ID #:4947

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                       15

1   Mr. Rubin.

2          In what capacity do you understand yourself to

3   be here today?  Are you here as an individual or in some

4   other capacity?

5      A    I'm here as the trustee for my grandmother's

6   estate.

7      Q    That's Betty Goldberg?

8      A    Betty Goldberg.

9      Q    Is there an estate of Al Goldberg?

10     A    No.

11         MR. BURES:  Yeah, Mr. Stone, you started to

12  mention that you had served --

13         MR. STONE:  Yeah.

14         MR. BURES:  -- objections yesterday.  Roy

15  Casstevens served something.  And I'm sorry.  I was only

16  able to print out a copy for myself last night at 5:56.

17         The objections, as I see them -- well, let me

18  just ask you this:  What -- so that we understand the

19  capacity in which you're offering Mr. Rubin, maybe you

20  can clarify what limitations, if any, you're putting on

21  his testimony today?

22         MR. STONE:  The limitation is that he is going

23  to be testifying to his own personal knowledge.

24         MR. BURES:  He's not testifying, therefore,

25  in a 30(b)(6) capacity on behalf of the Estate of



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 4 of 41   Page ID #:4948

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                       23

1    Q    What was the name of that tenant, SKD?

2    A    Yes, it was.

3    Q    Are you also the administrator of the Estate of

4    Betty Goldberg?

5    A    Clarify it.

6    Q    Is there a difference in your mind -- I just --

7    I -- just one second.  Let me mark an exhibit here.

8         (Exhibit 273 marked)

9    BY MR. BURES:

10   Q    Marked as Exhibit 273 is a multi-page document,

11   the first page of which bears the title "Purchase and

12   Sale Agreement," and the first page of which is Bates

13   numbered GOLDBERG0001692.

14        And if you could take a look through -- and

15   the reason why the Bates numbers are inconsistent is

16   sometimes things get printed inconsistently or saved

17   inconsistently.  But look through pages numbered at the

18   bottom 1 through 15, if you would, please.

19        Just glance through them.  You can read as much

20   or as little as you like, but generally, look over this

21   if you would.

22   A    Okay.

23   Q    And if you -- at Page 16, you'll see that the

24   exhibits to it are listed subsequently.

25        Do you see that?



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 5 of 41   Page ID
#:4949

DANIEL RUBIN Volume I
GOLDBERG vs. GOSS-JEWETT COMPANY

February 05. 2016
24

```
 1     A    Uh-huh.

 2     Q    Okay.

 3     A    Yes.

 4     Q    If you turn your attention to Page 15, please,

 5   the page before that.

 6          Is that your signature that appears there?

 7     A    Yes.

 8     Q    Who -- who signed on behalf of 220 West

 9   Gutierrez, LLC?

10          MR. STONE:  Objection.  Calls for speculation.

11          You can answer if you know.

12   BY MR. BURES:

13     Q    If you know.  If you don't know something, then

14   just tell me.

15     A    I don't know.

16     Q    Okay.  And was it signed in your presence by

17   somebody on behalf of the 220 West Gutierrez, LLC?

18     A    Not in my presence.

19     Q    Okay.  At Pages 1 through 15, understanding I'm

20   not identifying the exhibits, just for convenience, is

21   this a copy of the Purchase and Sale Agreement that you

22   executed on September 24, 2013 with respect to the

23   220 West Gutierrez property?

24     A    Yes.

25     Q    Okay.  And without going into details, did you
```



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 6 of 41   Page ID #:4950

DANIEL RUBIN Volume I                                        February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                            25

1   understand what you were signing when you signed this

2   agreement?

3        A    Yes.

4        Q    What was your understanding of the -- of what

5   this agreement was doing or was intended to do?

6        A    It was intended to -- to move forward with the

7   sale of the -- the property on Gutierrez.

8        Q    The sale of the property to 220 West Gutierrez,

9   LLC?

10       A    Yes.

11       Q    If you would turn back a few pages, at the

12  bottom it's marked GOLDBERG 1676.  You'll have to page

13  through a little bit.  Looks like -- it says "Addendum 2"

14  at the very top.

15            Keep going.  It's behind the Purchase and Sale

16  Agreement.

17       A    Oh.

18       Q    Deeper into that -- into that group of

19  documents.  Keep going further.

20       A    Oh, farther?

21       Q    Yeah.  It's five pages in from the back.

22       A    Okay.

23       Q    Okay.  And on the page bearing GOLDBERG0001676

24  entitled "Addendum 2 To Purchase and Sale Agreement," is

25  that your signature that appears there?



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 7 of 41   Page ID #:4951

DANIEL RUBIN Volume I
GOLDBERG vs. GOSS-JEWETT COMPANY

February 05. 2016
26

1    A    Yes.

2    Q    Okay.  Do you know who signed on behalf of

3  220 West Gutierrez, LLC?

4    A    Just what I see.

5    Q    Okay.  Was it signed in front of you?

6    A    No.

7    Q    Do you know John Till?

8    A    No.

9    Q    Have you ever met him?

10    A    No.

11    Q    If you look above your signature, it says

12  "Daniel Rubin, as administrator of the Decedent,

13  Betty Goldberg, Estate."  Under the -- and this is

14  Addendum 2.

15         Under the Purchase and Sale Agreement that we

16  looked at a moment ago, it -- you signed as trustee of

17  the Goldberg Family Revocable Trust dated January 21,

18  1991.

19         Do you know why your signature changed?

20    A    Sometimes -- I don't know.  I'd have to look

21  and see what it looks like.  Sometimes I write Daniel.

22  Sometimes I --

23    Q    No.  No.  No.  I'm asking a slightly different

24  question.

25         Pardon me reaching.  If you'll keep your thumb



Case 5:14-cv-01872-DSF-AFM Document 267-7 Filed 03/04/16 Page 8 of 41 Page ID #:4952

DANIEL RUBIN Volume I                                    February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                               27

 1  there, then what I was asking about is if you look to

 2  the words here, "Daniel Rubin, as administrator," here

 3  under the agreement it says the "Goldberg Family" --

 4       A    Oh.

 5       Q    -- "Trust," and you're signing as trustee.

 6  Here you're signing as administrator.

 7       A    I -- I got it.

 8       Q    What's the reason for the difference, if you

 9  know?

10       A    I do not know.  The only thing -- I just don't

11  know.

12       Q    Okay.  And you can fold this back over.  And if

13  you'd turn a little bit deeper, a couple of pages, there

14  is a page.  It doesn't -- the signatures are on 3185.

15  And the first page is Addendum 1.  If you'd flip back.

16            Are you there?

17       A    Yep.

18       Q    Okay.  Is that your signature on 3185, your

19  signature to Addendum 1?

20       A    Yes.

21       Q    Okay.  And do you know who signed on behalf of

22  the 220 West Gutierrez, LLC?

23       A    The -- the -- the same person.

24       Q    Okay.  And you never met that person?

25       A    No.



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 9 of 41   Page ID
#:4953

DANIEL RUBIN Volume I                                February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                     28

1       Q    Okay.  Then if you turn to the last page, is

2    that your signature on Addendum 3 to the Purchase and

3    Sale Agreement?

4       A    Yes.

5       Q    How many addenda were there to the Purchase and

6    Sale Agreement, just these three?

7       A    I don't know.

8       Q    Just if you were asked to sign one, then you

9    signed them?

10      A    Yes.

11      Q    Okay.  Following -- basically, following

12   whatever advice you were given?

13      A    From my counsel.

14      Q    Okay.  If you turn back to the very beginning of

15   Exhibit 273, the first page, right there -- no.  Right

16   there, the first page, under "Purchase Price," it says

17   "Zero Dollars."

18           Is that what the deal was, the estate got zero

19   dollars in exchange for the property?

20      A    Yes.

21      Q    What was the rationale behind zero dollars?

22      A    Because there was no way for -- for us to afford

23   to clean it up.  And the agreement was that whoever

24   purchased the property, whether it be him, or anybody

25   else, did -- they would have to assume the cleanup



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 10 of 41   Page ID
#:4954

DANIEL RUBIN Volume I                                    February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                      29

1    responsibility.

2         Q    Was there any back end financial benefit to the

3    estate once the property was cleaned up?

4         A    Depending --

5              MR. STONE:  Objection.  Vague and ambiguous.

6              What's a back end financial arrangement?

7    BY MR. BURES:

8         Q    Did you understand what I asked?

9         A    No.

10        Q    Okay.  And I'll rephrase the question.  But

11   again, generally, the process here is going to be I'll

12   ask a question.  Somebody may make an objection.

13             Unless you're instructed to answer -- pardon me.

14   Unless you're instructed not to answer by your attorney,

15   then you can go ahead and answer.

16             MR. WILCOXSON:  John Wilcoxson for Pacific

17   Engineering Associates, Inc. and Clay Scott Bradfield.

18             MR. BURES:  Can you restate your appearance,

19   please?

20             MR. WILCOXSON:  Again, I'm John Wilcoxson,

21   Skane Wilcox, for Pacific Engineering Associates, Inc.

22   and Clay Scott Bradfield.

23   BY MR. BURES:

24        Q    But if you understand the question, then you can

25   answer the question regardless of what the objections may



1   the whole purpose of the zero price for the -- for the

2   sale.

3        Q    And once the property is cleaned up, and

4   developed, or sold, is -- does the trust, the Betty

5   Goldberg Trust, anticipate receiving any sort of

6   monetary recompense?

7        A    No.

8        Q    So you expect zero dollars going forward with

9   respect to the conveyance of the property to the LLC?

10       A    Yes.

11       Q    What, if any, economic benefit, other than

12  ridding itself of the property, does the Betty Goldberg

13  Trust anticipate with respect to the 220 West Gutierrez,

14  LLC taking over the property?

15       A    That we will not be responsible for the cleanup.

16       Q    Has the Betty Goldberg Estate entered into any

17  sort of an agreement with a regulatory agency, like the

18  DTSC, or the California State Water Board, whereby they

19  agree they won't sue the estate?

20       A    I don't know.

21       Q    Did you read the Purchase and Sale Agreement

22  before you signed it?

23       A    Yes.

24       Q    You had an opportunity -- and I'm not asking you

25  for the communications, but you had an opportunity to



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 12 of 41   Page ID
#:4956

DANIEL RUBIN Volume I                                    February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                       40

```
 1    actually take title to the property?

 2        A    I don't know.

 3        Q    Have they taken title to the property?

 4        A    No.

 5        Q    Do you -- when, if at all, do you anticipate

 6    220 West Gutierrez, LLC will take title to the property?

 7        A    I would assume when the escrow closes.

 8        Q    When -- do you have a belief or an anticipation

 9    of when escrow will close?

10        A    I do not.

11        Q    Estimate, time frame?

12        A    One year.

13        Q    Are you waiting until basically this litigation

14    is concluded?

15        A    Yes, completed.

16        Q    And that's whether by appeal, or settlement, or

17    whatever the process is, correct?

18        A    Yes.

19        Q    Did you ever have any meetings with anybody

20    repre- -- on behalf of the buyer, 220 West Gutierrez,

21    LLC?

22             MR. STONE:   Objection.   Vague and ambiguous.

23    BY MR. BURES:

24        Q    At the time that you were negotiating the

25    Purchase and Sale Agreement.
```



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 13 of 41   Page ID
#:4957

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                          41

1        A    No.

2        Q    Never met with any individual representative

3   of 220 West Gutierrez, LLC?

4        A    No.

5        Q    At Best, Best & Krieger, that was Michael Grant

6   and Danielle Sacai; is that correct?

7        A    Yes.

8        Q    And who was the attorney who made the physical

9   appearance on behalf of 220 West Gutierrez, LLC as its

10  lawyer in connection with the Purchase and Sale

11  Agreement?

12           MR. STONE:   Objection to the extent of physical

13  appearance.

14           MR. BURES:   Well, meaning -- it's a good point.

15  Let me rephrase that.

16  BY MR. BURES:

17       Q    Who, to your understanding, was the attorney

18  responsible for representing 220 West Gutierrez, LLC's

19  interests in connection with the negotiation and drafting

20  of the Purchase and Sale Agreement?

21       A    Mr. Stone.

22       Q    Did you ever meet Mr. Stone at the time you were

23  negotiating the Purchase and Sale Agreement?

24       A    No.

25       Q    At the time that you were negotiating the



Case 5:14-cv-01872-DSF-AFM  Document 267-7  Filed 03/04/16  Page 14 of 41  Page ID
#:4958

DANIEL RUBIN Volume I                          February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                              42

1   Purchase and Sale Agreement, did you have an

2   understanding or expectation that the Paladin Law Group

3   would represent your interests in this litigation?

4        A    Yes.

5             MR. STONE:  Wait.  Can I hear the question back

6   again, please?

7             Slow it down so I can --

8             THE WITNESS:  Okay.

9             (Record read)

10            MR. STONE:  After you've heard the court

11  reporter back -- read that back, is that still your

12  answer?  His question was at the time --

13            THE WITNESS:  At the time --

14            MR. STONE:  At the time -- his question was at

15  the time you were negotiating the Purchase and Sale

16  Agreement.

17            THE WITNESS:  No.  I would like to change that

18  probably.  That was not -- not a --

19  BY MR. BURES:

20       Q    What would be accurate?

21       A    Well, because I really -- I mean, I knew I was

22  in conversation with him, but I didn't know if he himself

23  was going to be representing --

24            MR. STONE:  Just to be very clear, in your mind,

25  Mr. Rubin, he's asking you at a time where it's before



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 15 of 41   Page ID #:4959

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                          43

1    the signature on Exhibit 273, before there was a

2    Purchase and Sale Agreement, where you were represented

3    by Best, Best & Krieger.

4            So what he's asking you is did you already --

5    I'm going to let you ask the question again.  I don't

6    want to do it for you, but you've got to focus on the

7    timing of his question.

8            THE WITNESS:  Okay.  Could -- could she read it

9    back to us?

10   BY MR. BURES:

11       Q   I think I'll rephrase it:  When did you first

12   have an understanding that Mr. Stone and the Paladin Law

13   Group were going to be representing your interests or the

14   interests of the Betty Goldberg Estate in connection with

15   this litigation?

16           MR. STONE:  Do you understand the question?

17   Do you understand the question as far as timing goes?

18           MR. BURES:  You're coaching the question.

19           THE WITNESS:  For a timeline -- he's asking for

20   a timeline.

21   BY MR. BURES:

22       Q   I'm asking when did you first have that

23   understanding?

24       A   After I -- after my counsel, Best, Best &

25   Krieger, we -- we discussed the problem.



DANIEL RUBIN Volume I
GOLDBERG vs. GOSS-JEWETT COMPANY

February 05. 2016
44

1    Q    Okay.  I don't want to go further into what --

2    A    Okay.

3    Q    -- you discussed with them.

4    A    I wasn't going to.

5    Q    Okay.  No.  It's -- the reason I'm careful is

6  I don't want the record to suggest that I'm trying to

7  pry into an area where I'm not trying to pry.

8         And I don't expect you to be as careful about

9  it as Mr. Stone might be or anybody else might be.  So

10  I just want to make sure that we're clear on that.

11        So at some point while -- is it fair to say that

12  at some point while you were negotiating and signing the

13  Purchase and Sale Agreement, during that general time

14  frame, you -- it was -- you had -- you inquired an

15  understanding that Mr. Stone and the Paladin Law Group

16  were going to represent your interests, the interests

17  of the Betty Goldberg Estate, in connection with this

18  litigation?

19        MR. STONE:  Objection.  Vague and ambiguous.

20  Assumes facts not in evidence.

21  BY MR. BURES:

22    Q    You can answer.

23    A    I'm good with his objection.

24        MR. STONE:  I didn't instruct you not to answer,

25  so you --



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 17 of 41   Page ID #:4961

DANIEL RUBIN Volume I                                    February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                        45

```
 1              MR. BURES:  Let's have the --
 2              MR. STONE:  -- are -- you are required to answer
 3     it to the extent you know.
 4              THE WITNESS:  Okay.
 5              MR. STONE:  Do you want to have her read it
 6     back?
 7              MR. BURES:  Let's have the question read back.
 8     Let's go off the record.  When we come back on, you'll
 9     read it.
10              (Recess)
11              (Record read)
12              THE WITNESS:  My -- no.
13     BY MR. BURES:
14       Q    Okay.  At some point, you acquired an
15     understanding that Mr. Stone and the Paladin Law Group
16     were going to be representing your interests and the
17     interests of the Betty Goldberg Estate in connection
18     with this litigation, correct?
19       A    Yes.
20       Q    When?
21       A    I would say approximately a couple of months
22     after we got into it, the sale.
23       Q    Okay.  Got into the sale meaning?
24       A    Got into the -- I didn't know that -- I would
25     just say a couple of months.
```



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 18 of 41   Page ID
#:4962

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                         46

1       Q       A couple of --

2       A       After -- approximately a couple of months after

3    that -- the agreement.

4       Q       After the agreement was signed?

5       A       Yes.

6       Q       Okay.  Now, this property was a problem

7    property, correct?

8       A       Yes.

9       Q       So you were kind of happy to get rid of it?

10      A       Yeah.

11      Q       "Yes"?

12      A       Yes, I was.

13      Q       Did you talk about how happy you were with some

14   of your friends?

15      A       No.

16      Q       No.

17              Did you talk about the fact that you got rid of

18   this albatross --

19      A       No.

20      Q       -- with some of your friends?

21              Just stayed --

22              MR. STONE:  Slow down.

23   BY MR. BURES:

24      Q       Just stayed quiet about it with everybody?

25      A       Yes.



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 19 of 41   Page ID
#:4963

DANIEL RUBIN Volume I                                      February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                        61

1    should be Addendum 2.  And, actually, I already asked

2    you that question.

3          If you'd look at the very last page, Addendum 3,

4    do you see where it says "Closing Date"?

5       A    Yes.

6       Q    And then there is a big, long paragraph.  The

7    very last sentence reads, "As a result of the pending

8    litigation, all references in the Agreement to 'Closing

9    Date' shall now mean 'within 40 days, including the

10   40th day until 5:00 p.m., following the dismissal of the

11   entire action entitled Estate of Betty Goldberg," and

12   then it goes on, "including the completion or expiration

13   of any appeal thereof.'"

14          You read that at the time you signed it?

15      A    No.

16      Q    Just -- there was something that needed to be

17   signed your lawyers had given to you and so you signed

18   it?

19      A    Yes.

20      Q    But you understand that -- and -- because you

21   said this earlier, that the closing does not occur until

22   after this current litigation is resolved completely;

23   is that right?

24      A    Yes.

25          MR. BURES:  Let's go off the record for one



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 20 of 41   Page ID #:4964

DANIEL RUBIN Volume I                                        February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                           67

1   you know that suggest that Standard Fire Insurance

2   Company is anything other than a potential insurer

3   of Goss-Jewett?

4            MR. STONE:  Same objections.

5            THE WITNESS:  I don't know.

6   BY MR. BURES:

7      Q    Okay.  And rather than go through for each of

8   the -- if you take a look at REQUEST NO. 21 at the bottom

9   which talks about Great American Insurance Company of

10  New York, and then on Page -- or REQUEST 20 -- NO. 22

11  on Page 10, the same question is asked about Century

12  Indemnity Company.

13           Would your answer to those questions be the

14  same as what you just previously answered with respect

15  to Vigilant and Standard Fire?

16     A    Yes.

17     Q    If you'd turn to Page 10, REQUEST TO ADMISSION

18  NO. 23, the question is, "Admit that Robert Schack,

19  during his lifetime, was not a successor in interest to

20  GOSS-JEWETT."  And the answer is "Deny."

21           First of all, do you know who Robert Schack is?

22     A    No.

23     Q    Did you ever hear of Robert Schack?

24     A    No.

25     Q    Are you aware that his estate has been sued?



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 21 of 41   Page ID #:4965

DANIEL RUBIN Volume I
GOLDBERG vs. GOSS-JEWETT COMPANY

February 05, 2016
68

1        A     No.

2        Q     Do you have any facts showing that he was --

3    first of all, do you have any facts showing the

4    relationship between -- any relationship between Robert

5    Schack and Goss-Jewett?

6        A     No.

7        Q     Do you have any facts that show that Robert

8    Schack was any kind of a successor in interest to

9    Goss-Jewett?

10            MR. STONE:  Objection.  Calls for a legal

11   conclusion.

12            THE WITNESS:  I -- I don't know.

13   BY MR. BURES:

14       Q     If you'd turn to the next page, REQUEST NO. 24,

15   "Admit that Robert Schack, during his lifetime, was not

16   personally liable for the acts or omissions of

17   GOSS-JEWETT," and "Deny."

18            So the question is do you know of any facts

19   that show that Robert Schack, while he was alive, was

20   personally liable for the -- for Goss-Jewett's acts or

21   omissions?

22            MR. STONE:  Objection.  Lacks foundation.

23   Calls for a legal conclusion.

24            THE WITNESS:  I -- I don't know.  I don't -- I

25   don't know who Robert Schack is.



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 22 of 41   Page ID #:4966

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                      69

```
 1    BY MR. BURES:

 2        Q    And so you don't know what his relationship

 3    is --

 4        A    No.

 5        Q    -- if any -- I'm sorry.

 6             You don't know what, if any, relationship he

 7    had with Goss-Jewett, right?

 8        A    Yes.

 9        Q    So you don't know what he did?

10        A    I have no idea.

11        Q    And would your -- would you have the same

12    general answer with respect to Benjamin Fohrman?

13        A    Yes.

14        Q    So you don't know who he was, correct?

15        A    Yes.

16        Q    And you don't know what, if anything, he did at

17    Goss-Jewett, correct?

18        A    Correct.

19        Q    You don't know what, if any, relationship he

20    has with -- or had with Goss-Jewett, correct?

21        A    Correct.

22        Q    Do you have a signed representation agreement

23    with the Paladin law firm?

24        A    Would it be labeled as such?

25        Q    Probably it's a letter of some kind that you
```



1    memory issues," this is Dan Rubin giving a lay person

2    assessment of her condition?

3        A    Yes.

4        Q    "At that time "-- and you go on to say, "At that

5    time, I was not involved in handling any of her affairs."

6             First of all, at what time?

7        A    At the time she was alive.

8        Q    Okay.  At any point in time up until she passed?

9        A    Yes.

10       Q    "...not involved in handling any of her

11   affairs."

12            So during those latter years in her life, your

13   understanding is that Mr. Passovoy is the one who was

14   responsible?

15       A    Yes.

16       Q    Did Betty ever talk to you about trusting

17   Mr. Passovoy?

18       A    No.

19       Q    Did you ever talk to him about --

20       A    No.

21       Q    -- about her?

22            Did you ever talk to him about whether it was

23   easy or difficult to deal with the issues he had to

24   deal with with respect to the Gutierrez property?

25       A    No.



Case 5:14-cv-01872-DSF-AFM  Document 267-7  Filed 03/04/16  Page 24 of 41  Page ID #:4968

DANIEL RUBIN Volume I                                    February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                      104

1   attorney/client communications.

2   BY MR. BURES:

3       Q    I'm just asking a yes or no.

4            Do you know whether it does or does not?

5       A    It does not.

6       Q    And is your knowledge that it does not impact

7   the Betty Goldberg estate, is that something you know

8   independent of anything you may have learned through your

9   attorneys?

10      A    No.

11      Q    Is -- to your understanding, is the Estate of

12  Betty Goldberg still paying DTSC oversight costs?

13           MR. STONE:  Objection.  Vague and ambiguous.

14           THE WITNESS:  I don't -- no.

15  BY MR. BURES:

16      Q    Is it -- is the Estate of Betty Goldberg still

17  writing checks to DTSC?

18      A    No.

19      Q    Did the Betty Goldberg Estate ever write checks

20  to the DTSC?

21           MR. STONE:  Objection.  Calls for speculation.

22           THE WITNESS:  The estate never did.

23  BY MR. BURES:

24      Q    Okay.  Did you ever sign checks payable to the

25  DTSC at any point in time?



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 25 of 41   Page ID
#:4969

DANIEL RUBIN Volume I                                          February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                            105

1     A     No.

2     Q     Did you, as executor of the Estate of Betty

3  Goldberg, ever sign checks payable to the Department

4  of Toxic Substances Control at any time?

5     A     No.

6     Q     Did you as the administrator of the decedent

7  Betty Goldberg Estate ever sign checks payable to the

8  DTSC?

9     A     No.

10    Q     Do you understand that 220 West Gutierrez, LLC

11  is responsible for all of DTSC's costs incurred in

12  responding to contamination at the site?

13         MR. STONE:  Objection.  Vague and ambiguous.

14  Calls for speculation.  Calls a legal conclusion.

15  And potentially infringes on attorney/client

16  communications.

17         THE WITNESS:  I don't know.

18  BY MR. BURES:

19    Q     If you'd turn to Page 9, the very bottom,

20  section 9.3, "Cost Recovery," do you see that?

21    A     Okay.

22    Q     Okay.  9.3, it says, looking at the second line,

23  "Settling Respondent," and that's 220 -- you can look at

24  the beginning, but that's 220 West Gutierrez, LLC,

25  "Settling Respondent is liable for all of DTSC's costs



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 26 of 41   Page ID #:4970

DANIEL RUBIN Volume I                                    February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                      117

1    BY MR. BURES:

2        Q    Well, you -- the purpose behind the Purchase

3    and Sale Agreement was to get rid of the property, right?

4        A    Yes.

5        Q    And -- because there were environmental

6    conditions, correct?

7        A    Yes.

8        Q    And 220 West Gutierrez, LLC paid zero dollars

9    for the property, right?

10       A    Yes.

11       Q    And that was because you understood they were

12   going to be taking over and assuming responsibility for

13   handling all the environmental issues at the property;

14   is that right?

15       A    Yes.

16       Q    Do you know whether 220 West Gutierrez, LLC has

17   been doing any environmental investigation or cleanup

18   work at the property?

19            MR. STONE:  Objection.  Lacks foundation.  Calls

20   for speculation.

21            THE WITNESS:  I don't know.

22   BY MR. BURES:

23       Q    Is the Estate of Betty Goldberg currently paying

24   any money for investigation or cleanup of environmental

25   conditions at the Gutierrez property?



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 27 of 41   Page ID #:4971

DANIEL RUBIN Volume I                                      February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                        118

1        A      No.

2               MR. STONE:   Objection.  Objection.  Vague and

3     ambiguous.   Lacks foundation.   Assumes facts.

4               MR. BURES:   Off the record for a second.

5               (Discussion off the record)

6               MR. BURES:   We're back on the record.

7     BY MR. BURES:

8        Q      Have you ever seen the Complaint that was filed

9     in this action other than today?

10       A      No.

11       Q      Okay.   Did you play any role in reviewing a

12    Complaint before it was filed in this action?

13       A      No.

14       Q      Okay.   And while we were off the record, I

15    asked you to take a look at paragraphs 11 and 12 in the

16    Complaint.   Those are the paragraphs that contain

17    allegations with respect to the Estate of Robert W.

18    Schack and the Estate of Benjamin F. Fohrman.

19               And did that jog your memory in any way as

20    to whether you know anything about Robert Shack or

21    Ben Fohrman?

22       A      No.

23       Q      Still don't know who they are?

24       A      I don't know who they are.

25       Q      To your knowledge, have you been the sole point



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 28 of 41   Page ID
#:4972

DANIEL RUBIN Volume I                                    February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                      121

```
 1              How did you learn that?
 2      A     When he -- when he gave me all the information
 3  for the property, he told me that it had been leased
 4  recently.
 5      Q     Which he?
 6      A     Mr. Passovoy.
 7      Q     Okay.  Mr. Passovoy gave you information?
 8      A     Yeah, when he mailed me the -- like the bank
 9  account and a copy of the trust so that it showed that
10  I could -- I could be the trustee.
11      Q     When was this, ballpark?
12      A     Oh, beginning -- so 2003 maybe.
13      Q     Soon after Betty died?
14      A     Yes.  Uh-huh.
15      Q     Okay.  And what is it that Mr. Passovoy sent to
16  you?
17      A     The -- the checking information and a copy of
18  the trust that showed -- showed me next successor.  And
19  he -- he told me that the -- he didn't -- I didn't see
20  this.  He told me that the unit had just recently been
21  leased up.
22      Q     Did he provide you -- so he didn't give you
23  copies of any leases?
24      A     No.  Huh-uh.
25      Q     Do you know where he kept those?
```



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 29 of 41   Page ID
#:4973

DANIEL RUBIN Volume I                                    February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                          122

```
 1        A    I have no idea.

 2        Q    After you became a trustee of the trust, did

 3   Mr. Passovoy continue to manage the property?

 4        A    No.   No.   After I became the trustee, I managed

 5   the property.

 6        Q    Did you ever ask Mr. Passovoy for a copy of the

 7   lease?

 8        A    No.

 9        Q    Why not?

10        A    Because I called -- I actually called the

11   tenant.

12        Q    Okay.   What did you say to the tenant?

13        A    I introduced myself and said this is who I am,

14   and this is what I'm doing, and the address is going to

15   change.

16        Q    For sending checks?

17        A    Yes.

18        Q    And otherwise, you didn't really have any

19   contact with the tenant; is that right?

20        A    Just if he needed me.

21        Q    Like for repairs --

22        A    Yes.

23        Q    -- or something?

24        A    Uh-huh.

25        Q    Do you remember him calling you about any
```



1     Q     -- Exhibit 285.

2           Have you had a chance to do that or do you

3  need a little --

4     A     No, I'm good.

5     Q     -- more time?

6     A     I'm good.

7     Q     Okay.  And let me refer you -- leave that in

8  front of you, but let me refer you back to Exhibit 274.

9  Those were the Verifications.

10          Do you remember those?

11    A     I will in a second.  Got them.

12    Q     If you take a look on the new Exhibit 285, it

13 says "Responses To Intervenors' Interrogatories."  And

14 the very first page on 274 --

15    A     Yeah.

16    Q     -- your Verifications.  You're verifying your

17 responses to the interrogatories.

18          So you see that you verified them, right?

19    A     Yes.

20    Q     Okay.  And you verified them under penalty of

21 perjury, right?

22    A     Yes.

23    Q     And you said that they were true and correct,

24 right?

25    A     Yes.



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 31 of 41   Page ID
#:4975

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                      130

1        Q      Okay.  So you -- did you review Exhibit 285

2    before you verified it?

3        A      285?

4        Q      The responses to the interrogatories.

5               MR. STONE:  It's the whole exhibit.

6               THE WITNESS:  Oh, yes.

7    BY MR. BURES:

8        Q      You did.

9               How did you know that the responses were true

10   and correct?  What was your process?

11       A      My counsel.

12       Q      If you would turn in Exhibit 285 to Page

13   Number 3, INTERROGATORY NO. 1.  It asks you to "IDENTIFY

14   all costs to YOUR."  And you is referring to plaintiffs

15   here in this case, the Goldbergs.  Okay?

16              "IDENTIFY all costs YOU claim to have incurred

17   in connection with environmental conditions at the SITE."

18   If you look farther down, there are a bunch of

19   objections, but starting at line 19, it goes through a

20   list of responses.

21              And it says on line 21, it started on 20,

22   "Goldbergs incurred response costs in excess of $230,000

23   as of November 15, 1995."

24              Do you see that?

25       A      Yes.



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 32 of 41   Page ID #:4976

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                        131

1       Q    What facts do you know of to support the

2  assertion that the Goldbergs incurred response costs in

3  excess of $230,000.00 as of November 15, 1995?

4       A    I relied on my counsel --

5       Q    Okay.

6       A    -- for that.

7       Q    The word "incurred" there, what did -- what's

8  your understanding of the response that you verified

9  using that word "incurred"?  Does that mean paid?

10           MR. STONE:  Objection.

11           THE WITNESS:  I wouldn't -- either paid, take --

12  took care of.  I -- I would say that's -- that's a good

13  definition.

14  BY MR. BURES:

15       Q    Paid or taken care of?

16       A    Yeah.

17       Q    So it's not an outstanding, unpaid amount?

18           MR. STONE:  Objection.  Assumes facts.  Calls

19  for speculation.

20           THE WITNESS:  Yeah.  It's -- my -- my definition

21  of incurred would be like ran up costs, or run up costs,

22  or maybe costs of doing -- the cost of doing a job.

23  BY MR. BURES:

24       Q    When it says here that the Goldbergs incurred

25  response costs in excess of $230,000.00, does that mean



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 33 of 41   Page ID
#:4977

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                    132

1   that the Goldbergs had written checks, paid cash, used

2   credit cards, to pay $230,000.00 worth of response costs?

3          MR. STONE:  Objection.  Calls for a legal

4   conclusion or speculation.

5          You can answer.

6   BY MR. BURES:

7      Q   I'm just asking -- I'm asking for your

8   understanding.

9      A   I don't know.  That's what I would assume.

10     Q   Okay.  So you don't -- but you personally don't

11  know?

12     A   I personally don't know.

13     Q   And as you said, at the time you were verifying

14  these responses, you were relying on counsel; is that

15  right?

16     A   Yes.

17     Q   You don't have independent knowledge of whether

18  that's a true or false statement, correct?

19     A   True.

20     Q   And you don't personally have the documents that

21  may or may not reflect whether that's true, correct?

22     A   True.

23     Q   And below that at line 23 it says, "The

24  breakdown of these costs are currently unknown..."

25          Do you know why the breakdown of the cost was --



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 34 of 41   Page ID #:4978

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                      133

1    was unknown at the time you verified these responses?

2         A    No, I don't.

3         Q    Without telling me what was explained, was that

4    sentence -- that phrase explained to you?

5         A    No.

6         Q    Did you ask about it?

7         A    No.

8         Q    It then goes down -- line 26 begins, "Since

9    2012, the Goldbergs have incurred additional response

10   costs in excess of $150,000...," and then it goes on.

11             Between 1995 and 2012, did the Goldbergs incur

12   any response costs in connection with environmental

13   contamination at the property?

14             MR. STONE:  Objection.  Calls for speculation.

15             THE WITNESS:  Yeah, I -- I don't know.

16   BY MR. BURES:

17        Q    Between 1995 and 2012, have you personally

18   signed any checks -- well, actually, let me back up a

19   step.

20             The checking account is the only means of

21   paying an expense on behalf of the Betty Goldberg Estate;

22   is that correct?

23        A    Yes.

24        Q    Okay.  Since 1995 -- between 1995 and 2012, have

25   you written any checks to pay for costs associated with



DANIEL RUBIN Volume I
GOLDBERG vs. GOSS-JEWETT COMPANY

February 05, 2016
134

```
 1    investigating, or remediating, or removing environmental
 2    contamination at the property?
 3         A    No.
 4         Q    Going back to line 26, "Since 2012, the
 5    Goldbergs have incurred additional response costs in
 6    excess of $150,000...," had -- since 2012, have you
 7    signed checks on behalf of the Estate of Betty Goldberg
 8    in excess of $150,000.00 with respect to environmental
 9    conditions at the property?
10         A    No.
11         Q    Do you know where that number came from?
12         A    No.
13              (Exhibit 286 marked)
14    BY MR. BURES:
15         Q    Marked as Exhibit 286 is a three-page document,
16    or group of documents, bearing Bates Numbers CITYOFSB
17    2400 through 2402.
18              Have you seen these documents before, Mr. Rubin?
19         A    No.
20         Q    Did you on behalf of the Betty Goldberg Estate
21    write -- ever write any checks to California Rigging Co.?
22         A    No.
23         Q    So does -- do these documents demonstrate or
24    show any costs incurred by the Goldbergs in connection
25    with environmental conditions at the site, to your
```



Case 5:14-cv-01872-DSF-AFM Document 267-7 Filed 03/04/16 Page 36 of 41 Page ID #:4980

DANIEL RUBIN Volume I                                    February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                      135

1    knowledge?

2         A    Not to my knowledge, no.

3              (Exhibit 287 marked)

4    BY MR. BURES:

5         Q    Marked as Exhibit 287 is a one-page document

6    from Young's Environmental Services.  Bears the Bates

7    Number INS 013270.

8              Have you seen this document before?

9         A    No.

10        Q    Does this reflect an invoice that the Estate of

11   Betty Goldberg paid?

12        A    No.

13        Q    Does this reflect -- does Exhibit 287 reflect

14   costs incurred by the Goldbergs in connection with

15   environmental conditions at the site?

16        A    No.

17        Q    It's billable to Goss-Jewett; is that right?

18   If you look on the left-hand --

19        A    Yeah, I see it.

20        Q    -- side?

21        A    I see it, yeah.

22        Q    It's not billable to the Goldbergs, correct?

23        A    Right.  Yes.

24             (Exhibit 288 marked)

25



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 37 of 41   Page ID
#:4981

DANIEL RUBIN Volume I                                February 05. 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                        139

1    Q    It's payable to CampbellGeo, Inc.

2         Do you see that?

3    A    Yes.

4    Q    Who is CampbellGeo, Inc.?

5    A    They were doing -- in conjunction with my

6    attorney, Best, Best & Krieger, they were doing an

7    analysis on the property to see how bad it was.

8    Q    How bad the contamination was?

9    A    Yes.

10   Q    Do you have a recollection of the nature of

11   the work that they did?

12   A    No.  No, I don't.

13   Q    If you look under the Memo line where you have

14   a handwritten note --

15   A    Yes.

16   Q    -- on check Number 186, what does that note say?

17   A    It's -- it's a retainer.

18   Q    So the word written there is "Retainer"?

19   A    Yeah.

20   Q    Okay.

21   A    To get him going on the property.

22   Q    Who was your primary contact at CampbellGeo?

23   A    The gentleman, Mr. Campbell.

24   Q    Okay.  Do you remember his first name?

25   A    No, I don't.



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 38 of 41   Page ID #:4982

DANIEL RUBIN Volume I                               February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                               140

1      Q      Check 188, is that a check that you wrote on
2  or about, what, May, or is that March --
3      A      This --
4      Q      -- March 20, 2013?
5      A      Yeah.  It was the next month.
6      Q      Okay.
7      A      Yeah.
8      Q      At the bottom, the Memo -- and this is, again,
9  to CampbellGeo, correct?
10     A      Yes.
11     Q      Okay.  Under the Memo, what is -- what's the
12  handwriting there?
13     A      So his first name was Steve.
14     Q      Oh.
15     A      It says, "Thanks, Steve."
16     Q      Thanks, Steve.
17            So it's Steve Campbell?
18     A      Yes.
19     Q      Okay.
20     A      So we know his first name.
21     Q      And what was this for?
22     A      Same thing.  He needed more money.
23     Q      Okay.  Apart from these two checks, did you
24  write any other checks --
25     A      No.



Case 5:14-cv-01872-DSF-AFM    Document 267-7    Filed 03/04/16    Page 39 of 41    Page ID
#:4983

DANIEL RUBIN Volume I                                        February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                           141

1      Q      -- to CampbellGeo?

2      A      No.

3      Q      And this was for work that you did at the

4  request or in coordination with BB -- Best, Best &

5  Krieger?

6      A      Yes.

7      Q      Did you write any other checks for any other

8  environmental work --

9      A      No.

10     Q      -- other than these two?

11     A      No.  Those were the only two.

12     Q      And you don't recall specifically what it was

13 that Mr. Campbell --

14     A      No.  He ran a bunch of soil tests, soil tests.

15 And I guess they do an air quality test, or something.

16            (Exhibit 290 and 291 marked)

17 BY MR. BURES:

18     Q      Marked as Exhibit 290, there is Bates stamp

19 GOLDBERG 1502 is a document entitled "Invoice."  Marked

20 as Exhibit 291 is a one-page document Bates Number

21 GOLDBERG 1580.  It's entitled "Statement."

22            Have you seen these documents before?

23     A      Yes.

24     Q      And these are for environmental work that

25 CampbellGeo is doing at the site; is that correct?



Case 5:14-cv-01872-DSF-AFM   Document 267-7   Filed 03/04/16   Page 40 of 41   Page ID #:4984

DANIEL RUBIN Volume I                                    February 05, 2016
GOLDBERG vs. GOSS-JEWETT COMPANY                                      142

1      A     Yes.

2      Q     Apart from -- do these invoices reflect the

3   totality of the work that CampbellGeo did for you?

4      A     Yes.

5            MR. BURES:  Off the record.

6            (Discussion off the record)

7            (Exhibit 292 marked)

8   BY MR. BURES:

9      Q     Marked as Exhibit 292 is a one-page document.

10  It appears to be a copy of a check.  Bears Bates number

11  INS 001923.

12           Have you seen this document before?

13     A     No.

14     Q     Does this document reflect payment of costs

15  incurred by the Goldbergs in connection with

16  environmental conditions at the site?

17     A     I don't know.

18     Q     Do you know who Brian McCord is at Anacapa

19  GeoSciences?

20     A     No.

21     Q     Ever heard of the firm Gray, Cary, Ware?

22     A     No.

23     Q     Do you have any understanding why Exhibits 286,

24  287, 288, 289, 290 -- pardon me, 289 -- where is your

25  check?



1          REPORTER'S CERTIFICATION

2

3          I, Christine L. Herzing, a Certified Shorthand

4     Reporter in and for the State of California, do hereby

5     certify:

6

7          That the foregoing witness was by me duly sworn;

8     that the deposition was then taken before me at the time

9     and place herein set forth; that the testimony and

10    proceedings were reported stenographically by me and

11    later transcribed into typewriting under my direction;

12    that the foregoing is a true record of the testimony and

13    proceedings taken at that time.

14

15         IN WITNESS WHEREOF, I have subscribed my name this

16    18th day of February, 2016.

17

18                    

19          _____

20          Christine L. Herzing, CSR No. 7467

21

22

23

24

25