1  Bret A. Stone      SBN 190161  BStone@PaladinLaw.com
   Brian R. Paget     SBN 168694  BPaget@PaladinLaw.com
2  PALADIN LAW GROUP® LLP
   3 W. Carrillo Street, Suite 212
3  Santa Barbara, CA 93101
   Telephone:  (805) 898-9700
4  Facsimile:  (805) 852-2495

5  Counsel for Plaintiff and Counter-Defendant
   Estate of Betty Goldberg, Deceased, and
6  Estate of Al Goldberg, Deceased, by and
   through their successor in interest, Daniel Rubin
7

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                   WESTERN DIVISION

12

| | |
|---|---|
| 13  ESTATE OF BETTY GOLDBERG, DECEASED and ESTATE OF AL GOLDBERG, DECEASED, by and through their successor in interest Daniel Rubin, | Case No. EDCV14-01872 DSF (AFMx) |
| 14 | Assigned for all purposes to Judge Dale S. Fischer |
| 15 | |
| 16                    Plaintiff, | GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT |
| 17  v. | |
| 18  GOSS-JEWETT COMPANY, INC. *et al.*, | and REQUEST FOR MORE TIME TO PURSUE FURTHER DISCOVERY PURSUANT TO RULE 56(d) |
| 19 | |
| 20                    Defendants. | Hearing: April 18, 2016 1:30 p.m. Courtroom 840 |
| 21 | |
| 22  AND RELATED CROSS-ACTIONS AND THIRD-PARTY ACTIONS. | Action filed: September 8, 2014 Trial date: October 11, 2016 |
| 23 | |

24

25

26

27

28



# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES ............................................................................... ii

I.   INTRODUCTION ................................................................................. 1

II.  FACTS .................................................................................................. 1

III. PROCEDURAL HISTORY .................................................................. 7

IV.  LEGAL STANDARD ........................................................................... 8

V.   ARGUMENT ......................................................................................... 9

     A. The PSA and PPA do not prevent Goldberg from recovering .................. 9

     B. Civ. Proc. Code § 366.2 does not prevent Goldberg from recovering ..... 11

     C. Goldberg has incurred recoverable response costs ................................... 11

     D. Goldberg will dismiss its § 113(f) claim if its § 107(a) claim survives .. 14

     E. Recovery of response costs paid in the 1990s is not time-barred ............. 15

     F. Goldberg is entitled to pursue claims under the HSAA ............................ 16

     G. Goldberg's contractual indemnity claim is not time-barred ..................... 16

     H. Goldberg's indemnity claims are not barred by laches ............................. 17

          1. Intervenors' laches argument fails as a matter of law .......................... 17

          2. Goldberg is entitled to more time to pursue further discovery ........... 20

     I. Goldberg's declaratory relief claim is not derivative ............................... 21

     J. The Fohrman and Schack estates are liable ............................................... 22

     K. Goldberg can pursue claims as the successor to Al Goldberg's estate ..... 24

VI.  CONCLUSION ..................................................................................... 25



1

# **TABLE OF AUTHORITIES**

2

<u>CASES</u>

3   *Ameron Int'l Corp. v. Insurance Co. of Pa.,* 50 Cal.4th 1370 (2010)....................13

4   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .............................................8

5   *Brown v. Brown,* No. CV 13-03318 SI,

6       2013 WL 5947032 (N.D. Cal. Nov. 5, 2013)....................................................15

7   *California Dept. of Toxic Substances v. Alco Pacific, Inc.,*

8       308 F.Supp.2d 1124 (C.D. Cal. 2004)..............................................................15

9   *California Sansome Co. v. United States Gypsum,* 55 F.3d 1402 (9th Cir. 1995)..15

10  *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).......................................................8

11  *Chartis Specialty Ins. Co. v. United States,* No. C–13–1527 EMC,

12      2013 WL 3803334 (N.D. Cal. July 19, 2013), modified on

13      reconsideration, 2015 WL 328523 (N.D. Cal. Jan. 26, 2015) .......................13

14  *Chubb Cust. Ins. Co. v. Space Sys./Loral, Inc.,* 710 F.3d 946 (9th Cir. 2013) .......12

15  *City of Colton v. American Promotional Events, Inc.-West,*

16      614 F.3d 998 (9th Cir. 2010)...........................................................................22

17  *County of Fresno v. Fair Employment & Housing Commission,*

18      226 Cal.App.3d 1541 (1991)............................................................................18

19  *Exxon Corp. v. Hunt,* 475 U.S. 355 (1986) ............................................................15

20  *Exxonmobil Oil Corp. v. Nicoletti Oil, Inc.,*

21      713 F.Supp.2d 1105 (E.D. Cal. 2010).............................................................17

22  *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253 (1968) ..........................9

23  *Gofron v. Piscel Technologies, Inc.,* 804 F.Supp.2d 1030 (N.D. Cal. 2011)...........9

24  *Jacksonville Elec. Auth. v. Eppinger & Russell Co.,* No. 388CV873J20HTS,

25      2005 WL 3533163 (M.D. Fla. Dec. 21, 2005)................................................12

26  *Johnson v. City of Loma Linda,* 24 Cal.4th 61 (2000) ...........................................18

27  *Kaiser Aluminum v. Catellus Dev. Corp.,* 976 F.2d 1338 (9th Cir. 1992).............23

28  *Karras v. Teledyne Industries, Inc.,* 191 F.Supp.2d 1162 (S.D. Cal. 2002) ..........14

Case No. EDCV14-01872 DSF (AFMx)

GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

*Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549 (9th Cir. 2006) ............. 18

*Levin Metals Corp. v. Parr-Richmond Terminal Co.,*

    781 F.Supp. 1454 (N.D. Cal. 1991) ...................................................... 23

*Lincoln v. Narom Development Co.,* 10 Cal.App.3d 619 (1970) .......................... 17

*Long Beach Unified School Dist. v. Dorothy B. Godwin Calif. Living Trust,*

    32 F.3d 1364 (9th Cir. 1994) .............................................................. 22

*Mantilla v. United States,* 302 F.3d 182 (3d Cir. 2002),

    *cert. denied* 538 U.S. 969 (2003) ...................................................... 18

*Miller v. Eisenhower Medical Center,* 27 Cal.3d 614 (1980) ............................... 18

*Murphy v. Schneider Nat'l, Inc.,* 362 F.3d 1133 (9th Cir. 2004) ............................. 9

*Pelayo v. City of Downey,* 570 F.Supp.2d 1183 (C.D. Cal. 2008) ......................... 16

*Peregrine Pharm., Inc. Clinical Supplies Mgmt., Inc.,* No. SACV 12-1608 JGB

    ANX, 2014 WL 3791567 (C.D. Cal. July 31, 2014) ..................................... 15

*Quarles Petroleum Co. v. United States,* 551 F.2d 1201 (Ct. Cl. 1977) ................. 12

*Save the Peaks Coalition v. U.S. Forest Serv.,* 669 F.3d 1025 (9th Cir. 2012) ...... 18

*Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978 (9th Cir. 2007) ......................... 15

*State of California v. Celtor Chem. Corp.,* 901 F.Supp. 1481 (N.D. Cal. 1995) .... 23

*Tatum v. City & County of San Francisco,* 441 F.3d 1090 (9th Cir. 2006) ............. 9

*Team Enterprises, LLP v. Western Inv. Real Estate Trust,* No. CV F 08-0872

    LJO SMS, 2009 WL 1451635 (E.D. Cal. May 20, 2009) .............................. 23

*Trimble v. ASARCO, Inc.,* 232 F.3d 946 (8th Cir. 2000), abrogated by

    *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546 (2005) .............. 12

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,*

    809 F.2d 626 (9th Cir. 1987) ................................................................ 9

*United Alloys, Inc. v. Baker,* 797 F.Supp.2d 974 (C.D. Cal. 2011) ....................... 13

*United States v. Bestfoods,* 524 U.S. 51 (1998) ............................................... 22

*United States v. One Residential Property at 8110 E. Mohave,*

    229 F.Supp.2d 1046 (S.D. Cal. 2002) ................................................... 15



GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

*Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido, Inc.,*

    238 Cal.App.4th 468 (2015) ................................................................ 17

OTHER AUTHORITIES:

American Heritage Dictionary (4th ed. 2000) ...................................... 12

California Civil Code § 2778 ................................................................. 17

California Code of Civil Procedure § 337 ............................................. 16

California Code of Civil Procedure § 366.2 .......................................... 11

California Code of Civil Procedure § 377.11 .................................... 5, 25

California Health & Safety Code §§ 25300–25395.45 ........................... 7

California Health & Safety Code § 25319 ............................................. 16

California Health & Safety Code § 25323.5 .................................... 10, 13

California Health & Safety Code § 25363 ............................................. 13

California Probate Code §§ 550–555 ...................................................... 7

CERCLA §§ 101–405, 42 U.S.C. §§ 9601–9675 .................................. 7

CERCLA § 101, 42 U.S.C. § 9601 ................................................. 12, 15

CERCLA § 107, 42 U.S.C. § 9607 .................................... 10, 12, 13, 22

CERCLA § 113, 42 U.S.C. § 9613 ................................................. 15, 22

Federal Rules of Civil Procedure, Rule 30 ........................................... 25

Federal Rules of Civil Procedure, Rule 56 ......................................... 8, 9



# I.  INTRODUCTION

This is an environmental contamination case brought by a property owner against its former tenants and their dry-cleaning chemical supply business, who polluted the property with dry cleaning solvent and are liable to investigate and cleanup that contamination. The Complaint asserts claims against them for cost recovery, contribution, contractual and equitable indemnity, and declaratory relief. The insurers for the dry-cleaning chemical supply business and two of its former directors, officers, and shareholders have moved for summary judgment on all claims against the insureds. The insurers' arguments and evidence do not demonstrate an absence of a genuine dispute of a material fact and do not demonstrate that their insureds are entitled to judgment as a matter of law on the claims against them or on any single claim or part of any claim against them. The insurers' motion should therefore be denied.

# II.  FACTS

Al and Betty Goldberg purchased 220 W. Gutierrez Street, Santa Barbara, California 93101 (the "Property") in the 1960s. Fact No. 82.[1] On December 29, 1967, they formed Tri-County Sales, Inc. ("Tri-County") to operate at the Property as a wholesale distributor of dry cleaning supplies. Fact No. 83. The Goldbergs owned and operated Tri-County for about 2½ months, during which time they received sealed 55-gallon drums of the dry-cleaning solvent tetrachloroethylene ("PCE") and delivered the sealed drums to customers. Fact No. 84. There is no evidence that PCE or any other chemical was released at the Property during the 2½ months that the Goldbergs owned and operated Tri-County. Fact No. 85.

On March 14, 1968, the Goldbergs sold Tri-County to, and leased the Property to, Floyd and Wanda Baker for a term of ten years from April 1, 1968, through March 31, 1978 (the "1968 Lease"), "for the purpose of conducting a wholesale

---

[1] References to "Fact No. __" or "Fact Nos. __" are to Goldberg's Statement of Genuine Disputes and of Additional Uncontroverted Facts, filed herewith.

Case No. EDCV14-01872 DSF (AFMx)

GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

business of furnishing cleaning supplies to dry cleaning establishments, laundries, and hospitals." Fact Nos. 86 & 87. The 1968 Lease contains an indemnification clause that requires the lessees to indemnify the Goldbergs and hold them harmless from all liability, loss, cost, or obligations arising out of injury to the Property. Fact No. 88. The Bakers operated their cleaning supply business as lessees at the Property for about six months. Fact Nos. 86 & 89.

On or about September 24, 1968, the Bakers sold Tri-County to, and assigned their interest in the 1968 Lease to, Donald George. Fact No. 89. In the assignment, Donald George agreed to be bound by all conditions and covenants contained in the 1968 Lease. Fact No. 89. About six months later, in or around March, 1969, Donald George had a 5,000-gallon aboveground storage tank installed at the Property to store PCE. Fact Nos. 89 & 90. There were no storage tanks at the Property before then. Fact No. 91. About six months later, in late 1969 or early 1970, Donald George's brother, Terry George, joined him in the business. Fact No. 92. They operated Tri-County together until Donald George sold the business to Terry George on or about December 31, 1974. Fact No. 92. Terry George had a second aboveground storage tank installed on the Property sometime between 1975 and 1979. Fact No. 93. In early 1978, Terry George exercised his option to renew the 1968 Lease for an additional ten year period, from April 1, 1978, to March 31, 1988. Fact No. 94. Terry George died a year later, in March 1979, and his ex-wife, Carol George, took over the business as the executor of his estate. Fact No. 95.

One year later, on March 10, 1980, Carol George assigned the extended 1968 Lease to, and sold Tri-County's stock to, Goss-Jewett Company, Inc. ("Goss-Jewett"). Fact No. 96. One year later, in March 1981, Goss-Jewett and the Goldbergs amended the extended 1968 Lease to substitute "Goss-Jewett" in as the Lessee. Fact No. 97. The indemnification clause in the extended 1968 Lease was not amended and remained in effect as originally written. Fact No. 98. In December 1983, Tri-County merged into Goss-Jewett. Fact No. 99. As the extended 1968

Lease came to an end, Goss-Jewett entered into a new lease with the Goldbergs for a three-year term from April 1, 1988, through March 31, 1991 (the "1988 Lease"). Fact No. 100. The 1988 Lease contains an indemnification clause that requires Goss-Jewett to indemnify the Goldbergs and hold them harmless from all liability, loss, cost and obligations arising out of injuries to the Property. Fact No. 101. After the 1988 Lease ended on March 31, 1991, Goss-Jewett continued operating at the Property on a month-to-month basis until it finally vacated the Property on May 14, 1991. Fact Nos. 73 & 74. In August 1991, at the Goldbergs' insistence, Goss-Jewett had the two aboveground PCE storage tanks removed from the Property. Fact No. 104. Pictures taken as the tanks were being removed show that they were rusty and corroded, and that the concrete slab upon which they sat was caved in, cracked, and stained. Fact No. 104.

The aboveground storage tanks were installed at the Property during the time that the Georges operated their chemical supply businesses there.  Fact Nos. 90 & 93.  Since March 1969, tanker trucks delivered PCE to the Property, and the PCE was transferred by hose from the tanker trucks to the storage tanks. Fact No. 105. Employees of Tri-County and later Goss-Jewett would then transfer the PCE from the storage tanks to the tanks in their delivery trucks for transport and delivery to their customers. Fact No. 106. This process resulted in spills and other releases of PCE to the Property, contaminating the soil, soil vapor, indoor air, and groundwater at the Property and surrounding area (the "Site"). Fact Nos. 107 & 108.

After Goss-Jewett removed the tanks, the Goldbergs discovered that the concrete slab that the tanks had been sitting on had caved in and was cracked and stained. Fact No. 136. The Goldbergs hired Environmental & Industrial Consultation Services ("EICS") to determine whether PCE from the tanks had contaminated the Property. Fact No. 137. That inspection revealed elevated levels of PCE in the soil at the Property. Fact No. 138. The Goldbergs then hired Pacific Engineering Associates, Inc. ("Pacific") in September 1991, to further investigate the contami-

GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

nation. Fact No. 139. That inspection confirmed that the Property was contaminated with PCE. Fact No. 140. This triggered a series of correspondence between the County of Santa Barbara ("County"), the Regional Water Quality Control Board ("RWQCB") (which had jurisdiction over the Site), and the Goldbergs and their agents. Fact No. 141. The Goldbergs complied with the agencies' requests for additional information and testing by hiring Pacific to continue its investigations and to conduct quarterly monitoring of the soil and groundwater at the Site. Fact No. 142. On September 29, 1993, RWQCB issued a Cleanup and Abatement Order ("CAO") to the Goldbergs. Fact No. 141. The CAO found that PCE had been "discharged to the waters of the State" at the Site creating "a condition of pollution or nuisance," which the CAO ordered the Goldbergs to abate. Fact No. 141.

After the Goldbergs regained possession of and discovered the contamination at the Property in 1991, they repeatedly asked Goss-Jewett to investigate and cleanup the contamination, pointing to its obligation to do so under the 1988 Lease. Fact No. 143. Goss-Jewett refused, claiming that the conditions at the Property were "easily attributable to normal wear and tear." Fact No. 144.

The Goldbergs continued to incur response costs throughout the early 1990s, investigating the contamination and paying oversight costs to the County. Fact No. 146. Because they were an elderly couple on a limited income, they were forced to ask their children to assist them financially with these costs. Fact No. 147.

On June 8, 1994, the Goldbergs filed a suit, *Goldberg v. Arns,* No. CV94-3834 DSF (SHx) (C.D. Cal.) (the "*Arns* Action"), against Goss-Jewett and several of its officers, directors, and shareholders with substantial managerial and supervisory control over operations at the Property, including Robert Schack and Benjamin Fohrman, to address the contamination at the Site. Fact Nos. 12 & 148. Three months later, on September 13, 1994, Al Goldberg died. Fact Nos. 13 & 150.

Two years later, in 1996, during settlement discussions in the *Arns* Action, Goss-Jewett agreed to prepare an interim remediation plan to analyze remediation

strategies for the Site, submit the plan to the California Department of Toxic Substances Control ("DTSC"), and work with DTSC to finalize the plan and obtain its approval of the plan. Fact No. 149. While the parties waited for Goss-Jewett to implement the plan, which it never did, the *Arns* Action became inactive and never concluded. Fact No. 149.

After Al Goldberg's death in 1994, Betty Goldberg continued to spend her life savings dealing with the contamination until she depleted her resources and could no longer afford to pay her consultants or her attorney in the *Arns* Action. Fact No. 150. She lived in a nursing home for six to seven years until she died on January 14, 2003. Fact Nos. 15 & 141. During that time, she showed signs of Alzheimers and often could not recognize her grandson, Daniel Rubin. Fact No. 151.

The Property is now part of Betty Goldberg's estate. Fact No. 152. Mr. Rubin is the personal representative and administrator of Betty Goldberg's estate, and the successor to Al Goldberg's interests in the Property and in this litigation. Fact No. 153. *See* Cal. Civ. Proc. Code § 377.11.

When Mr. Rubin became the successor to the Goldberg estates after Betty Goldberg's death in 2003, there was no action by any regulatory agency related to the Site. Fact No. 154. His first notice from any regulatory agency of a contamination problem at the Site was not until July 17, 2012, when the DTSC issued an Imminent and Substantial Endangerment Determination and Order and Remedial Action Order ("I&S/E Order") to Mr. Rubin, as the representative of the Goldberg estates, and Goss-Jewett. Fact Nos. 16 & 155. The I&S/E Order found that the PCE at the Site presents or may present an imminent and substantial endangerment to the public health or welfare or to the environment, and ordered Mr. Rubin and Goss-Jewett to abate it. Fact Nos. 155-158. DTSC later tested the indoor air within the building at the Property and, on January 30, 2014, sent a letter to Mr. Rubin in care of the Goldbergs, informing him that the indoor air was also contaminated and a health risk, and demanding that he abate that contamination, too. Fact No. 159.

GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1    Faced with these agency demands, Mr. Rubin retained Best Best & Krieger,

2  LLP ("BBK"). Fact No. 160. In October 2013, Mr. Rubin entered into an agreement

3  to sale the Property to 220 W. Gutierrez LLC ("220 LLC"). Fact No. 162. This was

4  an arms-length transaction that included multiple drafts of the Purchase and Sale

5  Agreement and addendums (collectively, "PSA"). Fact No. 163. BBK represented

6  Mr. Rubin throughout the process of negotiating and drafting the PSA. Fact No.

7  163. Escrow has not closed and title has thus not yet passed to the buyer. Fact No.

8  164. The buyer and seller anticipate closing after this litigation has concluded. Fact

9  No. 164. Closing is within the sole subjective discretion of the buyer. Fact No. 165.

10   After executing the PSA, Mr. Rubin learned about the *Arns* Action and there-

11  after retained Paladin Law Group® LLP ("Paladin"). Fact No. 166. Believing that

12  reopening the *Arns* Action would be a quicker and more cost-effective way to

13  compel Defendants to address the contamination than filing a new lawsuit, Paladin

14  filed an appearance on March 28, 2014, and requested a status conference in the

15  *Arns* Action. Fact No. 167. Ultimately, however, the Court dismissed the *Arns*

16  Action without prejudice on August 21, 2014, for lack of prosecution. Fact No. 50.

17   On December 17, 2014, 220 LLC and DTSC entered into an Agreement and

18  Covenant Not to Sue, a Prospective Purchaser Agreement ("PPA"). Fact No. 168.

19  The purpose of the PPA is to settle the potential liability of 220 LLC for the

20  contamination at the Site which would otherwise result from it becoming the owner

21  of the Property. Fact No. 168. The PPA requires 220 LLC to perform a limited

22  removal of the source of the contamination at the Property only (not the overall

23  Site) and to return the Property to productive use, and, in exchange, the PPA bars

24  DTSC from suing or asserting claims for environmental remediation against 220

25  LLC. Fact No. 169. The PPA is subject to 220 LLC's acquisition of title to the

26  Property. Fact No. 171. The PPA does not alter Goldberg's liability for the

27  contamination. Fact No. 172. The PPA notes that the contamination at the Site has

28  gone unabated for decades, that the current owner does not have the financial



GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

resources to perform the investigation and cleanup, and that the work to be performed at the Property after the sale will benefit public health, the environment, and the community. Fact No. 170. As such, DTSC determined that the PPA was fair, reasonable, and in the public interest. Fact No. 170.

## III. PROCEDURAL HISTORY

With the *Arns* Action having been dismissed without prejudice, Daniel Rubin in his capacity as successor in interest to the Goldberg estates ("Goldberg"), filed this action on September 8, 2014, in an effort to compel Defendants to investigate and abate the contamination at the Site and thereby avoid or minimize the costs that Goldberg would otherwise incur to respond to the contamination. Dkt. No. 1.

On October 27, 2014, Goss-Jewett's insurers[2] filed a motion to intervene in this action on behalf of Goss-Jewett, which, as a suspended corporation, cannot defend itself. Dkt. No. 19. The Court granted that motion on November 19, 2014. Dkt. No. 37. Goss-Jewett's insurers are also involved in this case as the insurers for Estate of Benjamin F. Fohrman, Deceased, and Estate of Robert Schack, Deceased, who, as former officers, directors and shareholders of Goss-Jewett, are additional insureds under the policies that the insurers issued to Goss-Jewett, and who are being sued herein to the extent of their insurance assets pursuant to California Probate Code §§ 550–555. Dkt. No. 1 at ¶¶ 11, 12; Dkt. No. 237 at 2:2–14.[3]

On December 16, 2014, the Court dismissed several claims in Goldberg's Complaint. Dkt. No. 49. Six claims remain: cost recovery under CERCLA[4] § 107(a); contribution under CERCLA § 113(f); contribution under the HSAA[5];

---

[2] Goss-Jewett's insurers are: Vigilant Insurance Company; The Standard Fire Insurance Company; Great American Insurance Company of New York, f/k/a American National Fire Insurance Company; and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America. Dkt. Nos. 19 & 265.

[3] All page number citations herein are to the page numbers at the bottom of the documents, not to the ECF page numbers at the top of the documents.

[4] "CERCLA" refers to the Comprehensive Environmental Response, Compensation, and Liability Act, CERCLA §§ 101–405, 42 U.S.C. §§ 9601–9675.

[5] "HSAA" refers to the Carpenter-Presley-Tanner Hazardous Substances Account Act, Cal. Health & Saf. Code §§ 25300–25395.45.

contractual indemnity; equitable indemnity; and declaratory relief.

The Court issued a Scheduling Order on March 9, 2015, Dkt. No. 88, and an Amended Scheduling Order on March 3, 2016, Dkt. No. 264. The Amended Scheduling Order sets July 11, 2016, as the cut-off date for motions to be heard, and October 11, 2016, as the trial date. Dkt. No. 264.

On March 4, 2016, the insurers for Goss-Jewett and the Fohrman and Schack estates ("Intervenors") filed the motion presently under consideration, their Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("MSJ"). Dkt. No. 265. This is Goldberg's timely opposition to that MSJ.

## IV.  <u>LEGAL STANDARD</u>

Summary judgment is properly entered on each claim—or on the part of each claim[6]—on which summary judgment is sought where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the opposing party, and a dispute is "material" if it could affect the outcome of the suit under governing law. *See Anderson,* 477 U.S. at 248–49. If the movant produces evidence showing that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law, then the burden shifts to the nonmovant who must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmovant need not establish a material issue of fact conclusively in her favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

---

[6] A motion for partial summary judgment is resolved under the same standard as a motion for summary judgment. *See California v. Campbell,* 138 F.3d 772, 780 (9th Cir. 1998).



Case No. EDCV14-01872 DSF (AFMx)

GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1    versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,*

2    809 F.2d 626, 630 (9th Cir. 1987) (quoting *First Nat'l Bank of Ariz. v. Cities Serv.*

3    *Co.,* 391 U.S. 253, 288–89 (1968)). In making this determination, the Court

4    believes the nonmovant's evidence and liberally construes, draws all justifiable

5    inferences from, and resolves all factual conflicts in, the evidence in her favor, and

6    does not engage in credibility determinations or the weighing of evidence as these

7    functions are for the jury. *Anderson,* 477 U.S. at 255; *Celotex,* 477 U.S. at 325;

8    *Murphy v. Schneider Nat'l, Inc.,* 362 F.3d 1133, 1138 (9th Cir. 2004).

9        Moreover, the Federal Rules allow the nonmovant to request more time to

10   pursue additional discovery in order to develop the evidence necessary to oppose

11   the motion.  Federal Rule of Civil Procedure 56(d) provides:

12       If a nonmovant shows by affidavit or declaration that, for specified
         reasons, it cannot present facts essential to justify its opposition, the
13       court may: (1) defer considering the motion or deny it; (2) allow time
         to obtain affidavits or declarations or to take discovery; or (3) issue
14       any other appropriate order.

15   To obtain the postponement or denial for further discovery contemplated by Rule

16   56(d), the non-moving party's declaration must identify "the specific facts that

17   further discovery would reveal, and explain why those facts would preclude

18   summary judgment." *Tatum v. City & County of San Francisco*, 441 F3d 1090,

19   1101(9th Cir. 2006).  "This rule should be applied with a spirit of liberality to

20   prevent injustice to the party facing summary judgment." *Gofron v. Piscel*

21   *Technologies, Inc.*, 804 F.Supp.2d 1030, 1036 (N.D. Cal 2011).

22                          **V.   <u>ARGUMENT</u>**

23   **A.   The PSA and PPA do not prevent Goldberg from recovering.**

24       Intervenors argue, first, that Goldberg faces no liability for the contamination

25   at the Site because the prospective purchaser of the Property, 220 LLC, has

26   assumed such liability. MSJ at 11:3–12:6. Therefore, they argue, Goldberg cannot

27   recover against their insureds under CERCLA § 107(a), MSJ at 16:14–17:3, under

28   the HSAA, MSJ at 20:21-27, for equitable or contractual indemnity, MSJ at 22:1-



GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

27, or for declaratory relief, MSJ at 24:1-6.

Intervenors' argument fails for several reasons. First, 220 LLC has not committed itself to do anything at the Property *yet;* the PPA is contingent on closing and closing is within the sole discretion of 220 LLC. Fact Nos. 165 & 171. Second, 220 LLC has not committed itself to a Site-wide cleanup; it has only agreed to perform a *limited* response action at the Property itself; not the overall Site. Fact No. 169. Third, Goldberg faces potential liability for the contamination at the Site as a current owner of the Property, *see e.g.* 42 U.S.C. § 9607(a)(1), and after closing will continue to face such potential liability as a former owner of the Property, *see e.g.* 42 U.S.C. § 9607(a)(2). *See also* Cal. Health & Saf. Code § 25323.5(a). The PPA will not extinguish Goldberg's potential liability after closing, will not provide Goldberg with contribution protection after closing, and will not prevent DTSC or anyone else from pursuing environmental remediation claims against Goldberg after closing. Fact Nos. 172 and 173.[7] Fourth, even if closing were certain to happen, and even if 220 LLC had agreed to assume all post-closing liability for the contamination throughout the entire Site, and even if the PPA had extinguished Goldberg's post-closing liability or barred post-closing claims against Goldberg, that would still only affect *post*-closing response costs, litigation costs, damages, etc. Goldberg would still be able to maintain its claims against Defendants for *pre*-closing costs and damages. As such, nothing in the PSA or the PPA prevents Goldberg from recovering on its claims herein. The Court should therefore reject Intervenors' argument for summary judgment on this basis.

---

[7] Intervenors cite two probate filings and some deposition testimony of Mr. Rubin, *see* Fact Nos. 37, 42 & 71, to support their assertion that 220 LLC has assumed all responsibility for the contamination and that Goldberg thus no longer has any such responsibility. MSJ at 11:10–12:5. Intervenors, however, mischaracterize what was said in those filings and in that testimony. Also, those filings and that testimony do not accurately describe and do not and cannot modify what the PSA and PPA provide, and the PSA and PPA themselves are the best evidence of what those documents provide. Fact Nos. 37 and 71. *See* Evidentiary Objections in Support of Goldberg's Opposition to Intervenors' Motion for Summary Judgment ("Evid. Objs."), filed herewith, at Objs. 8, 10, 14, 18, 20.



Case No. EDCV14-01872 DSF (AFMx)

GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1

2       **B.    Cal. Civ. Proc. Code § 366.2 does not prevent Goldberg from recovering.**

3           Next, Intervenors argue that Goldberg faces no liability for contamination at

4       the Site because California Code of Civil Procedure § 366.2 bars suits against an

5       estate more than one year after the decedent's death, and both Al and Betty

6       Goldberg died many years ago. MSJ at 12:7–15:4. Therefore, they argue, Goldberg

7       cannot recover against the Intervenors' insureds under CERCLA § 107(a), MSJ at

8       16:14–17:3, under the HSAA, MSJ at 20:21-27, for equitable or contractual

9       indemnity, MSJ at 22:1-27, or for declaratory relief, MSJ at 24:1-6.

10          This argument, too, is without merit. First, Goldberg has already tried to have

11      Defendants' counterclaims dismissed on the ground that they are time-barred by

12      Code of Civil Procedure § 366.2. Dkt. No. 208. This Court rejected that argument.

13      Dkt. No. 223. Second, even if Goldberg had prevailed on that motion, only

14      Defendants' counterclaims against Goldberg would have been dismissed, not

15      Goldberg's affirmative claims against Defendants. Third, even assuming that claims

16      against Goldberg *as a defendant* would be time-barred by § 366.2, there is no

17      reason why that should bar claims by Goldberg *as a plaintiff*. Goldberg is still an

18      indemnitee and a current owner of a contaminated Property and, as such, is entitled

19      to pursue claims *as a plaintiff* against the indemnitor and polluters to clean up its

20      Property regardless of whether claims against it *as a defendant* would be time-

21      barred. Intervenors are arguing, in effect, that only a potentially responsible party

22      ("PRP") with no defenses to liability can sue other PRPs. MSJ at 12:7–15:4. That

23      makes no sense and is wholly unsupported by any legal authority. Accordingly, the

24      Court should reject Intervenors' argument for summary judgment on this basis.

25      **C.    Goldberg has incurred recoverable response costs.**

26          Next, Intervenors argue that Goldberg cannot prove that it has incurred

27      recoverable response costs. MSJ at 15:5–16:6. Therefore, they argue, Goldberg

28      cannot recover against their insureds under CERCLA § 107(a), MSJ at 17:4–18:8,



GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

under the HSAA, MSJ at 20:1-20, for equitable or contractual indemnity, MSJ at 22:1-27, or for declaratory relief, MSJ at 24:7-14.

This argument also fails. CERCLA provides that PRPs are liable for necessary costs of response incurred by any person consistent with the national contingency plan ("NCP"). 42 U.S.C. § 9607(a)(4). CERCLA defines "response" as "remove, removal, remedy, and remedial action," along with related enforcement activities. 42 U.S.C. § 9601(25). "The terms 'remove' or 'removal' mean the cleanup or removal of released hazardous substances from the environment," 42 U.S.C. § 9601(23), and the terms "remedy" or "remedial action" mean "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances. . . ," 42 U.S.C. § 9601(24). Because CERCLA does not define "incur," courts apply the ordinary meaning, which is "[t]o acquire or come into," "[t]o become liable or subject to as a result of one's action," to "bring upon oneself." *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.,* 710 F.3d 946, 961 (9th Cir. 2013) (quoting Am. Heritage Dictionary (4th ed. 2000)). In other words, "[t]o incur means to become liable for or subject to; it does not mean to actually pay for."[8] *Jacksonville Elec. Auth. v. Eppinger & Russell Co.,* No. 388CV873J20HTS, 2005 WL 3533163, *10 (M.D. Fla. Dec. 21, 2005); *Quarles Petroleum Co. v. United States,* 551 F.2d 1201, 1205 (Ct. Cl. 1977) (interpreting Federal Water Pollution Control Act). "Applying these definitions, section 107(a) plainly applies to a person who, through his or her

---

[8] Intervenors cite *Trimble v. ASARCO, Inc.,* 232 F.3d 946 (8th Cir. 2000), abrogated by *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546 (2005), for the proposition that "incur" means "to pay for." The Eighth Circuit held in *Trimble* that costs advanced by a law firm were not "incurred" by plaintiffs because plaintiffs had no existing obligation to reimburse their attorneys for those costs; that obligation was contingent on them winning their case. *Trimble,* 232 F.3d at 958. *Trimble* thus stands for the proposition that a plaintiff does not "incur" response costs unless and until he becomes obligated to pay those costs (even if only at some later date). This is entirely consistent with the proposition stated above that "[t]o incur means to become liable for or subject to; it does not mean to actually pay for."



GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1   own actions, becomes statutorily liable for, or is subject to, the costs related to the

2   cleanup of hazardous substances or the permanent remediation of a release or

3   threatened release of hazardous substances into the environment in a manner

4   consistent with the NCP." *Chubb,* 710 F.3d at 961–62; *Chartis Specialty Ins. Co. v.*

5   *United States,* No. C–13–1527 EMC, 2013 WL 3803334, *5 (N.D. Cal. July 19,

6   2013), modified on reconsideration, 2015 WL 328523 (N.D. Cal. Jan. 26, 2015).

7       The HSAA, California's version of CERCLA, incorporates the same liability

8   standards, defenses, and classes of PRPs as CERCLA, and is generally interpreted

9   consistently with CERCLA. *Ameron Int'l Corp. v. Ins. Co. of Pa.,* 50 Cal.4th 1370,

10   1379 (2010); *United Alloys, Inc. v. Baker,* 797 F.Supp.2d 974, 1004–05 (C.D. Cal.

11   2011). Like CERCLA, the HSAA provides that "[a]ny person who has incurred

12   removal or remedial action costs in accordance with this chapter or the federal act

13   may seek contribution or indemnity from any person who is liable pursuant to this

14   chapter. . . ." Cal. Health & Saf. Code § 25363(e).

15       Here, Goldberg has "incurred" response costs under CERCLA and the

16   HSAA.[9] The following are examples of costs that Goldberg has become statutorily

17   liable for or subject to:

18      ▪  The Goldbergs and the Estate of Al Goldberg have become potentially
19         *statutorily liable* for response costs because they were current owners of the
          Property, 42 U.S.C. § 9607(a)(1), and are former owners of the Property at
20         the time of a disposal of a hazardous substance at the Property, 42 U.S.C.
          § 9607(a)(2). *See also* Cal. Health & Saf. Code § 25323.5(a)(1).

21      ▪  The Estate of Betty Goldberg has become potentially *statutorily liable* for
          response costs because it is the current owner of the Property. 42 U.S.C.
22         § 9607(a)(1). *See also* Cal. Health & Saf. Code § 25323.5(a)(1).

23      ▪  The Goldbergs and their estates have become *subject to* response costs
          because they have been ordered by the County, RWQCB, and DTSC to in-
24         vestigate and remediate the contamination at the Site. Fact Nos. 141 & 146.

25      ▪  In 2015 and 2016, Goldberg became *liable for* the cost of hiring
          environmental consultants to investigate and remediate the contamination at
26         the Site. Fact Nos. 146 & 161.

27

28        [9] Intervenors have not challenged the necessity or consistency with the NCP of Goldberg's response costs. As such, these issues are not discussed herein.



GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1

▪ Since 2012, Goldberg has become *liable for* oversight costs from DTSC. Fact No. 146.

2

And the following are just a few of the many costs that Goldberg has actually paid:

3

▪ Goldberg *paid* BBK to research PRPs and other sources of the contamination at the Site. Fact No. 175.

4

5

▪ Goldberg *paid* Campbell Geo for environmental consulting work related to the Site.[10] Fact No. 176.

6

▪ The Goldbergs *paid* Pacific Engineering for investigative work at the Site. Fact No. 139 and 146.

7

▪ The Goldbergs *paid* oversight costs to the County. Fact No. 146.

8

These costs are also costs that the Intervenors' insureds are contractually obligated

9

to indemnify Goldberg for pursuant to the indemnity provision in the 1968 Lease

10

and 1988 Lease. Fact Nos. 88 & 101. In any event, the examples above should

11

suffice to rebut Intervenors' argument that Goldberg cannot prove that it has

12

"incurred" response costs and thus cannot state a claim for cost recovery,

13

contribution, indemnity, etc. Accordingly, the Court should reject Intervenors'

14

argument for summary judgment on this basis.

15

**D.    Goldberg agrees to dismiss its CERCLA § 113(f) claim if its CERCLA § 107(a) claim survives.**

16

Next, Intervenors argue that Goldberg's contribution claim under CERCLA

17

§ 113(f) fails because Goldberg has not been subject to a civil action under

18

CERCLA § 106 or § 107(a). MSJ at 19:11-27.

19

As Goldberg stated in its meet-and-confer letter to Intervenors, it added a

20

claim for contribution under CERCLA § 113(f) as a precautionary measure, it

21

22

_____

[10] Intervenors point out that these payments were made by the Goldberg Family Revocable Trust, not the Estate of Betty Goldberg. MSJ at 18:6-8. This is irrelevant. Mr. Rubin uses the trust account as the estate account. He deposits income from the Property into the trust account, and he withdraws money from the trust account to pay expenses for the Property. Fact No. 177. Furthermore, Mr. Rubin is here not on his own account, but as the sole representative and successor to his grandparents and their undistributed assets wherever they might exist, whether in a judicially-created estate or a privately-created trust or otherwise. Fact No. 153. Moreover, whether a plaintiff has "incurred" response costs is broadly interpreted; courts are not required to trace the source of funds used to pay response costs, and the entity to whom a government order is directed need not be the entity that "incurs" the response costs. *See e.g., Karras v. Teledyne Industries, Inc.,* 191 F.Supp.2d 1162, 1169 (S.D. Cal. 2002) (where government agency ordered PRPs to perform certain environmental work, and where PRPs set up and funded plaintiff trusts to perform such work, trusts "incurred" costs for such work even though the order was not directed to them).

23

24

25

26

27

28

1  agrees that it does not need both a CERCLA § 107(a) claim and a CERCLA

2  § 113(f) claim, and it will stipulate to a dismissal without prejudice of the latter

3  claim on the condition that the former claim is upheld against all challenges on

4  summary judgment or otherwise.

5  **E.    Recovery of response costs paid in the 1990s is not time-barred.**

6  Next, Intervenors argue that Goldberg cannot rely on response costs Goldberg

7  incurred during the 1990s to support its cost recovery claims because CERCLA

8  § 113(g)(2) bars recovery of such costs. MSJ at 18:19–19:9.

9  This argument has no merit. The statute of limitations for a cost-recovery

10  action under CERCLA § 107(a) is three years after completion of the removal

11  action or six years after initiation of the "physical on-site construction of a remedial

12  action." 42 U.S.C. § 9613(g)(2)(A). In general, a "removal" is a "short-term

13  cleanup," *see* 42 U.S.C. § 9601(23), while a "remedial action" is characterized by

14  "measures to achieve a permanent remedy," *see* 42 U.S.C. § 9601(24). *Exxon Corp.*

15  *v. Hunt,* 475 U.S. 355, 360 (1986). Intervenors have the burden to prove their

16  statute of limitations defense. *See California Sansome Co. v. United States Gypsum,*

17  55 F.3d 1402, 1406 (9th Cir.1995); *Brown v. Brown,* No. CV 13-03318 SI, 2013

18  WL 5947032, at *4 (N.D. Cal. Nov. 5, 2013). As such, they must present *conclu-*

19  *sive* evidence in order to obtain summary judgment in their favor on the defense.

20  *Peregrine Pharm., Inc. Clinical Supplies Mgmt., Inc.,* No. SACV 12-1608 JGB

21  ANX, 2014 WL 3791567, *1-2 (C.D. Cal. July 31, 2014); *United States v. One*

22  *Residential Property at 8110 E. Mohave,* 229 F.Supp.2d 1046, 1047 (S.D. Cal.

23  2002); *see Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007).

24  Intervenors fall far short of meeting this burden. They do not even attempt to

25  show that a removal action was completed at the Site more than three years before

26  this action was filed or that the physical on-Site construction of a remedial action

27  was initiated more than six years before this action was filed. MSJ at 18:19–19:9.

28  Nor could they. The entire removal phase of the work to be performed at the Site



-15-                                        Case No. EDCV14-01872 DSF (AFMx)

has clearly not been completed. *See California Dept. of Toxic Substances v. Alco Pacific, Inc.* 308 F.Supp.2d 1124, 1132–33 (C.D. Cal. 2004) (general rule is that "all removal actions performed at a single site constitute a single indivisible removal action" and that "statute of limitations only begins to run at the conclusion of the entire removal phase"). Nor has construction commenced on a physical on-Site remedial action (measures to achieve a permanent remedy). None of Goldberg's preliminary investigations in the 1990s can be characterized as physical on-Site remedial actions. Intervenors certainly have not presented any evidence that they are. Recovery of response costs from the 1990s is thus not time-barred, and such costs can be recovered as part of Goldberg's cost recovery claims in this action.

**F.    Goldberg is entitled to pursue its HSAA claim.**

Next, Intervenors argue that Goldberg's HSAA claim against their insureds fails as a matter of law because Goldberg is an estate and the HSAA does not authorize suits by estates. MSJ at 21:1-24.

Under California law, "[a]n estate can neither sue nor be sued," except as provided by statute, *Pelayo v. City of Downey,* 570 F.Supp.2d 1183, 1192 (C.D. Cal. 2008), and the HSAA does not appear to be such a statute given that its definition of a "person" entitled to pursue claims under the HSAA does not include an estate. Cal. Health & Saf. Code § 25319. But that is irrelevant here since the plaintiff here is not an estate. Neither the Estate of Betty Goldberg, nor the Estate of Al Goldberg, is a plaintiff here. The plaintiff is Daniel Rubin (in his capacity as representative of, and successor to, the Goldbergs and their estates), and, as a natural person, Mr. Rubin is a "person" entitled to pursue claims under the HSAA. Cal. Health & Saf. Code § 25319.

**G.    Goldberg's contractual indemnity claim is not time-barred.**

Next, Intervenors argue that Goldberg's contractual indemnity claim against their insureds fails as a matter of law because it is time-barred by the four-year statute of limitations in California Code of Civil Procedure § 337. According to the



Intervenors, "[t]he Goldbergs were aware of their alleged injuries no later than September 29, 1993, when the Water Board issued an order regarding the Site to Al and Betty Goldberg," and, therefore, their "contractual indemnity claims expired no later than September 29, 1997." MSJ at 23:1-11.

This argument fails as well. An indemnitee cannot recover from an indemnitor without first paying the claim for which indemnity is sought. Cal. Civ. Code § 2778. So, "[a] cause of action for breach of an express indemnity agreement (contractual indemnity) accrues when the indemnitor sustains the loss by paying the money sought to be indemnified from the indemnitee." *Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido, Inc.,* 238 Cal.App.4th 468, 481 (2015). Thus, the statute of limitations does not begin to run until such payment is actually made. *Exxonmobil Oil Corp. v. Nicoletti Oil, Inc.,* 713 F.Supp.2d 1105, 1113 (E.D. Cal. 2010); *Lincoln v. Narom Development Co.,* 10 Cal.App.3d 619, 627 (1970). Thus, the statute here has only run on losses that were actually paid four or more years before this case was filed. All other losses—those that have not yet been paid, such as loss of use damages, or that were paid within four years before this case was filed—are recoverable, and there are many such losses. Fact Nos. 174–176.

**H.   Goldberg's indemnity claims are not barred by the doctrine of laches.**

Next, Intervenors argue that, since the Court has already found that Goldberg's delay in bringing this suit was unreasonable and in fact "negligent conduct," the Court should now rule that Goldberg's equitable and contractual indemnity claims are barred by the doctrine of laches. MSJ at 23:12-24.

As discussed below, based on the evidence submitted, Intervenors' laches defense fails as a matter of law. To whatever extent the Court is inclined to grant their motion based on their laches defense, however, Goldberg requests more time to conduct further discovery to support its opposition pursuant to Rule 56(d).

**1.  Intervenors' laches argument fails as a matter of law.**

Intervenors' laches argument is without merit. First, Intervenors previously

GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

moved to dismiss other claims in the Complaint on the basis of laches, Dkt. No. 39, and the Court previously dismissed several claims on that basis, Dkt. No. 49. Intervenors made a conscious decision not to challenge Goldberg's indemnity claims on this basis. It is too late now, almost two years into this case and countless hours of discovery by all parties into the indemnity claims, for Intervenors to change their minds and seek judgment on those claims on the basis of laches, especially without citing *any* new evidence. Based on their own delay and unclean hands, they should be estopped from asserting, and be held to have waived, their defense of laches.

Second, laches is not a defense in an environmental suit because the public at-large, and not just the plaintiff, will be harmed by environmental damage. *Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549, 555 (9th Cir. 2006); *see Save the Peaks Coalition v. U.S. Forest Serv.,* 669 F.3d 1025, 1031 (9th Cir. 2012). In fact, laches is also presumptively inapplicable to claims, like the indemnity claims here, that were brought within the applicable statute of limitations. *Mantilla v. United States,* 302 F.3d 182, 186 (3d Cir. 2002), *cert. denied,* 538 U.S. 969 (2003).

Third, even if laches were a defense here, Intervenors have not proven it. The defense of laches requires "unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." *Johnson v. City of Loma Linda,* 24 Cal.4th 61, 77 (2000). The first element requires "inexcusable" delay on the part of the plaintiff. *County of Fresno v. Fair Employment & Hous. Comm.,* 226 Cal.App.3d 1541, 1556 (1991). As to the second element, "[p]rejudice is never presumed; rather it must be affirmatively demonstrated by the defendant in order to sustain his burdens of proof and the production of evidence on the issue." *Miller v. Eisenhower Med. Ctr.,* 27 Cal.3d 614, 624 (1980). The party asserting laches bears the burden of production and proof on both elements of the defense. *Miller,* at 624. Here, Intervenors have not met their burden on either element. On the element of prejudice, for instance, they have not pointed to even a single item of evidence that was lost or a single witness who died or



whose memory faded before their testimony could be taken.

Fourth, even if Intervenors had met their burden, Goldberg has met its burden to demonstrate a genuine issue of material fact on both elements of the laches defense. With respect to the first element, Goldberg should not be charged with "inexcusable delay." The Goldbergs had asked Goss-Jewett to cleanup the contamination after they first discovered it in 1991, pointing to Goss-Jewett's obligation to do so under their lease. Fact No. 143. When Goss-Jewett refused, the Goldbergs promptly filed the *Arns* Action without delay and within the applicable statutes of limitations. Unfortunately, Al Goldberg died shortly thereafter, Fact Nos. 148, 13 and 150, and although Betty Goldberg carried on, she exhausted her life savings on the *Arns* Action, Fact No. 150, had to borrow money from her family, Fact No. 147, but, in the end, could not pay her environmental consultants or her attorney, Fact No. 150, as she contracted Alzheimers and was moved into a nursing home for six or seven years where she ultimately died in 2003, Fact No. 151. In the meantime, in 1996, Goss-Jewett agreed in the *Arns* Action to prepare an interim remediation plan, submit the plan to DTSC, and work with DTSC to finalize the plan and obtain its approval of the plan. Fact No. 149. While the parties waited for Goss-Jewett to implement the plan, which it never did, the *Arns* Action became inactive and never concluded. Fact No. 149. Goss-Jewett is thus responsible for, or at least played the central role in, the *Arns* Action becoming inactive for 17 years. The Goldbergs' grandson, Mr. Rubin, was unaware of the contamination when Betty Goldberg died in 2003, and only learned of its existence in 2012. Fact No. 154. So, he was diligent in trying to resurrect the *Arns* Action and, failing that, in bringing this action. With respect to the prejudice element of the laches defense, it must be remembered that the parties to this action were parties to the *Arns* Action, and they had the opportunity and incentive to conduct discovery, and in fact did conduct extensive discovery, in the *Arns* Action, which they have used in this action and in bringing the instant motion. They have therefore not been prejudiced. The Court should thus



-19-

rule that Goldberg's indemnity claims are not barred by laches.

**2.  Goldberg is entitled to more time to pursue further discovery.**

Finally, if the Court is inclined to rule that Goldberg's indemnity claims *are* barred by laches, then Goldberg requests more time to conduct further discovery on Intervenors' role in and responsibility for the "delay." As discussed above, Federal Rule of Civil Procedure 56(d) allows the nonmovant to submit a declaration demonstrating that, for specific reasons, it cannot present the facts necessary to justify its opposition. In response, upon a satisfactory showing, the court may "(1) defer considering the motion or deny it; (2) allow time . . . to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).  Here, for the reasons outlined in the accompanying Declaration of Bret A. Stone in Support of Goldberg's Request for Denial of, or Continuance of the Hearing On, Intervenors' Motion for Summary Judgment Pursuant to FRCP 56(d) ("Stone 56(d) Decl."), Goldberg seeks an order allowing it time to take certain specific depositions and submit the resulting evidence in support of its opposition to Intervenors' motion.

As the facts outlined in the Stone 56(d) Declaration demonstrate, Intervenors have unjustifiably resisted Goldberg's legitimate discovery efforts, requiring the intervention of the Court. *See* Stone 56(d) Decl. at ¶¶ 2–5. In response to Goldberg's motion to compel, the Court ordered Intervenors to produce documents and present certain witnesses for deposition. *Id.* Despite the Court's order, however, Goldberg's discovery requests have required an extensive and time-consuming meet and confer process. *Id.* at ¶¶ 6, 8. Additionally, and critically, Intervenors have not produced the witnesses that the Court ordered them to produce, only recently agreeing to deposition dates that post-date the hearing on the instant motion for summary judgment. *Id.* at ¶¶ 8, 9 and 13. Intervenors cannot use their own intransigence in the face of Goldberg's diligent discovery efforts to strategically delay the discovery of evidence that can be used to oppose their motion.

And the requested discovery is vital to Goldberg's response to Intervenors'

laches defense. Because laches is an equitable defense, the extent to which Intervenors', or their insured Goss-Jewett, are the primary cause of the alleged delay is relevant to the defense. In particular, Goldberg contends that the primary cause of the alleged delay was Intervenors', or their insured Goss-Jewett's, failure to implement an interim remedial action plan that they had agreed to implement in the previous case. *Id.* at ¶ 11. Evidence regarding that failure is directly relevant to the determination of both elements of Intervenors' laches defense. Specifically, the extent to which Goldberg's alleged delay in bringing this lawsuit was "inexcusable" is partly determined by whether it was caused by Intervenors' agreement and then failure to timely submit and implement an interim remedial action plan, thus lulling Goldberg's predecessors into inaction long enough that circumstances beyond their control caused unintended delay. Similarly, the extent to which Intervenors' were "prejudiced" by the alleged delay is also informed by the extent to which they unreasonably and inexcusably failed to implement the remedial action plan pursuant to agreements reached in the previous case. Goldberg expects that evidence directly relevant to these issues will be discovered through the depositions of the witnesses that Intervenors have been ordered to produce. *Id.* at ¶ 12.

But, after months of resistance and a resulting Court order, Intervenors have only recently agreed to schedule the depositions of the key witnesses that Goldberg seeks to depose on these topics.  Moreover, the dates they offer post-date the hearing on this motion.  Thus, Intervenors seek to benefit from their intransigence by preventing Goldberg from obtaining the discovery it needs in time to use such discovery in response to their motion. The Court should prevent that result and either deny Intervenors' motion to the extent it relies on a laches defense, or grant Goldberg's request for a delay so that it can take the depositions it needs to support its opposition to that motion.

**I.   Goldberg's declaratory relief claim states an independent basis for relief.**

Next, Intervenors argue that Goldberg's declaratory relief claim against



Case No. EDCV14-01872 DSF (AFMx)

GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1 | Intervenors' insureds fails as a matter of law because it is derivative of Goldberg's
2 | other claims and does not state any independent basis for relief. MSJ at 24:15-17.

3 | This argument also fails. CERCLA § 113(g)(2) provides that in any initial
4 | cost-recovery action under CERCLA § 107(a), "the court shall enter a declaratory
5 | judgment on liability for response costs or damages that will be binding on any
6 | subsequent action or actions to recover further response costs or damages." 42
7 | U.S.C. § 9613(g)(2). Thus, a plaintiff is entitled to a declaratory judgment as to
8 | *future* response costs is available under § 113(g)(2) if it can establish liability for
9 | *past* response costs under § 107(a). *City of Colton v. American Promotional Events,*
10 | *Inc.-West,* 614 F.3d 998, 1007-1008 (9th Cir. 2010). Here, Goldberg can establish
11 | liability for *past* response costs, as discussed above, and is therefore entitled to a
12 | declaratory judgment as to *future* response costs.[11] The Court should therefore deny
13 | Intervenors' motion on this ground.

**J.     The Fohrman and Schack estates are liable.**

15 | Next, Intervenors argue that Goldberg's claims against the Fohrman and
16 | Schack estates fail as a matter of law because Goldberg has no evidence that Mr.
17 | Fohrman or Mr. Schack was an owner of, operator of, or tenant at the Site, caused
18 | or contributed to the contamination at the Site, or was responsible for any of the
19 | acts alleged in the Complaint. MSJ at 24:18–25:4.

20 | One who "directs the workings of, manages, or conducts the affairs of a [con-
21 | taminating] facility" may be held liable as an "operator" under CERCLA § 107(a).
22 | 42 U.S.C. § 9607(a). To be liable, an "operator" "must manage, direct or conduct
23 | operations specifically related to pollution, that is, operations having to do with the
24 | leakage or disposal of hazardous waste, or decisions about compliance with
25 | environmental regulations." *United States v. Bestfoods,* 524 U.S. 51, 66–67 (1998).
26 | An "operator" must, in effect, be actively involved in running the facility where the

---

[11] Goldberg's declaratory relief claim is not limited by its terms or otherwise to CERCLA § 113(g)(2), and Goldberg reserves its right to assert such claim under other federal and state law.



GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

pollution occurs. *See Long Beach Unified School Dist. v. Dorothy B. Godwin Calif. Living Trust,* 32 F.3d 1364, 1367 (9th Cir. 1994). The same is true of a corporation's officers, directors, and shareholders: they can be liable as "operators" if they were actively involved in running the facility where the pollution occurred. *State of California v. Celtor Chem. Corp.,* 901 F.Supp. 1481, 1485–86 (N.D. Cal. 1995); *Team Enterprises, LLP v. Western Inv. Real Estate Trust,* No. CV F 08-0872 LJO SMS, 2009 WL 1451635, *8–*9 (E.D. Cal. May 20, 2009); *Levin Metals Corp. v. Parr-Richmond Terminal Co.,* 781 F.Supp. 1454, 1454 (N.D. Cal. 1991); *see Kaiser Aluminum v. Catellus Dev. Corp.,* 976 F.2d 1338, 1341 (9th Cir. 1992).

Here, there is a genuine issue of material fact as to the Fohrman and Schack estates' liability as "operators" of Goss-Jewett under CERCLA § 107(a). Both Mr. Fohrman and Mr. Schack were intimately involved with Goss-Jewett's operations, and, as a supplier of PCE to dry cleaners, almost *all* of Goss-Jewett's operations specifically related to PCE: buying PCE in bulk, taking deliveries of PCE, storing PCE, handling PCE, selling PCE, transporting PCE, delivering PCE, complying with environmental regulations regarding PCE, maintaining equipment used to store, handle, and transport PCE, etc. Fact Nos. 115, 116, 118, 119, and 124.

Mr. Schack was the president, the treasurer, and a director of Goss-Jewett from 1980 to 1989. Fact No. 109. He visited the Property and spoke with the Goldbergs in 1980 in connection Goss-Jewett's acquisition of Tri-County. Fact No. 111. He negotiated that acquisition and signed the agreement for Goss-Jewett's purchase of Tri-County's stock. Fact No. 110. Thereafter, he continued to visit the Property and meet with the Goldbergs. Fact No. 112. He also told Darold Merritt that he (Merritt) was to be president and treasurer of Tri-County and that he should identify products that would continue to exist, eliminate products that were not part of the product line, and have all the processes and procedures in place to integrate Tri-County into Goss-Jewett. Fact No. 113. Mr. Schack also negotiated with PPG Industries, one of Goss-Jewett's suppliers of PCE. Fact No. 114. He also made

GOLDBERG'S OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT

decisions about Goss-Jewett's compliance with environmental regulations. Fact Nos. 115 and 116. On January 13, 1987, he sent Goss-Jewett's board of directors an outline of the materials covered during a seminar regarding legal requirements for controlling toxic substances, along with notes from one of the attendees, Darold Merritt. Fact Nos. 116 and 117. One of those notes says, "A serious violation would be a failure to comply with any of the requirements listed above. GJ [Goss-Jewett] complies with 1&2 only." Fact No. 118. Another note reminds Goss-Jewett that it needs to "[m]onitor employee compliance and document disciplinary action for failure to comply." Fact No. 119. Mr. Schack failed to properly monitor his employees during his tenure as Goss-Jewett's president, treasurer, and a directors. Fact Nos. 120-130. One of his employees, Flemming (Andy) Anderson, was a warehouse supervisor with "bad work habits" who was responsible for at least one release of PCE, an overfill incident involving five to seven gallons in 1987. Fact No. 120 and 127.

Benjamin Fohrman was nominated as Secretary and Director of Tri-County on March 10, 1980. Fact No. 131. He became Chairman of the Board of Goss-Jewett, Fact No. 132, and signed the amendment to the 1968 Lease of the Property that substituted in Goss-Jewett as the lessee. Fact No. 133. He also negotiated with the Goldbergs regarding the provisions of the amended lease. Fact Nos. 134. He also negotiated and signed the agreement which extended the 1988 Lease of the Property for three years beginning on April 1, 1988. Fact No. 135.

In sum, both Mr. Schack and Mr. Fohrman played prominent roles in the management and operations of Goss-Jewett at the Property. There is thus a genuine issue of material fact as to their liability. Accordingly, the Court should reject Intervenors' argument for summary judgment on this basis.

**K.    Goldberg can pursue claims as the successor to Al Goldberg's estate.**

Finally, Intervenors argue that "[t]he claims asserted by Plaintiff 'Estate of Al Goldberg' should also be dismissed on summary judgment because the Goldberg

1  Estates' representative [Dan Rubin] admitted in deposition that there is no estate of

2  Al Goldberg." MSJ at 25:5-9.

3      This argument also has no merit. First, Mr. Rubin testified in his own

4  individual capacity. He did not testify in his capacity as the personal representative

5  for, or successor in interest to, the Estate of Al Goldberg or, for that matter, the

6  Estate of Betty Goldberg. Nor did he testify as either estate's 30(b)(6) designee, see

7  Fed. R. Civ. P. 30(b)(6). Fact No. 178. Second, when he testified that there was no

8  Estate of Al Goldberg, he meant that there is no current probate estate for Al

9  Goldberg since his assets have long since been distributed given that he died over

10  20 years ago. This testimony did not relate to Mr. Rubin's capacity to sue as the

11  successor in interest to Al Goldberg's interests in the Property and in this action.

12  Fact No. 179. He is the successor in interest to Al Goldberg pursuant to California

13  Code of Civil Procedure § 377.11, and he has succeeded to Al Goldberg's interest

14  in this action and to the Property. Fact No. 153. As such, the Court should reject

15  Intervenors' argument for summary judgment on this ground.

16                          **VI.  <u>CONCLUSION</u>**

17      For the reasons stated above, Intervenors' arguments and evidence do not

18  demonstrate an absence of a genuine dispute of material fact and do not demon-

19  strate that their insureds, Defendants Goss-Jewett and the Fohrman and Schack

20  estates, are entitled to judgment as a matter of law on Goldberg's claims against

21  them or on any single claim or part of any claim against them. Intervenors' motion

22  should therefore be denied.

23      Respectfully submitted,

24  Dated:  March 28, 2016          PALADIN LAW GROUP® LLP

25                          By:  /s/ *Bret A. Stone*

26                          Counsel for Plaintiff and Counter-Defendant
                            Estate of Betty Goldberg, Deceased, and
27                          and Estate of Al Goldberg, Deceased, by
                            and through their successor in interest,
28                          Daniel Rubin



                            -25-                    Case No. EDCV14-01872 DSF (AFMx)