# Joint Stipulation
# Exhibit 1



# Expert Rebuttal Report
# *of* **Adam H. Love, Ph.D.**

*Prepared by:*
**Roux Associates, Inc.**
555 12th Street, Suite 250
Oakland, California 94607

July 1, 2019

*Estate of Betty Goldberg*
*vs.*
*Goss-Jewett Company, Inc., et al.*

*United States District Court*
*Central District of California.*
*Case No. EDCV14-01872 DSF (AFMx)*

Adam H. Love, Ph.D.
Vice President/Principal Scientist

**Environmental Consulting**
**& Management**
1-415-967-6000
rouxinc.com

# Table of Contents

Introduction ......................................................................................................................... 2

Testifying Appearances ....................................................................................................... 2

Background .......................................................................................................................... 4

Recent Site-related Changes .............................................................................................. 4

Opinion and Bases for Opinion............................................................................................ 6

Rebuttal Opinion 1: Everett and Wells state within the basis for their Opinion 1 that "Releases of PCE and other contaminants were reported for the Caltrans site, east of the former Goss-Jewett Property, which Caltrans cleaned up in the 1990s. There is likely some residual contamination from this site that is comingled with the Goss-Jewett contamination and, in our opinion, there is no reliable means to differentiate contamination from these distinct sources." These statements are without basis and incorrect. ............................................. 6

Rebuttal Opinion 2: Everett and Wells Opinion 3 statement that "Goss-Jewett's delay in responding to the contamination and failure to follow through with an interim remedial action plan in 1996 allowed the plume to migrate further offsite thereby increasing the cost of cleanup" appears to draw a legal conclusion and is speculative as to cleanup remedy.................... 7

Rebuttal Opinion 3: Everett and Wells estimate for the cost required for the necessary investigation and remediation has an incomplete basis, includes numerous speculative elements, and assumes unreasonable cost elements. .................................................................. 9

Rebuttal Opinion 4. Everett and Wells speculate when they state that "The releases of PCE into the environment from the Goss-Jewett created subsurface contamination that constitutes an imminent and substantial endangerment to human health and the environment within the meaning of the Resource Conservation and Recovery Act (RCRA)."................................ 11

Rebuttal Opinions 5: Everett and Wells incorrectly assesses the site conditions when they state that "soil contamination at this Site generally follows a pattern of decreasing contaminant concentrations away from a single hot spot (the former AST area). This spatial pattern is commonly recognized as a tool for mapping the release point. The general pattern of contamination where concentrations decrease with distance as one moves radially away from a possible release point, as observed at this Site, is recognized in numerous guidance documents and scientific publications as evidence that the contamination came from the source area in question." ................................................................................................... 13

Rebuttal Opinion 6: Everett and Wells claim a nuisance exists for an "entire community or neighborhood" based on RWQCB screening levels – but only references data collected in shallow soil and groundwater on or immediately adjacent to the parcel – not data collected throughout the entire community or neighborhood............................................................ 16

Rebuttal Opinion 7: Laton's Supplemental Opinion does not refute the evidence of PCE discharges to the sewer at 407 Bath Street, because he offers no opinion about whether releases ever occurred, and he provides no support for his opinion that there were no releases from L&R Dry Cleaning, Inc. ........................................................................................................... 17

# Introduction

My name is Adam Hamilton Love and I am a Vice President and Principal Scientist at Roux Associates, Inc., located at 555 12th Street, Suite 250, Oakland, California 94607. I have been retained by a Joint Defense Group of defendants and asked to provide rebuttal opinions responding to characterizations by Dr. Lorne Everett and Dr. James Wells in their May 31, 2019 Expert Report and by Dr. Richard Laton in his May 31, 2019 Supplemental Expert Report related to the PCE contamination in the vicinity of 220 W Gutierrez Street in Santa Barbara, California. In my previous report I presented my qualifications and general background of the Site, so I have not repeated that information for this report, other than to update my appearance list. This report presents my rebuttal opinions and the bases for those opinions. I was compensated at a rate of $310 per hour for this engagement.

The conclusions stated herein represent the application of my education, training, and experience within the disciplines of engineering, geology, hydrogeology, chemistry, fate and transport, and environmental forensics to the facts and conditions associated with the Site involved with this litigation. The conclusions set forth in this report are based, in part, upon the facts, information, and data that have been provided to me by counsel and/or which I obtained during the course of my investigation. To the extent that any of the underlying facts, information, or data change or are amended, I reserve the right to consider modifying my conclusions and opinions, if necessary and appropriate.

## Testifying Appearances

My expert testifying appearances within the last 4 years are listed below.

- *King County, Washington v. Traveler's Indemnity Co., et al.* United States District Court. Western District of Washington. Case No. 14-cv-1957. Deposition April 9, 2019. Rebuttal Report.

- *Chemtronics Inc. v. Northrop Grumman Systems Corp.* American Arbitration Association Arbitration. Case No. 01-17-0007-1884. Arbitration Testimony November 12-13, 2018. Expert Report. Rebuttal Report. Supplemental Report.

- *Estate of Robert Renzel, Deceased et al. v. estate of Lupe Ventura, Deceased, et al.* United States District Court, Northern District of California. Case No. 4:15-cv-1648-HSG. Deposition August 27, 2018. Expert Declaration. Expert Report. Rebuttal Report.

- *Von Duprin LLC v. Moran Electric Service, Inc. Major Holdings, LLC, Major Tool and Machine, Inc., and Zimmer Paper Products Incorporated.* United States District Court Southern District of Indiana, Indianapolis Division. Case No. 1:16-CV-01942-TWP-DML. Deposition June 7, 2018. Expert Report.

- *Power Authority of the State of New York v. The tug M/V Ellen S. Bouchard, et al. United States District Court, Southern District of New York. Case No. 14-cv-4462 (PAC).* Deposition May 30, 2018. *Expert Report.*

- *Siltronic Corporation v. Employers Insurance Company of Wausau et al.* United States District Court, Central District of Oregon. Case No. 3:11-cv-01493-BR. Deposition May 24, 2018. Expert Report.

- *Crown Central, LLC v. Petroleum Marketing Investment Group, LLC, et al.* Circuit Court for Baltimore County, Maryland. Case No. 03-C-16-010774 CN. Deposition December 19, 2017. Expert Declaration. Rebuttal Declaration.

- *Sunflower Redevelopment, LLC v. Illinois Union Insurance Company*. United States District Court, Western District of Missouri, Western Division. Case No. 4:15-cv-00577-DGK. Deposition November 10, 2017. Rebuttal Report. Supplemental Report.

- *Insurance Company of the State of Pennsylvania v. County of San Bernardino.* United States District Court, Central District of California. Case No. 5:16-cv-00128-PSG-SS. Deposition June 15, 2017. Expert Report. Rebuttal Report.

- *Lennar Mare Island, LLC v. Steadfast Insurance Company*. United States District Court, Eastern District of California, Sacramento Division. Case No. 2:12-cv-02182-KJM-KJN. Case No.2:16-cv-00291-KJM-CKD860. Deposition May 26, 2017. Expert Report. Supplemental Report.

- *860 Kaiser, LLC v. Greene's Cleaners, Inc.,* Napa County Superior Court. Case No: 26-63995. Deposition January 11, 2016, September 12, 2016. September 26, 2016. Expert Declaration.

- *Lewis v. Russell,* United States District Court, Eastern District of California. Case No. CIV. S-03-02646 WBS AC. Deposition July 20, 2016. Expert Report. Rebuttal Report. Supplemental Report.

- *Goldberg v. Goss-Jewett Company, Inc., et al*., United States District Court, Central District of California. Case No. EDCV14-01872 DSF (AFMx). Deposition May 25, 2016. Expert Report. Rebuttal Report.

Please also refer to my resume, which is attached as Exhibit A.

# Background

## Recent Site-related Changes

In 2016, on-site interim remedial efforts removed a significant mass of contamination at the location around the former AST in the southeast portion of the 220 W Gutierrez property.[1] Nonetheless, significant amounts of contamination remain in the vicinity. After the remedial efforts, DTSC stated that "there is still a significant source that has been left in place"[2] and that "Further site investigation maybe required prior to final removal action or remedial action."[3]

In addition, site mitigation of indoor air concentration of PCE has occurred for the building on-site. The mitigation includes the installation of six roof vents and three fans in the warehouse area and a sub-slab vapor barrier system that includes sub-slab horizontal vent pipes that are designed such that they will initially be connected to an active SVE system and later can passively vent to the atmosphere.[4]

In January 2017, indoor and outdoor ambient air samples were collected from 220 West Gutierrez. The air sampling event was performed with the ventilation system (three electric air supply fans and six passive roof vents) in operation. Rincon reported the following results:[5]

*Indoor*

- o   *PCE was detected in the former retail area at concentrations of 0.98 micrograms per cubic meter (µg/m³) and 1 µg/m³ from samples AS1 and AS2, respectively. During the 2013 sampling event no air samples were collected in the immediate vicinity of samples AS1 and AS2. The 2013 sampling was completed prior to the 2015 demolition of the office portion of the building to accommodate the soil removal excavation in that area. PCE was detected in samples collected nearest to the AS1/AS2 location at concentrations of 2,100 µg/m³ and 2,400 µg/m³ in the 2013 air samples GGJ-1 and GGJ-3, respectively.*

- o   *PCE was detected in the warehouse at a concentration of 0.47 µg/m³ in sample AS3. In 2013 PCE was detected at concentrations of 1,400 µg/m³ and 1,100 µg/m³ in samples GGJ-5 and GGJ-6, respectively.*

*Outdoor*

- o   *PCE was detected in the parking lot area at a concentration of 1.22 µg/m³ in the outdoor sample AS4. In 2013 PCE was detected at concentrations of 1.7 µg/m³ and 3.9 µg/m³ in the outdoor parking lot samples GGJ-7 and GGJ-8."*

---

[1] Rincon Consultants, Inc. Technical Memorandum. Former Goldberg/Goss-Jewett 220 West Gutierrez Street Santa Barbara, California. DTSC Site Code 60001561. February 4, 2016.

[2] DTSC. Approval of Site Investigation Report for the Goldberg Goss/Jewett Site, 220 West Gutierrez Street, Santa Barbara California. (Site Code: 301675). October 28, 2016.

[3] DTSC. Approval of Site Investigation Report for the Goldberg Goss/Jewett Site, 220 West Gutierrez Street, Santa Barbara California. (Site Code: 301675). October 28, 2016.

[4] Rincon Consultants, Inc. Technical Memorandum. Former Goldberg/Goss-Jewett 220 West Gutierrez Street Santa Barbara, California. DTSC Site Code 60001561. November 16, 2016.

[5] Rincon. Email from Shawn Decker to Manjul Bose. 220 West Gutierrez (Site Code 301675)- Air Sampling Results. March 14, 2017.

*PCE was detected at a slightly higher concentration in the outdoor air sample than in the indoor air samples. Other VOCs were detected at similar concentrations in the outdoor air to the concentrations in the indoor air.*

In April 2018, Rincon performed an SVE system pilot test[6] to establish the radius of influence of the vapor probes installed.[7,8]

A structural addition to the on-site building at 220 W Gutierrez Street was constructed over the former AST area.

In 2019, DTSC and San Francisco Bay Regional Water Quality Control Board updated both commercial/industrial and residential screening levels for PCE and TCE.[9]

Accessible groundwater monitoring wells in the vicinity 220 W Gutierrez Street were sampled in May 2019.

---

[6] DTSC. Site Visit Report from Tanya Brosnan to Manjul Bose. Site/Project Name: Goldberg Goss-Jewett. PCA/SiteCode/WR#: 301675-11 / WR# 20048805. Purpose of Visit: Oversight of SVE pilot test. April 11-12, 2018.

[7] Rincon. Technical Memorandum. Former Goldberg/Goss-Jewett 220 West Gutierrez Street Santa Barbara, California DTSC Site Code 60001561. November 16, 2016.

[8] DTSC. Soil Vapor Extraction Pilot Test – 45-Day Report Deadline Ends May 31, 2018. Former Goldberg/Goss-Jewett-  220 West Gutierrez Street Santa Barbara, California (Site Code 301675) Docket # HAS-PPA 14/15-064. April 24, 2017..

[9]  https://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/esl.html

# Opinion and Bases for Opinion

**Rebuttal Opinion 1: Everett and Wells state within the basis for their Opinion 1 that "Releases of PCE and other contaminants were reported for the Caltrans site, east of the former Goss-Jewett Property, which Caltrans cleaned up in the 1990s. There is likely some residual contamination from this site that is comingled with the Goss-Jewett contamination and, in our opinion, there is no reliable means to differentiate contamination from these distinct sources."[10] These statements are without basis and incorrect.**

Everett and Wells state that the Caltrans property was "cleaned up in the 1990s", when in fact, Caltrans only performed soil mixing on the Caltrans site in the 1990s.[11,12] Caltrans never got site closure for the groundwater contamination from the County of Santa Barbara Environmental Health Services Department,[13] Caltrans acknowledges "that shallow groundwater under this parcel is still impacted by PCE" and that "this parcel may require additional site investigation and remediation,"[14] and Caltrans concedes that "Caltrans will always retain liability for the contamination."[15] Thus, Everett and Wells statements that the Caltrans site was cleaned up is without basis and ultimately incorrect. Everett and Wells do not provide a single specific citation to a reference, data point, or other type of evidence to support their assertion that the site was cleaned up. Instead, their opinion must be relying only on subjective belief and unsupported speculation based on their experience working in the environmental field. Thus, this opinion is not grounded in the methods and procedures of science and is not the modern standard of practice in the environmental industry for how an environmental professional would determinine when a site is cleaned up. In addition, any personal experience relied upon by Everett and Wells that provides the basis for this statement is only in their heads and cannot be tested for its validity and appropriateness, cannot be peer reviewed to accuracy, and cannot be evaluated for potential rates of error.

More so, their characterization of the effort necessary to cleanup the Caltrans site is starkly different from what they opine is necessary to cleanup the 220 W Gutierrez site. Everett and Wells are willing to accept as a "cleanup" the work done at the Caltrans site, without any soil remediation or groundwater remedy, but propose an elaborate series of treatment technologies for contamination related to the 220 W Gutierrez property. The inconsistencies in Everett and Wells procedure for evaluating PCE cleanup requirements are not explained and cannot be tested for validity and appropriateness, cannot be peer reviewed to accuracy, and cannot be evaluated for potential rates of error. Such inconsistencies in Everett and Wells procedures demonstrate that the methodology and/or criteria they used to evaluate whether the Caltrans site was

---

[10] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 13-14.

[11] Caltrans. Proposal for Closure. 324 De La Vina Street, Santa Barbara, CA. August 27, 1991.

[12] Dames & Moore. Letter to County of Santa Barbara Air Pollution Control District. Potential Aeration of Contaminated Soils, Caltrans Property, 324 De La Vina Street, Santa Barbara, CA. November 15, 1989.

[13] SB EHS letter to Caltrans. Re: Request for SMU Removal, 324 De La Vina, Santa Barbara, CA. March 11,1993.

[14] Department of Transportation. Property Contamination Disclosure for 324 De La Vina Street, Santa Barbara, CA. May 31, 2007.

[15] Caltrans. Meeting Minutes. February 2, 1993 Meeting.

cleaned up was developed only for this litigation and is not the modern standard of practice for environmental professionals.

Everett and Wells are overly-broad, incorrect, and misleading when they state "there is no reliable means to differentiate contamination from these distinct sources". As above, Everett and Wells do not provide a single specific citation to a reference, data point, or other type of evidence to support their assertion that the PCE contamination in the area is not divisible. Instead, their opinion must be relying only on subjective belief and unsupported speculation based on their experience working in the environmental field. Thus, this opinion is not grounded in the methods and procedures of science and is not the modern standard of practice in the environmental industry for how an environmental professional would try to establish contaminant divisibility.[16]   In addition, any personal experience relied upon by Everett and Wells that provides the basis for this statement is only in their heads and cannot be tested for its validity and appropriateness, cannot be peer reviewed to accuracy, and cannot be evaluated for potential rates of error.

In fact, there are a number of potential technical approaches to differentiate contamination from distinct sources,[17] but Everett and Wells (who have been aware of this key expert consideration for over 3 years)[18] did not attempt to collect the data or perform any analyses to try to differentiate the source locations of PCE contamination in the vicinity of 220 W Gutierrez. As a result, their conclusion regarding the divisibility of the PCE contamination between the Caltrans site and the 220 W Gutierrez site is without basis and ultimately incorrect.

## Rebuttal Opinion 2: Everett and Wells Opinion 3 statement that "Goss-Jewett's delay in responding to the contamination and failure to follow through with an interim remedial action plan in 1996 allowed the plume to migrate further offsite thereby increasing the cost of cleanup"[19] appears to draw a legal conclusion and is speculative as to cleanup remedy.

In general, PCE left in the environment can migrate.  However, Everett and Wells conclusion that additional contaminant migration would result in an increase in the costs of cleanup is speculative and without basis. Again, Everett and Wells do not provide a single reference, data point, or other type of evidence to support their assertion that the cleanup would be more expensive. Instead, all they do is to calculate the additional volume of impacted material based on their assumptions related to contaminant migration.[20] Thus, their opinion must be relying only on subjective belief and unsupported speculation based on their experience working in the environmental field. Thus, this opinion is not grounded in the methods and procedures of science and is not the modern standard of practice in the environmental industry for how an environmental professional would determine the cost of a cleanup remedy for different scenarios. In addition, any personal

---

[16] Environmental Forensic Tools for Establishing Divisibility. Stafford Webinar. Adam H. Love, Ph.D. . November 2018.
[17] Environmental Forensic Tools for Establishing Divisibility. Stafford Webinar. Adam H. Love, Ph.D. . November 2018.
[18] Expert Rebuttal Report of Adam H. Love, Ph.D. In the Matter of: Goldberg vs. Arns et al. United States District Court, Central District of California Case No. 94-3834RMT(Shx). May 9, 2016. Pg. 6.
[19] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 17.
[20] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 17.

experience relied upon by Everett and Wells that provides the basis for this statement is only in their heads and cannot be tested for its validity and appropriateness, cannot be peer reviewed to accuracy, and cannot be evaluated for potential rates of error.

Everett and Wells also asserted that because of changes in cleanup standards, the cleanup costs "will be more expensive than if the cleanup occurred in 1996".[21] As above, Everett and Wells do not provide a single specific citation to a reference, data point, or other type of evidence to support their assertion that the cleanup would be more expensive. Instead, their opinion must rely on subjective belief and unsupported speculation based on their experience working in the environmental field. Similarly, this opinion is not grounded in the methods and procedures of science and is not the modern standard of practice in the environmental industry for how an environmental professional would determine the cost of a cleanup remedy for different scenarios. In addition, any personal experience relied upon by Everett and Wells that provides the basis for this statement is only in their heads and cannot be tested for its validity and appropriateness, cannot be peer reviewed to accuracy, and cannot be evaluated for potential rates of error.

In fact, whether or not a cost of cleanup would differ under different scenarios of contaminant distribution depends on a number of site-specific factors that require knowing the final remedy and remedy configuration. There are numerous PCE remedy approaches, such as reactive barrier walls or enhanced natural attenuation, where the future remedy costs could be unchanged depending on site-specific conditions and remedy configurations. The ultimate remedy and remedy configuration for contamination originating at the 220 W Gutierrez property has not been finalized, therefore any conclusions regarding cleanup costs or differences in cleanup costs is speculative, Everett and Wells did not perform a cost evaluation for any proposed remedy, including their own, under different contaminant distribution scenarios or different cleanup requirement scenarios that identify and demonstrate whether cleanup elements are more expensive as a result of the differences in site and regulatory conditions compared to 1996.

In addition, Everett and Wells appear to attribute the liability for any additional cleanup costs, resulting from the additional time the PCE contamination has been in the environment, solely to Goss Jewett and not any other PRPs, such as the site owners. Again, Everett and Wells do not provide a single specific citation to a reference, data point, or other type of evidence to support their assertion that Goss Jewett is solely responsible for any difference in cleanup costs. Instead, their opinion appears to be a legal conclusion that would be relying only on their subjective belief and unsupported speculation, since neither Everett or Wells report to have any legal expertise, and such an opinion would be outside the appropriate scope and opinion area that an environmental professional is typically qualified to opine on. In addition, any personal experience relied upon by Everett and Wells that provides the basis for this legal conclusion is only in their heads and cannot be tested for its validity and appropriateness, cannot be peer reviewed to accuracy, and cannot be evaluated for potential rates of error.

---

[21] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 17-18.

## Rebuttal Opinion 3: Everett and Wells estimate for the cost required for the necessary investigation and remediation has an incomplete basis, includes numerous speculative elements, and assumes unreasonable cost elements.

Everett and Wells in Opinion 3 of their 2019 Report state that "Until the contamination is fully investigated and characterized, a complete and effective remediation plan cannot be developed"[22] – but yet provide a estimated cost for their remediation plan in Opinion 4. Thus, Everett and Wells recognize that their cost estimate is highly speculative. In addition, the cost bases for numerous line items in their overall cost estimate are without description or detail. As a result, this opinion must be relying only on their subjective belief and unsupported speculation based on their experience working in the environmental field. Thus, this opinion is not grounded in the methods and procedures of science and engineering and is not the modern standard of practice in the environmental industry for how an environmental professional would determine a reliable cost of a cleanup. In addition, any personal experience relied upon by Everett and Wells that provides the basis for this cost estimate is only in their heads and cannot be tested for its validity and appropriateness, cannot be peer reviewed to accuracy, and cannot be evaluated for potential rates of error.

Everett and Wells 2019 cost estimate is an update of their 2016 estimate for their assumed cleanup costs where they reduced the total estimated cost from $11.1M to $11.0M. The difference in costs reflect the changes shown in Table 1.

Apart from these modifications to the total cleanup costs, my previous rebuttal opinion[23] details why these costs are excessive still hold.

1. The choice of electrical resistive heating (ERH) for on-site groundwater remediation is in general among to most expensive remedial technologies available for VOC cleanup, and Everett and Wells estimate for ERH costs appears to use an estimate of ERH costs that is skewed high even among documented ERH site cleanup costs.[24]
2. Off-site groundwater treatment costs appear to include cleanup of a significant amount of groundwater contaminated from the Caltrans parcel and not the plume from the 220 W Gutierrez property.
3. 5 years of on-site SVE system operation appears excessive, as long as on-site groundwater remediation is performed to eliminate most of the PCE groundwater contamination first, so it does not continue to be a source of PCE vapors to the overlying soil.

---

[22] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 16.
[23] Expert Rebuttal Report of Adam H. Love, Ph.D. In the Matter of: Goldberg vs. Arns et al. United States District Court, Central District of California Case No. 94-3834RMT(Shx). May 9, 2016. Pg. 8-11.
[24] Expert Rebuttal Report of Adam H. Love, Ph.D. In the Matter of: Goldberg vs. Arns et al. United States District Court, Central District of California Case No. 94-3834RMT(Shx). May 9, 2016. Pg. 9.

**Table 1.** Changes in Everett and Wells Cleanup Cost Estimate from 2016 to 2019.

| Item | 2019 Remediation Cost Estimate | 2016 Remediation Cost Estimate | Rationale for Cost Estimate Adjustment |
|---|---|---|---|
| SVE-Capital & Construction Costs | $310,000 | $340,000 | • The cost has been adjusted from our 2016 estimate to account for the fact that six vapor extraction wells were installed at the Site as part of the SVE pilot test, although at least one additional extraction well will be needed.[25]<br>• No details regarding the number of SVE wells associated with the SVE Construction Capital Costs were previously provided 2016 report.[26]<br>• Everett and Wells do not provide the basis for their conclusion that a $30K reduction was appropriate. |
| On-Site Vapor Mitigation System | $50,000 | $100,000 | • 2016 cost estimate included $100,000 for designing, permitting, and installing a vapor mitigation system for the commercial building on the Goss-Jewett Property[27]<br>• 2019 cost estimate was adjusted based on "consideration of the vapor mitigation completion work completed in 2017" and "the amount of work still needed at the warehouse"[28]<br>• Vapor mitigation work completed in 2017 was associated with the replacement construction at the front of the onsite structure[29]<br>• Everett and Wells do not appear to consider whether there even is a need for future on-site vapor mitigation, given the installation of other mitigation measures in the existing structure on the property |

[25] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 21.
[26] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. April 11, 2016.
[27] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 18.
[28] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 18.
[29] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 18.

In addition, numerous additional issues raise concerns about the accuracy of their cleanup cost estimate:

1. Everett and Wells continue to use their own cost estimates instead of the actual costs for the on-site remediation performed to date, based on the contractor invoices that performed the work. Everett and Wells costs estimate should reflect actual costs, where such costs are available.

2. Everett and Wells include speculative costs for additional soil vapor assessment that they claim is needed "to supplement this work with a focused evaluation of vapor intrusion risk for occupants of the homes and commercial structures that overlie the Goss-Jewett groundwater plume."[30] Everett and Wells do not indicate why they believe the "10 buildings immediately east of the Property" should be assessed – especially since the property immediately East of the parcel had only minor vapor intrusion component to its indoor air PCE concentration when assessed in 2013.[31] Given interim remedial efforts on the property have already occurred, it is reasonable to expect any indoor air impacts to the adjacent parcel would have also decreased.

3. Everett and Wells discuss their claimed need for active treatment downgradient of Highway 101 since "It is infeasible to conduct active groundwater remediation under Highway 101, so the plan for downgradient groundwater calls for active treatment on both sides of the Highway."[32] Everett and Wells do not explain why active treatment is needed on both sides of Highway 101 and how implementing that technology fits in with a comprehensive remedial design. Everett and Wells do not appear to have considered the Caltrans dewatering system that operates under the freeway has the potential to be used to withdraw and treat any migration of contaminated groundwater under Highway 101 in a cost-effective way.[33]

As a result of these numerous deficiencies with their methodology for determining cleanup costs, it is reasonably expected that Everett and Wells cleanup costs estimate is inaccurate.

## Rebuttal Opinion 4. Everett and Wells speculate when they state that "The releases of PCE into the environment from the Goss-Jewett created subsurface contamination that constitutes an imminent and substantial endangerment to human health and the environment within the meaning of the Resource Conservation and Recovery Act (RCRA)."

Everett and Wells misleadingly focus on the on-site conditions as examples of conditions representing imminent and substantial endangerment to human health and the environment from the PCE contamination at the 220 W Gutierrez property and extrapolate those conditions to the larger area. While they correctly state that "Indoor air concentrations at the Property itself have been found to greatly exceed California

---

[30] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 18-19.

[31] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 12.

[32] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 21

[33] State of California. Department of Public Works. Division of Highways. As Built Plans. Plans for Construction on State Highway in Santa Barbara County in Santa Barbara between 0.2 mile east of Bath Street and 0.6 mile west of Los Olivos Street;. State of California. Department of Transportation. As Built Plans. Project Plans for Construction on State Highway in Santa Barbara County in Santa Barbara from Route 114 to Castillo Street Undercrossing.

screening levels"[34] that threat has been mitigated based on the previous remediation and mitigation work and no longer represent an imminent and substantial endangerment.

Everett and Wells seem to suggest that there is also an imminent and substantial endangerment to human health from PCE contamination that migrated off-site from the 220 W Gutierrez property but do not provide an appropriate analysis to support their speculation. Everett and Wells state that PCE releases threaten human health[35] – but do not provide any site-specific human health risk assessment to support their conclusion. They state generally that "people are threatened with exposure to PCE via the pathway of vapor intrusion,"[36] but do not identify any specific people at risk in the vicinity of the property or why they specifically would be at risk.

Everett and Wells state that "an imminent and substantial endangerment exists and that immediate action is necessary to protect human health and the environment."[37] – but they do not state where this risk is located. Even some of the minimal analyses performed by Everett and Wells related to imminent and substantial endangerment contradict other analyses they have performed. Everett and Wells conclude that "In fact, since 2012, the groundwater plume has migrated at least 650 feet into the surrounding mixed residential/commercial neighborhood and across Highway 101"[38], but this is inconsistent with their earlier estimate of groundwater plume growth of "between 5 and 10 feet per year"[39] – which would suggest migration since 2012 would be 35-70 feet.

Thus, Everett and Wells repeatedly state the idea that  "current conditions at this Site indicate an existing risk to health or the environment"[40] and that "There is a community in the neighborhood that may be threatened from a health risk and DTSC is concerned about vapor intrusion risks."[41], but they have not performed any analysis that allows them to do more than speculate that a community "may" be threatened and they do not specifically state where this speculated at-risk community is located. Everett and Wells state that while remediation efforts were performed in 2016, "elevated levels of contamination still persist and the off-Property contamination continues to threaten public health and the environment" but, again, they do not site to any post 2016 data to support that statement.

---

[34] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 31
[35] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 31
[36] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 31
[37] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 29-30.
[38] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 30 and 31
[39] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 17
[40] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 31
[41] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 29

Again, Everett and Wells do not provide a single specific citation to a reference, data point, or other type of evidence to support their assertion that there is also an imminent and substantial endangerment to human health and the environment from PCE contamination that migrated off-site from the 220 W Gutierrez property. Instead, their opinion must be relying only on subjective belief and unsupported speculation based on their experience working in the environmental field. Thus, this opinion is not grounded in the methods and procedures of science and is not the modern standard of practice in the environmental industry for how an environmental professional would determine there is also an imminent and substantial endangerment to human health and the environment from PCE contamination. In addition, any personal experience relied upon by Everett and Wells that provides the basis for this statement is only in their heads and cannot be tested for its validity and appropriateness, cannot be peer reviewed to accuracy, and cannot be evaluated for potential rates of error.

## Rebuttal Opinions 5: Everett and Wells incorrectly assesses the site conditions when they state that "soil contamination at this Site generally follows a pattern of decreasing contaminant concentrations away from a single hot spot (the former AST area). This spatial pattern is commonly recognized as a tool for mapping the release point. The general pattern of contamination where concentrations decrease with distance as one moves radially away from a possible release point, as observed at this Site, is recognized in numerous guidance documents and scientific publications as evidence that the contamination came from the source area in question."[42]

Everett and Wells' site assessment assumes a single on-site release location of PCE based on a pattern of decreasing concentration from a hot spot location. A forensic assessment of release point locations at any facility should, where possible, include additional lines of evidence and consideration of a feasible conceptual site model.

In this case, by focusing only on the overall pattern of PCE contamination, Everett and Wells are required to develop a very complex and convoluted transport pathway explanation for the extent of PCE contamination observed.

*A. Yes, sir. So what we have is a soil concentration at J -- GJS-1, right here, of 21,000,000 micrograms per kilogram, very high number, right here where the tank was. And if we look at the closest data point to the hot spot, the closest data point is right here.*

*Q. At what number? SB –*

*A. SB-9.*

*Q. Okay.*

*A. SB-9 at five feet is 69,000. Now, nowhere else underneath the warehouse do we see any kind of numbers that high. So the highest number under the warehouse is the number closest to the hot spot. So logic would say that if you have a hot spot, the closest number away from it should be a hot number,*

---

[42] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 30

*and everything else beyond that would be less. And that is exactly what we find, and that is classic hydrology, fundamental to all my books.*[43]

Everett and Wells suggest in their report the "Contamination under the building is consistent with releases from the AST area, followed by lateral transport of DNAPL and/or contaminated soil moisture in the vadose zone"[44] In his deposition, Everett's explanation was even more complicated:

*Q. So let me try and see if I can summarize your opinions in this case with respect to the detections at one foot at SB-3.*

*A. Yes, sir.*

*Q. Your opinion is that the aboveground storage tank leaked in some manner?*

*A. Yes, sir.*

*Q. And made its way to the soil surface, correct?*

*A. Yes, sir.*

*Q. And then from the soil surface, it went down at least five feet to the preferential pathway, which is sand, which exists between five feet and 10 feet below ground surface?*

*A. Yes, sir.*

*Q. And then from there, it went north 60 feet, across the sand layer, underneath the warehouse, correct?*

*A. I'm saying -- and in spreading out, yes, sir.*

*Q. Then once it got to 60 feet, it also, then, because of the capillary rise, the PCE that was put five feet down, now came up four feet, through the silty clay.*

*A. Right.*

*Q. And was detected at one foot. And that is how you explained the detections at SB-3 at one foot?*

*A. Capillary rise in silts and clay is going to be 10 to 15 feet. So these distances are small.*

*Q. My question is correct, that it rose four feet and got detected at one foot?*

*A. Yes, that's correct.*

*Q. You believe that is a more plausible site conceptual model than a release at the surface that migrated through the porous concrete, or a crack in the concrete, or a footing in the concrete, and was detected at one foot?*

*A. Yes. But not taken alone. For example --*

*Q. I understand what you are saying. You've got your basis. I wanted to make sure, of those two scenarios -- I understand you have other bases than just the soil data. You have the groundwater data,*

---

[43] Deposition of Lorne Gordon Everett, Ph.D. May 31, 2016. Estate of Betty Goldberg, Deceased and Estate of Al Goldberg, Deceased, by and through their successor in interest, Daniel Rubin vs. Goss-Jewett Company, Inc, et al.  No. 5:14-cv-01872-DSF (AFMx). Pg 96
[44] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. April 11, 2016. Pg. 13.

*et cetera. But I correctly step-by-step walked through your site conceptual model of how PCE was released from the tank and detected at one foot at SB-3?*

*A. I believe that is a fair representation, yes, sir.[45]*

It is important to note that the complex and convoluted transport pathway described by Everett and Wells is not supported by any technical transport analysis either in their reports or deposition that demonstrates the processes actually occurred in the environment at this site. Everett and Wells did not create a reality-based numerical multiphase fluid flow transport model demonstrating the feasibility of the pathway they describe, nor do they have site specific data that reflects the various transport pathways were completed as they described from the AST area to directly beneath the warehouse. Thus, without evidence to support their assertion that there is a reasonable pathway from the AST area to the warehouse area, it appears that their opinion must be relying only on subjective belief and unsupported speculation based on their experience working in the environmental field. Thus, this opinion is not grounded in the methods and procedures of science and is not the modern standard of practice in the environmental industry for how an environmental professional would determine contaminant migration pathways. In addition, any personal experience relied upon by Everett and Wells that provides the basis for this statement is only in their heads and cannot be tested for its validity and appropriateness, cannot be peer reviewed to accuracy, and cannot be evaluated for potential rates of error.

Alternatively, extremely high concentrations from one release point can mask the existence of additional release points if you only analyze concentration contours absent a realistic site conceptual model. As such, a much simpler and more likely explanation for PCE contamination in the soil beneath the warehouse is that there was a secondary release location in the warehouse area related to the documented drum storage that occurred in the warehouse.[46] [47] Wells acknowledged that this conceptual site model of releases in the warehouse area fit the site data:

*Q. My question for you is -- yes or no, if you can answer it that way -- that the concentration depicted at SB-3, at one, three, five and seven feet, are consistent with the site conceptual model that finds a release of PCE in the warehouse floor?*

*A. I'll agree with that, but I would like to add one caveat.*

*Q. Okay.*

*A. And that is that I think Mr. Simpson makes too much of concentration profiles, and I don't think that analysis is valid. But the presence of contamination under a building could theoretically be explained by release from a building.[48]*

PCE releases of drips and small spills in the warehouse when transferring PCE from drums are reasonably expected to be less severe than would be releases from the AST. Thus, where the impacted soil from the warehouse PCE releases merged with impacted soil from AST PCE releases, the overall concentration distribution at the site would appear to be a single hotspot that extends in all directions – when the observed

---

[45] Deposition of Lorne Gordon Everett, Ph.D. May 31, 2016. Estate of Betty Goldberg, Deceased and Estate of Al Goldberg, Deceased, by and through their successor in interest, Daniel Rubin vs. Goss-Jewett Company, Inc, et al.  No. 5:14-cv-01872-DSF (AFMx). Page 99-101.

[46] Deposition of Daniel Rubin. December 7, 2018. 220 W Gutierrez, LLC.  Vs. Goss-Jewett & Co., Inc, et al.  No. 17cv05689. Pg. 53-56

[47] Deposition of Betty Goldberg. June 6, 1995. Betty Goldberg and Al Goldberg vs. Arthur P. Arns and Cynthia Arns, et al. No. 94-3834 RMT (SHx). Pg. 31-32

[48] Deposition of James Thomas Wells, Ph.D. June 1, 2016.Estate of Betty Goldberg, Deceased and Estate of Al Goldberg, Deceased, by and through their successor in interest, Daniel Rubin vs. Goss-Jewett Company, Inc, et al.  No. 5:14-cv-01872-DSF (AFMx). Pg. 46.

pattern of PCE in soil at the site more likely resulted from multiple release locations, at the AST and in the warehouse area.

In fact, in 2016, DTSC stated that they expected the presence of additional PCE release locations on-site, other than the AST: "Based on the results of this investigation, it appears all the source areas have not been fully identified and characterized. The only source area identified is the area of the former above ground storage tank (now the excavation). However, highly elevated concentrations of PCE in soil and groundwater throughout the entire south and southeastern portions of the site indicate there are other areas of concern at this site."[49]

## Rebuttal Opinion 6: Everett and Wells claim a nuisance exists for an "entire community or neighborhood"[50] based on RWQCB screening levels – but only references data collected in shallow soil and groundwater on or immediately adjacent to the parcel[51] – not data collected throughout the entire community or neighborhood.

Everett and Wells' claims of nuisance in the entire community or neighborhood are not supported by any data or analysis. They state the existence of nuisance based on RWQCB screening levels, but the exceedances they reference are from data collection in shallow soil and groundwater on or immediately adjacent to the 220 W Gutierrez property – not data collected throughout the entire community or neighborhood. Everett and Wells state "The plume of groundwater contamination is quite large, extending 650 feet to the east of the property into the surrounding mixed residential and commercial neighborhood"[52] but do not provide a basis as to why they consider the entire plume a nuisance to the community or what the condition is that "interfere with the comfortable enjoyment of life and property."[53]

In addition, Everett and Wells also state that "contamination discharges into, and degrades the quality of the surface water in, Mission Creek"[54] but do not cite to any data collected from Mission Creek that supports that statement and demonstrates there are current impacts. I am not aware of any current or reasonably foreseeable use of groundwater in this neighborhood for any purpose, nor do Everett and Wells identify any.

Again, Everett and Wells do not provide a single specific citation to a reference, relevant data point, or other type of evidence to support their assertion that a nuisance exists in the community or neighborhood. Instead, their opinion must be relying only on subjective belief and unsupported speculation based on their

---

[49] DTSC. Approval of Site Investigation Report for the Goldberg Goss/Jewett Site, 220 West Gutierrez Street, Santa Barbara California. (Site Code: 301675). October 28, 2016.
[50] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 32
[51] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 32
[52] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 32
[53] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 32
[54] Expert Report of Lorne G. Everett, PhD, DSc and James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: Estate of Betty Goldberg vs. Goss-Jewett Company, Inc., et al. May 31, 2019. Pg. 32

experience working in the environmental field. Thus, this opinion is not grounded in the methods and procedures of science and is not the modern standard of practice in the environmental industry for how an environmental professional would determine a community or neighborhood nuisance. In addition, any personal experience relied upon by Everett and Wells that provides the basis for this statement is only in their heads and cannot be tested for its validity and appropriateness, cannot be peer reviewed to accuracy, and cannot be evaluated for potential rates of error.

Lastly, Everett and Wells fail to recognize the well-documented contribution of PCE from the Caltrans site to the groundwater contamination in the community or neighborhood, or from any other locations where PCE has been released and has contributed to observed concentrations of PCE in groundwater.

## Rebuttal Opinion 7: Laton's Supplemental Opinion does not refute the evidence of PCE discharges to the sewer at 407 Bath Street, because he offers no opinion about whether releases ever occurred, and he provides no support for his opinion that there were no releases from L&R Dry Cleaning, Inc.

Laton's primary rebuttal to my opinion that PCE releases to the sewer system from the 407 Bath Street location contribute to the PCE in the vicinity of the 220 W Gutierrez property is to assert there is no evidence of PCE releases during the narrow time period when L&R operated the 407 Bath Street site (1985-1988). Laton has no opinions regarding dry cleaning operations at 407 Bath Street outside of the 1985-1988 time period.

> *Q Okay. So in response to your counsel's request, what we'll do, then, is we will assume that when I ask you questions about the operations of 407 Bath for which you have investigated and provide opinions, they will start in August of 1985 and go through 1988.*
> *A That works, yes.*[55]

Because Laton has no opinion regarding the other years of operations at 407 Bath Street, his suggestion that "PCE used at the L&R site between February 1985 and late November 1988 was de minimis when compared to the use of PCE by others during the additional 23.5 years of operations at 407 Bath Street,"[56] is without basis.

Additionally, in Laton's Supplemental Report, he appears to misunderstand the nature of the PCE contribution from 407 Bath Street:

"*Environmental consultants hired by the Goss Jewett owners or other parties have consistently mapped the PCE contamination plume as emanating from the Goss Jewett site and not the L&R site. In fact, none of the PCE plume maps produced by plaintiffs' consultants even extend the plume to L&R property.*"[57]

---

[55] Deposition of W Richard Laton, Ph.D. June 2, 2016.Estate of Betty Goldberg, Deceased and Estate of Al Goldberg, Deceased, by and through their successor in interest, Daniel Rubin vs. Goss-Jewett Company, Inc, et al.  No. 5:14-cv-01872-DSF (AFMx). Page 42.

[56] Supplemental Expert Report. W. Richard Laton, PhD. Donald J. George; Estate of Terrence J. George a/k/a Terry George, Deceased vs. L&R Dry Cleaning, Inc., et al. 407 Bath Street Santa Barbara, California. Case No. 5:14-cv-01872-DSF(SHx). May 31, 2019. Page 7.

[57] Supplemental Expert Report. W. Richard Laton, PhD. Donald J. George; Estate of Terrence J. George a/k/a Terry George, Deceased vs. L&R Dry Cleaning, Inc., et al. 407 Bath Street Santa Barbara, California. Case No. 5:14-cv-01872-DSF(SHx). May 31, 2019. Page 2.

Instead, the evidence suggests PCE contribution from 407 Bath Street to the area downgradient of the 220 W Gutierrez property results from discharges of PCE into the sewer system that are reasonably expected to have then been released along W Gutierrez Street from sections of the sewer line that were degraded.

Laton attempts to rebut the assertion that L&R discharged PCE into sewers by asserting "All wastes associated with the dry-cleaning operations were handled and disposed of off-site."[58] However, Laton does not provide the waste manifests to support his speculation and, in fact, it is unreasonable for him to assume such additional waste disposal costs were incurred without documentation of waste hauling details. Furthermore, it is unrealistic to assume L&R incurred such waste disposal costs when it was not required by regulatory agencies at that time. In fact, Laton did not even know that a dry-to-dry machine of that era would have had a wastewater stream from its still:

> Q Does the still create a wastewater stream in this machine?
> A I'd have to go back and look in this particular machine if -- if it has a waste stream or not.[59]

Laton seems to suggest that because a closed-system dry-to-dry cleaning machine was used at the site, nothing was discharged to the sewer system.[60] Laton speculates that any wastewater is collected in large drums and hauled off as hazardous waste:

> Q Where would the operator of the Supermatic dry cleaner, when they're maintaining their water separator, drain it to?
> A They would drain it to drums.
> Q What kind of drums?
> A 30, 55-gallon drums that they would use for hauling off the hazardous waste[61].

Thus, Laton also fails to recognize that while the dry cleaning equipment installed at the site may have been dry-to-dry and may not have been directly plumbed to the sewer system, there were dry cleaner waste streams that included PCE that were commonly discharged to the sewers during that era of operations.[62]

It was not until 1992 that the Central Valley Regional Water Quality Control Board recognized the problem with the standard of practice in the dry cleaning industry at that time was that the "main discharge point for dry cleaners is the sewer line" and that "discharge from most dry cleaning units contains primarily water with dissolved PCE."[63] The 1996 PCE impacts observed along the sewer line in soil samples collected in front of 407 Bath Street[64] provide further support that PCE was reasonably expected to have been released into the sewer system from the dry cleaning operations at 407 Bath Street.

---

[58] Supplemental Expert Report. W. Richard Laton, PhD. Donald J. George; Estate of Terrence J. George a/k/a Terry George, Deceased vs. L&R Dry Cleaning, Inc., et al. 407 Bath Street Santa Barbara, California. Case No. 5:14-cv-01872-DSF(SHx). May 31, 2019. Page 2.

[59] Deposition of W Richard Laton, Ph.D. June 2, 2016.Estate of Betty Goldberg, Deceased and Estate of Al Goldberg, Deceased, by and through their successor in interest, Daniel Rubin vs. Goss-Jewett Company, Inc, et al.  No. 5:14-cv-01872-DSF (AFMx). Page 46-47

[60] Supplemental Expert Report. W. Richard Laton, PhD. Donald J. George; Estate of Terrence J. George a/k/a Terry George, Deceased vs. L&R Dry Cleaning, Inc., et al. 407 Bath Street Santa Barbara, California. Case No. 5:14-cv-01872-DSF(SHx). May 31, 2019. Page 2, 6

[61] Deposition of W Richard Laton, Ph.D. June 2, 2016.Estate of Betty Goldberg, Deceased and Estate of Al Goldberg, Deceased, by and through their successor in interest, Daniel Rubin vs. Goss-Jewett Company, Inc, et al.  No. 5:14-cv-01872-DSF (AFMx). Page 69

[62] Central Valley Water Board, 1992. Dry Cleaners – A Major Source of PCE in Groundwater. March 27.

[63] Central Valley Water Board, 1992. Dry Cleaners – A Major Source of PCE in Groundwater. March 27.

[64] Pacific, 1996a. Report of Subsurface Soil Sampling and Installation/Sampling of a Groundwater Monitoring Well, Vicinity of 220 West Gutierrez Street, Santa Barbara, California. March 4, 1996.

Based on this, while there are no contemporaneous records for L&R, it is reasonably expected that dry cleaning operations at 407 Bath Street discharged PCE into the sewers, including during the three years (1985-1988) that L&R operated the facility, and Laton does not provide any evidence otherwise. In fact, even after L&R no longer operated the dry cleaner and a subsequent owner operated the dry cleaner at this site, PCE was detected in the sewer system immediately downgradient of the 407 Bath Street.[65]

---

[65] City of Santa Barbara, Various Dates. Dry Cleaners Standard Sampling Procedures. 1996-1999.